**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-02402 |
| PDD HOLDINGS INC., WHALECO, INC., and DOES 1-20, | |
| Defendants. | |

**COMPLAINT**

Plaintiff Roadget Business Pte. Ltd. ("Plaintiff" or "SHEIN") brings this action to hold Defendants PDD Holdings Inc., WhaleCo, Inc. d/b/a Temu, and Does 1-20 (collectively, "Temu") accountable for an unlawful enterprise built on counterfeiting, theft of trade secrets, infringement of intellectual property rights, and fraud as they seek to infiltrate the U.S. with their platform popularly known as Temu.[1]  Temu masquerades as a legitimate e-commerce "marketplace" where independent sellers can offer their products for sale.  But the facts uncovered to date—and those expected to be uncovered in discovery—demonstrate otherwise.  Temu is not actually a "marketplace" platform.  It controls every aspect of its sellers' activity.  It directs what products they can list and the prices for which they can sell; encourages them to infringe the intellectual property rights of others; and even prevents them from removing their products from Temu's website after they have admitted to infringement.  These are not the actions of a legitimate third-party "marketplace."

---

[1]   As explained further below, Whaleco, Inc. does business under the brand name Temu and is a wholly-owned subsidiary of PDD Holdings Inc.  Temu is the name of the website and mobile application as well.

1

Temu draws U.S. consumers into downloading and using its mobile application with promises of extremely low pricing.  But Temu is not profiting from the sale of these products, which are priced so low that Temu must subsidize each sale, losing money on every transaction. Only by encouraging its sellers to infringe the intellectual property rights of others and sell counterfeit or sub-standard goods can Temu hope to minimize the massive losses it is subsidizing.

Temu can no longer hide behind the protection afforded by U.S. law and it should be held liable for its participation in the illegal conduct on its platform.  Significantly, Temu's sister website in China, Pinduoduo, has been recognized repeatedly by the U.S. Government as one of the most notorious websites for piracy and counterfeiting.  Temu has used the same illegal business model to build a massive counterfeiting and infringement machine in the U.S., which must be stopped.

This complaint relates to the dispute *WhaleCo Inc. v. SHEIN Tech. LLC*, No. 23-cv-03706, pending in this district before the Honorable Timothy Kelly.[2]

## PRELIMINARY STATEMENT

1.      SHEIN is a global online fashion and lifestyle retailer that has spent years building the immensely valuable SHEIN brand and retail business.  Through the hard work and creativity of its dedicated employees, SHEIN grew the SHEIN brand into a successful international e-commerce platform that offers highly sought-after clothing, accessories, and home wares through its popular SHEIN-branded website and mobile application.  In May 2022, SHEIN's mobile application was the most downloaded mobile application in the United States in any category.  This

---

[2]  SHEIN has elected to file its claims as a separate—but related—action because it believes Temu's claims against SHEIN in the first action will be dismissed for the reasons explained in SHEIN's pending motions to dismiss.  As such, any counterclaims could only be filed if, and when, SHEIN is required to file an Answer to the Complaint.

success was achieved by designing products that consumers love and can afford, and by selling these products on an efficient and consumer-friendly website and mobile application.

2.  The foundation of SHEIN's success lies in its innovative and vertically integrated business model.  SHEIN uses a data-driven approach to product design and development and utilizes an on-demand production model.  SHEIN tests the market by producing small batches of new design items first, monitors customer feedback in real time, and restocks products that are in high demand.  This enables SHEIN to quickly identify emerging trends and provide offerings that resonate immediately with its customer base, and to keep prices low by minimizing excess inventory and reducing waste.

3.  A key component of SHEIN's business model is its highly efficient and responsive supply chain, which SHEIN developed over more than a decade through substantial investment and hard work.  By working closely with its broadly cultivated supplier network and maintaining healthy profit margins and payment schedules for its suppliers, SHEIN ensures steady and rapid design-to-production-to-market cycles.  This allows SHEIN to fulfill customer orders quickly and efficiently, further enhancing its reputation as a reliable online retailer.

4.  Defendants are infamous infringers that have strategically ripped off the SHEIN brand and swindled consumers.

5.  The Temu retail platform launched in the United States in the fall of 2022.  Similar to its sister operation Pinduoduo, Temu is a discount-driven platform that focuses on offering the lowest possible prices for a wide range of consumer goods.  This relentless pursuit of low prices is central to its business model and competitive strategy but its low prices are achieved by any means.  Temu offers counterfeit and infringing products and uses infringing photographs to market its product offerings, undercutting legitimate business and fair competition.

6.      Through these unfair competition practices, Temu has, within two years of its launch, secured an unearned and illicit foothold in the U.S. market.  It is reported that as of May 2024, Temu had about 150-160 million users in the United States alone, including about 80 million monthly active users,[3] and that it had generated a gross merchandise volume of $20 billion in just the first half of 2024.[4]

7.      It is widely reported that Temu is losing an average of $30, or according to a later report, 30-50 percent on every U.S. order placed.  Temu's parent company PDD is subsidizing these losses.  Temu minimizes these losses by selling infringing, counterfeit, and sub-standard products.

8.      Temu has also flagrantly misappropriated and tarnished SHEIN's popularity and substantial investment by passing itself off as SHEIN through a coordinated scheme of trade secret theft, counterfeiting, trademark and copyright infringement, and false advertising.

9.      Temu's illicit behavior is brazen.  At least one Temu employee stole valuable trade secrets that identify best-selling SHEIN products—and internal pricing information—to give Temu a blueprint for unlawfully competing with SHEIN.  Armed with this stolen information, Temu then directed its sellers to copy those and other best-selling SHEIN products and sell knock-off versions on Temu's website and mobile application.

10.     Temu is no garden-variety infringer.  In order to advertise the counterfeit versions of SHEIN products, Temu has reproduced virtually identical copyrighted images of SHEIN

---

[3] Ed Sander, *The current state of Temu*, CHINATALK (last updated May 11, 2024), https://www.chinatalk.nl/the-current-state-of-temu/ (last visited Aug. 11, 2024), at 1, attached as Exhibit 1.

[4] *Temu's first half 2024 sales surpass its total sales for 2023*, INTERIOR DAILY (last updated Aug. 6, 2024), https://www.interiordaily.com/article/9646855/temu-s-first-half-2024-sales-surpass-its-total-sales-for-2023/ (last visited Aug. 11, 2024), attached as Exhibit 2.

products and used them, or instructed sellers to use them, as promotional images on the Temu website and mobile application.

11.    Temu has falsely pretended to be SHEIN by creating (or directing the creation of) imposter X (formerly Twitter) accounts purporting to represent SHEIN and displaying counterfeit SHEIN marks, in an effort to misdirect customers away from the SHEIN platform to the Temu platform.

12.    Temu also uses the SHEIN trademark in sponsored Google ads that leverage the brand equity of the SHEIN trademark to direct consumers to the Temu platform.  As shown below, consumers searching for SHEIN will be misdirected to Temu's URL at https://www.temu.com/:



广告 · https://www.temu.com/ ▾

SHEIN - Don't Miss These Great Deals

Awesome Price With Good Quality Here On Temu. New Users Can Enjoy Free Shipping As A Plus. Unbelievably Low Price For High-Quality Storage On Temu. Free 90-Day Returns...

The Treat-Yourself Sale · Kids' Fashion · Kids' Collection · Jewelry And Accessories

Deal: 30% off For Everything

13.    To further deceive consumers, Temu has instructed its paid social media influencers to falsely claim that Temu products—which are often counterfeits of SHEIN products—are cheaper and of higher quality than genuine SHEIN goods.

14.    Temu has gone to great lengths to imitate SHEIN, including by poaching resources, employees, and suppliers from SHEIN.

15.    Although Temu holds itself out as an agnostic marketplace where independent third-party sellers come to offer their wares, that is a fiction.  Temu controls every aspect of its sellers' business—including the creation, design, and pricing of the infringing products sold on its platform.  Temu does not merely tolerate infringement on its platform; Temu directs it.  In fact,

Temu refuses to remove infringing listings from its fake marketplace even when its sellers request removal of their own products because they are infringing.  Temu is Pinduoduo with a new name—and its actions show that, like Pinduoduo, Temu conducts its business in the United States in deliberate violation of the intellectual property rights of others.

16.     Temu's misconduct must be stopped.  Temu's wide-ranging infringement and theft of SHEIN's intellectual property have wrongfully deceived customers and diverted them to Temu's retail website and mobile application, where Temu benefits financially by trading on SHEIN's original trademarks and copyrights.  In addition to robbing SHEIN of sales, Temu's actions have damaged, and continue to damage, SHEIN's reputation and goodwill, because, for among other reasons, SHEIN has no control over the quality of the products Temu falsely associates with SHEIN through its scheme.

## THE PARTIES

**A.     Plaintiff**

17.     SHEIN is a private limited company organized under the laws of Singapore.  SHEIN owns the famous trademarks for the SHEIN brand and other affiliated brands in the United States (and worldwide), the website located at https://us.shein.com (the "SHEIN Website"), and the corresponding mobile application (the "SHEIN App").  SHEIN uses its SHEIN and affiliated brand trademarks to sell a wide variety of products around the world, including in the United States.  Through its affiliate and licensee, SHEIN Distribution Corporation ("SDC"), SHEIN sells goods in the United States on the SHEIN Website and SHEIN App.

**B.     Defendants**

18.     PDD is a Cayman Islands corporation, with its principal place of business at First Floor, 25 St. Stephen's Green, Dublin 2, D02 XF99, Ireland.  PDD is a publicly traded company listed on the NASDAQ stock exchange as "PDD."  PDD previously operated as Pinduoduo, Inc.

until it changed its name to PDD Holdings Inc. on or around February 8, 2023.  Entities affiliated

with Zheng Huang, the founder of Pinduoduo, still owned 25.4% of PDD as of February 29, 2024,

according to PDD's most recent annual report submitted to the SEC.[5]  PDD operates an e-

commerce platform in China under the Pinduoduo brand.  "Pinduoduo" in Chinese means

"combining many," which reflects the platform's business model incentivizing group buying,

where consumers can purchase items in bulk with other products at lower prices.  PDD also

operates and controls the Temu-branded e-commerce platform in the United States, including its

website, temu.com (the "Temu Website") and corresponding mobile application (the "Temu

App").  PDD operates and controls the Temu Website and App directly and indirectly through

agents and alter-egos, including WhaleCo, as well as other direct and indirect affiliates,

subsidiaries, and variable interest entities for which PDD is a primary beneficiary.

19.     Defendant WhaleCo is a Delaware corporation with a principal place of business at

31 St. James Avenue, Boston, Massachusetts 02116, doing business under the brand name Temu.

WhaleCo operates the Temu Website and App in the United States under the direction and control

and as an agent and alter ego of PDD, with actual, apparent, and ostensible authority from PDD.

PDD in fact directs the operations of WhaleCo and the Temu Website and App, including by

controlling the sale, exportation, importation, and distribution of products offered to U.S.

consumers on the Temu Website and App, and marketing the Temu brand and the Temu Website

and App in the United States.

20.     Defendants Does 1-20 (the "Temu Group Defendants") are an interrelated

corporate web of parents, subsidiaries, sister companies, offshore holding companies, variable

---

[5] *See* Excerpt of PDD Holdings Inc., Annual Report (Form 20-F) at 109 (Apr. 25, 2024), attached
as Exhibit 3.

interest entities, and other affiliated entities, the operations of which PDD directly or indirectly controls.  On information and belief, the Temu Group Defendants may include: Shanghai Yucan Information Technology Co., Ltd., Guangzhou Yucan Information Technology Co., Ltd., HongKong Walnut Street Limited, Hangzhou Weimi Network Technology Co., Ltd., Hangzhou Aimi Network Technology Co., Ltd., Five Bells Limited, WhaleCo Technology Limited, Shanghai Xunmeng Information Technology Co., Ltd., Walnut Street (Shanghai) Information Technology Co., Ltd., Shenzhen Qianhai Xinzhijiang Information Technology Co., Ltd., Elementary Innovation Pte. Ltd., Radiance Sea Hong Kong Limited, and Shanghai Congjing Information Tech. Co., Ltd., among other entities and subsidiaries of these entities.  PDD controls the Temu Group Defendants through wholly-owned or controlled entities and various overlapping officers and directors, including, on information and belief, the individuals Lei Chen, Jiazhen Zhao, Zhenwei Zheng, Junyun Xiao, Jun Liu, and Haifeng Lin.[6]

21.    The true identities of the Temu Group Defendants are presently unknown to SHEIN.  SHEIN will seek leave to amend this complaint to provide their true names, capacities, and relationship to Temu and the acts alleged herein when SHEIN ascertains this information through discovery.

## C.    Defendants' Corporate Structure

22.    Temu operates the Temu Website and App in the United States as an agent of PDD, with actual, apparent, and ostensible authority from PDD.  As of March 2023, the "About Us" page on the Temu Website stated: "Temu leverages **parent company PDD Holdings'** vast and

---

[6] For example, Guangzhou Yucan Information Technology Co. ("Guangzhou Yucan")—which registered in China on August 30, 2022, just days before the Temu Website and App launched in the United States—is wholly owned by Shanghai Yucan Information Technology Co., Ltd. ("Shanghai Yucan"), which in turn is 100% indirectly owned by PDD.

deep network of merchants, logistic partners, and its established ecosystem built over the years to offer a wide range of affordable quality products to [its] customers.  In 2021 alone, PDD Holdings .  .  . generated US$14.7 billion revenue, US$2.2 billion net income and US$4.6 billion net cash from operating activities."[7]

23.    As of November 2022, PDD stated on its own website, www.pddholdings.com, that it "owns and operates a portfolio of businesses, including Temu, an e-commerce marketplace for North American consumers .  .  . [and] has built a network of sourcing, logistics, and fulfillment capabilities and shares these capabilities with its various businesses."[8]

24.    Temu relies on PDD for its business model.  Temu is able to offer very low prices for the products it sells because it relies on PDD's supplier network and all of its costs and losses are subsidized by PDD.  Temu's product pricing does not reflect the cost of marketing and shipping or consider the profitability of selling products.[9]

25.    After being sued in the United States by SHEIN, PDD has tried to mask its control of the Temu Website and App.  PDD has deleted all references to Temu from the PDD website— including the fact that it shares its sourcing, logistics, and fulfillment networks with Temu—now stating only that it "owns and operates a portfolio of businesses."[10]  Following SHEIN's filing of a complaint in *Roadget Business Pte. Ltd. v. WhaleCo, Inc.*, No. 22-cv-07119 (N.D. Ill. Feb.  3, 2023), Temu also removed all references to PDD from the Temu Website and App, on information

---

[7] Compilation of  "About Temu" Website, TEMU.COM, attached as Exhibit 4 (screenshot taken Mar.  27, 2023).

[8] Compilation of PDD HOLDINGS Website, https://www.pddholdings.com/, attached as Exhibit 5 (Nov. 2022 archival at web.archive.org).

[9] *See What is Temu? What Impact Does Temu Have on Dropshipping?* SOURCINBOX (last updated May 25, 2023), http://sourcinbox.com/blog/what-is-temu-what-impact-does-temu-have-on-dropshipping (last visited June 9, 2023), at 4, attached as Exhibit 6.

[10] *See* Ex. 5 (screenshot taken Aug. 13, 2024).

and belief at the direction of PDD as its principal and corporate parent.[11]  On information and belief, Temu instructed social media influencers to no longer include the hashtag "#PDD" in posts, and instead to include only "#Temu" and "#Shein."

26.    On information and belief, PDD also operates the Temu Website and App through the Temu Group Defendants in order to provide goods and services to U.S. customers.  The diagram below, disclosed by PDD in its April 25, 2024 Annual Report (Form 20-F) filing with the SEC, shows some of the Temu Group Defendants' connections with PDD[12]:



[11] *See* Ex. 4 (screenshot taken May 31, 2023).

[12]   Ex. 3 at 4.

27.     PDD's ownership and control over the Temu Group Defendants is only partially ascertainable from PDD's public disclosures[13] and will be further developed in discovery.

28.     Ultimately, as described further below, Temu and the Temu Group Defendants are alter egos of PDD.

29.     PDD is heavily involved in directing the operations of Temu and the Temu Group Defendants.  On information and belief, PDD directs Temu to take action in the United States on PDD's behalf, including soliciting social media influencers and consumers using false and disparaging statements about SHEIN.  It also promotes the Temu Website and App during major U.S. media events and holidays, such as the NFL Super Bowl, Memorial Day, and Black Friday. On information and belief, PDD provides sellers with (and instructs them to use) image-editing software that allows third-party sellers to modify infringing images for use on the Temu Website and App and promote the sale of infringing products to U.S. customers, including in the District of Columbia.  On information and belief, PDD directs Temu and the Temu Group Defendants to source, export, import, and distribute products sold on the Temu Website and App.  On information and belief, Shanghai Yucan and/or its subsidiaries, each of which are indirectly owned and controlled by PDD, package and distribute the products sold on the Temu Website and App in the United States, including in the District of Columbia.  On information and belief, PDD directed personnel located at the offices of Shanghai Yucan, Guangzhou Yucan, and other Temu Group Defendants to steal valuable trade secrets from SHEIN, which it then used to jump-start its U.S.

---

[13] Public information does indicate, for example, that PDD's co-CEO and board chairman, Lei Chen, owns 86.6% equity in Hangzhou Aimi Network Technology Co., Ltd. ("Hangzhou Aimi"), a variable interest entity for which PDD is the primary beneficiary.  Ex. 3 at 4.  Mr.  Zhu owns the remainder.  *Id.*    On information and belief, Hangzhou Aimi "holds the value-added telecommunication business operation license, or the VATS License, covering online data processing and transaction processing business (operating e-commerce) and internet content-related services" for the Temu Website and App.  *Id.* at 5.

operations, thus avoiding research and development costs, and to sell competing and infringing products in the United States on the Temu Website and App.

30.     On information and belief, PDD, Temu, and the Temu Group Defendants fail to observe corporate formalities, including by sharing the same small group of officers and directors, sharing employees, failing to maintain separate employment and financial records, sharing office space and payroll accounts, and regularly commingling funds.  For instance, PDD is required to disclose, pursuant to U.S. securities laws, consolidated financial statements that include revenue, expenses, and profits generated by the Temu Group Defendants that such entities are not required to disclose themselves.  On information and belief, "[a]ll [of] the costs and losses" associated with the marketing and shipping of products offered on the Temu Website and App, nominally borne by Temu, "are covered by its parent company PDD."[14]  Recognizing the intricate and extensive links among PDD, Temu, and the Temu Group Defendants, the SEC has ordered PDD to produce additional information regarding some of these entities' revenues, costs, and operating expenses. The SEC also directed PDD to present intercompany transactions "in separate line items" and to "provide investors with meaningful information about the economic relationship between" entities and related individuals.[15]  On information and belief, PDD, Temu, and one or more Temu Group Defendants keep insufficient corporate records of transactions among the Temu Group Defendants.

31.     Further demonstrating the intertwinement of the Temu Group Defendants and PDD's control over Temu, on information and belief, individuals in charge of Temu's business currently hold or formerly held key positions at Pinduoduo.

---

[14] Ex. 6 at 4.

[15] PDD Holdings Inc., Correspondence regarding Annual Report filed April 25, 2022 (Form CORRESP) at 2 (Dec. 8, 2022), attached as Exhibit 7.

32.     Operating Temu and the Temu Group Defendants as mere instrumentalities and alter egos allows PDD to defraud and mislead U.S. consumers and infringe the rights of intellectual property owners in the United States, while remaining functionally impervious to enforcement of judgments obtained in the United States.   Continued observance of the fiction of corporate separateness between PDD, Temu, the Temu Group Defendants, and certain of their individual officers and directors materially involved in the misconduct alleged herein, would permit a fraud on SHEIN and consumers, as well as promote injustice in U.S. legal proceedings.

33.     On information and belief, Temu and the Temu Group Defendants that conduct business in the United States are undercapitalized to cover ongoing ordinary business expenses in addition to foreseeable risks and liabilities.

34.     Indeed, despite PDD's admitted ownership and operation of the Temu Website and App—which regularly sells, fulfills, and facilitates the sale of millions of products to millions of U.S. consumers—PDD believes it is judgment-proof in the United States.   For instance, in a recent Form 20-F filing, PDD stated that "[w]e conduct a significant portion of our operations in China and a significant portion of our assets are located in China" and "[i]t may . . . be difficult for you to enforce in U.S. courts judgments obtained in U.S. courts based on the civil liability provisions of the U.S. federal securities laws against us and our officers and directors as most of our current directors and officers are nationals and residents of countries other than the United States and a significant portion of the assets of these persons may be located outside the United States. . . . [T]here is uncertainty as to whether the courts of the Cayman Islands or the PRC would recognize or enforce judgments of U.S. courts against us or such persons predicated upon the . . . securities laws of the United States or any state. . . . China does not have any treaties or other forms of written arrangement with the United States that provide for the reciprocal recognition and enforcement of

foreign judgments. . . . [T]he PRC courts will not enforce a non-PRC judgment against us or our directors and officers if they decide that the judgment violates the basic principles of PRC laws or national sovereignty, security or public interest."[16]  PDD also expressly warns the public that government regulators and the public may be unable to collect evidence against PDD due to that evidence's location within China.  PDD explains to its investors that "there are significant legal and other obstacles to providing information needed for regulatory investigations or litigation initiated outside China" and that according to Chinese law, "no securities regulator outside of China is allowed to directly conduct investigations or collect evidence within the territory of the PRC."[17]

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331, 1337, and 1338(a) and (b), because the claims arise out of federal questions concerning trademark infringement and counterfeiting of federally registered trademarks pursuant to 15 U.S.C. § 1114, federal unfair competition pursuant to 15 U.S.C.  § 1125(a), copyright infringement pursuant to 17 U.S.C. § 101, dilution pursuant to 15 U.S.C.  § 1125(c), and trade secret misappropriation pursuant to the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

36.     This Court has jurisdiction over the claims in this action that arise under the laws of the District of Columbia and Massachusetts pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

---

[16] Ex. 3 at 47–48.

[17] *Id.* at 55.

37.     This Court has personal jurisdiction over Temu pursuant to D.C. Code § 13-423 and Fed. R. Civ. P. 4(k)(2) because Temu has purposefully availed itself of the benefits of the District of Columbia by filing a related lawsuit against SHEIN in this District.  In addition, Temu transacts business within the District of Columbia by selling infringing products to consumers in the District of Columbia, through the Temu Website and App, and further causing tortious injury within the District of Columbia.  Temu purposely directs its infringing business activities toward District of Columbia residents through the Temu Website and App, as well as various unlawful social media accounts and posts, as described below.  Temu also derives substantial revenue from its infringing product sales in the United States and the District of Columbia.

38.     This Court has personal jurisdiction over PDD pursuant to D.C. Code § 13-423 and Fed. R. Civ. P. 4(k)(2) because PDD "owns and operates . . . Temu, an e-commerce marketplace for North American consumers . . . [and] has built a network of sourcing, logistics, and fulfillment capabilities and shares these capabilities with its various businesses."[18]  On information and belief, PDD has purposely directed its business activities towards residents in the United States and District of Columbia, including by encouraging influencers to make false and deceptive statements on social media to promote Temu's goods and services to U.S. residents, including to residents of the District of Columbia.

39.     This Court also has personal jurisdiction over PDD as Temu's parent corporation because it operates Temu as its agent and a mere instrumentality of PDD, insofar as Temu offers for sale and sells products to consumers in the United States and District of Columbia on behalf of PDD.  On information and belief, on its own and through its agent Temu, PDD solicits consumers in the United States and the District of Columbia to visit the Temu Website and App, and to

---

[18] Ex. 5 (screenshot taken April 21, 2023).

download the App from the Apple App Store and Google Play Store. To do so, PDD uses advertisements targeting consumers in the United States and the District of Columbia, including advertisements referencing United States holidays, such as Black Friday sales, television ads that aired multiple times during the 2023 and 2024 NFL Super Bowls, and geotargeted advertisements tailored to consumers located in the District of Columbia.

40.     On information and belief, PDD controls and dominates its subsidiary Temu, which serves as a mere agent and instrumentality for PDD in the District of Columbia and the United States. On information and belief, the sole purpose of Temu is to serve as a U.S.-based agent that manages the operations of PDD's online retail store operating under the Temu brand. Temu has no purpose other than to conduct business for PDD, such that Temu's existence is simply a formality. This business includes the unlawful conduct described in this action—the sale of infringing products on the Temu Website and App, the listing of infringing images on the Temu Website and App, false advertising, and the misappropriation of valuable trade secrets—as well as the purposeful engagement with and purposeful availment of United States-based regulatory agencies, intellectual property registration, tariff regulations and ports of entry, social media advertising, social media influencers, app stores, payment processors, and the use, control, lease, and/or ownership of real property, including fulfillment centers, to support the sale, advertisement, and transportation of products offered on the Temu Website and App to U.S. customers, including in the District of Columbia.

41.     Specifically, on information and belief, PDD owns, leases, operates, or controls, either directly or through direct or indirect subsidiaries, fulfillment centers and/or return centers in the United States for products sold on the Temu Website and App throughout the United States. These include at least centers located at 301 Grove Rd, Suites #200, West Deptford, Thorofare, NJ

08086 and 9059 Hermosa Avenue, Rancho Cucamonga, CA 91730.  PDD purposefully contracts with or directs its subsidiaries to contract with entities that own, lease, or operate these properties for the purpose of facilitating order fulfillment and returns for products sold on the Temu Website or App throughout the United States, including the District of Columbia.

42.     On information and belief, PDD, directly or indirectly through Temu and/or the Temu Group Defendants, has informed third-party vendors seeking to sell products on the Temu Website and App that PDD controls the process for selecting the vendors who are allowed to sell products on the Temu Website and App and specifically prefers vendors with experience selling to U.S. consumers, including in the District of Columbia, through other e-commerce platforms operating in the United States.

43.     On information and belief, PDD directly or indirectly owns, controls, and operates warehouses where Temu Group Defendants package, ship, and export products supplied by third-party sellers on the Temu Website and App with the express intent and expectation that these products will reach consumers in the United States, including in the District of Columbia, as evidenced by the inclusion of U.S. consumer addresses on shipping labels affixed to products shipped from these warehouses in China:[19]

---

[19] *See* Image of Shipping Label, attached as Exhibit 8.



44.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that gave rise to SHEIN's claims and injuries occurred in this district.  In particular, Defendants' trademark and copyright infringement, false advertising, and trade secrets misappropriation from SHEIN have been used to target customers in this district, including through the Temu Website and App, infringing advertisements, and social media posts.

**SHEIN's Business And Intellectual Property Rights**

**A.     Trade Secrets Relating to SHEIN's Business Operations**

45.     SHEIN's ability to stay at the forefront of the latest trends by designing and delivering products that satisfy consumers has been critical to the tremendous success of the business.  SHEIN's ability to both anticipate and create consumer demand for products has been integral to its achievements.

46.     Underpinning this success are various trade secrets relating to SHEIN's business operations.  These include information about the top-selling and most popular styles on the SHEIN Website and App ("SHEIN Best Seller Data").  SHEIN Best Seller Data includes (1) a list of the best-selling styles; (2) the styles' rankings among the items sold on the SHEIN Website; (3) internal pricing information; and (4) photos of each style—among other confidential business information.  The dataset also contains links to the items on the SHEIN Website, making them easily identifiable.

47.     The SHEIN Best Seller Data is highly confidential and proprietary and cannot be obtained from any public sources.  SHEIN derives independent economic value from this data, including the ability to monitor the costs of, and the market for, its products and the ability to set sales strategy.

48.     SHEIN keeps tight control over the SHEIN Best Seller Data to ensure the secrecy of this information.  SHEIN employs rigorous internal controls, which include, among other things, the implementation of an extensive and detailed protocol for protecting company trade secrets.  This protocol includes, among other things, (1) restrictions on the dissemination of trade secret information both within and outside the company; (2) restrictions on employee access to trade secret information, including protocols requiring user logins and passwords to gain access; (3) protocols for the proper destruction of trade secret information; and (4) training for employees about the proper handling of company trade secrets.

**B.      SHEIN's Copyrights**

49.     SHEIN owns or is the exclusive licensee of copyrights for the designs and photographs it uses in connection with its business operations.

50. SHEIN employs numerous designers and creators to conceive of the on-trend, stylish products that have made the SHEIN business so successful.

51. SHEIN also employs professional photographers to photograph its products for display on the SHEIN Website and SHEIN App.

52. SHEIN owns copyrights in both the promotional photographs of products displayed on the SHEIN Website and the SHEIN App ("Asserted Photos") and in the two-dimensional designs incorporated into the products sold on the SHEIN Website and the SHEIN App ("Asserted Designs").

53. Copies of the certificates for the Asserted Photos and Asserted Designs are attached as Exhibit 9 (collectively "Asserted Copyright Registrations").

54. SHEIN owns all exclusive rights in the Asserted Copyright Registrations, including the right to reproduce, to prepare derivative works, and to distribute copies.

**C.    The SHEIN Brand And Affiliate Trademarks**

55. SHEIN is one of the most popular online fashion and lifestyle brands in the world. The SHEIN Website and the SHEIN App are operated by SHEIN's affiliate.  Both the SHEIN Website and SHEIN App sell a wide variety of products under the SHEIN brand, including apparel for women, men, and children, home goods, pet supplies, and more.

56. SHEIN began by selling affordable, stylish clothing under the SHEIN brand name, but has since expanded to offer accessories, footwear, beauty products, and home goods, enjoying enviable success.  Today, the SHEIN Website and SHEIN App sell products under increasingly popular brand names SHEIN CURVE, DAZY, SHEGLAM, ROMWE, and LUVLETTE (the "Affiliate Brands"), among many others, in addition to SHEIN.  SHEIN owns all of these Affiliate Brands.  As described above, the popularity of SHEIN and the Affiliate Brands has skyrocketed

among U.S. consumers.  SHEIN has invested significant time, effort, and money promoting, advertising, and marketing its business operations across multiple channels.

57.    The SHEIN brand also enjoys a significant presence on social media, with over 33 million followers on Instagram, 9.5 million followers on TikTok, and over 749,800 followers on X (formerly, Twitter).

58.    Through extensive use and promotion over the years, the distinctive SHEIN trademark and Affiliate Brands have come to identify SHEIN exclusively and uniquely in connection with the sale of high-quality fashion and home goods at a fair price.

59.    As a result of the success and popularity of SHEIN and the Affiliate Brands, and through extensive promotional efforts, the SHEIN brand and Affiliate Brands have become famous and widely recognized by the general consuming public throughout the United States.

60.    In addition to its extensive common-law rights in the SHEIN trademark, SHEIN owns the following valid and subsisting U.S. trademark registrations for the SHEIN brand:

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN (Stylized)<br><br>RN: 6224013<br>SN: 88776666<br><br>Registered 12/15/2020 | (Int'l Class: 14)<br>Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; jewelry brooches; watches; hat jewelry; jewelry pins for use on hats; pins being jewelry; precious metals, unwrought or semi-wrought; jewelry accessories, namely, jewelry clips for adapting pierced earrings to clip-on earrings; jewelry findings; jewelry boxes, jewelry charms, alarm clocks, split rings of precious metal for keys |
| SHEIN (Stylized)<br><br>RN: 6649062<br>SN: 87857183<br><br>Registered 2/22/2022 | (Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; t-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers, shorts; shoes; shoes, namely, flats and pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats |
| SHEIN (Stylized)<br><br>RN: 5689042<br>SN: 87857147 | (Int'l Class: 09)<br>Cell phone cases; eyeglasses; digital photo frames; bathroom scales; sunglasses; downloadable computer software in the nature of applications for purchases of clothes and fashion accessories; |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| Registered 3/5/2019 | spectacle cases; spectacle frames; remote control apparatus for the control of televisions which the remote is designed to control; counters, namely, thread counters |
| SHEIN (Stylized)<br><br>RN: 5944948<br>SN: 87857222<br><br>Registered 12/24/2019 | (Int'l Class: 16)<br>Posters; printed matter, namely, photographs in the field of fashion; paper; steel pens; drawing materials, namely, brushes; ink, namely, ink for pens, stamping ink; stationery; gummed tape for stationery or household use; stamps in the nature of stamp pads and ink stamps; seals; coasters of paper |
| SHEIN (Stylized)<br><br>RN: 5893349<br>SN: 87857249<br><br>Registered 10/22/2019 | (Int'l Class: 24)<br>Bed liners in the nature of mattress covers; table liners in the nature of textile tablecloths; bed sheets; towels of textile; silk fabrics for printing patterns; travelling rugs; lap robes; pillowcases; fitted furniture covers of textile; linen cloth; canvas for tapestry or embroidery |
| SHEIN (Stylized)<br><br>RN: 5893350<br>SN: 87857258<br><br>Registered 10/22/2019 | (Int'l Class: 26) Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; bobby pins; hat ornaments not of precious metal, namely, hat trimmings |
| SHEIN (Stylized)<br><br>RN: 5893348<br>SN: 87857247<br><br>Registered 10/22/2019 | (Int'l Class: 21)<br>Battery-powered applicators for applying cosmetics to eyelashes; daily used enamel plastic wares, namely, basins in the nature of receptacles, bowls, plates, pots, cups; daily use glassware, namely, cups, plates, pots, butter crocks; daily use chinaware, namely, basins in the nature of receptacles, bowls, plates, pots, coffee services in the nature of tableware, butter crocks, candle jars, trash cans; basting brushes; beverage glassware for serving liqueur; boxes for dispensing paper towels for household use; toothbrushes; toothpicks; combs |
| SHEIN (Stylized)<br><br>RN: 5840545<br>SN: 87857225<br><br>Registered 8/20/2019 | (Int'l Class: 18)<br>Bags, namely, suit bags; pocket wallets; rucksacks; attaché cases; handbags; travelling trunks; key cases; bags for sports; umbrellas; imitation leather; wallets; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases sold empty; string bags for shopping |
| SHEIN<br>RN: 6861756<br>SN: 88107563<br><br>Registered 10/4/2022 | (Int'l Class: 25)<br>Bandanas; Beachwear; Belts; Blazers; Blouses; Bodysuits; Camisoles; Coats; Dresses; Footwear; Gloves; Headwear; Jackets; Jeans; Jumpsuits; Kimonos; Leggings; Lingerie; Loungewear; Pants; Robes; Rompers; Scarves; Shirts; Shorts; Skirts; Sleepwear; Socks; Sweaters; Sweatshirts; Swimwear; T-shirts; Tights; Tops as clothing; Underwear; Vests |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN<br><br>RN: 6861757<br>SN: 88107571<br><br>Registered 10/4/2022 | (Int'l Class: 35)<br>On-line retail store services featuring clothing, clothing accessories, hair accessories, bags, purses, footwear, headwear, jewelry, sunglasses, belts for clothing, makeup, bedding, and cell phone cases and accessories |
| SHEIN (Stylized)<br><br>RN: 5256688<br>SN: 86526588<br><br>Registered 8/1/2017 | (Int'l Class: 14)<br>Jewelry; costume jewelry; necklaces; earrings; bracelets; rings; brooches; watches; hat ornaments of precious metal; pins being jewelry<br><br>(Int'l Class: 18)<br>Wallets; handbags; purses; knapsacks; suitcases; beach bags; all-purpose sports bags; book bags; travel utensils made of leather, namely, travel cases; shopping bags, namely, leather shopping bag, textile shopping bag; travel kits, namely, travel cases; string bags for shopping<br><br>(Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; T-shirts; knitwear, namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers, shorts; shoes; flats; pumps; heels; sandals; boots; shawls; socks; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats<br><br>(Int'l Class: 26)<br>Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; Bobby pins; hat ornaments not of precious metal<br><br>(Int'l Class: 35)<br>Online retail store services in the fields of clothing, accessories, footwear, and jewelry |

61.    Copies of these trademark registrations for SHEIN, which are valid and subsisting, are attached as Exhibit 10 ("SHEIN Trademark Registrations").

62.     SHEIN also owns valid and subsisting trademark registrations on the U.S. Principal

Register for the Affiliate Brands:

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| SHEIN CURVE<br><br>RN: 6181709<br>SN: 88809699<br><br>Registered 10/20/2020 | (Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; tshirts; knitwear; namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers; shorts; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats |
| DAZY (Stylized)<br><br>RN: 6681049<br>SN: 90545647<br><br>Registered 3/22/2022 | (Int'l Class: 25)<br>Scarves; dresses; kimonos; shirts; tank tops; camisoles; blouses; tshirts; knitwear; namely, knit tops, knit bottoms; sweaters; jumpers; coats; vests; parkas; capes; sweatshirts; lingerie; negligees; swimwear; jackets; blazers; leggings; jumpsuits; pants; trousers; shorts; bikinis; night gowns; pajamas; bathrobes; gloves; bras; bustiers; rainwear; aprons; belts for clothing; hats; footwear |
| ROMWE<br>RN: 4446768<br>SN: 85865232<br><br>Registered 12/10/2013 | (Int'l Class: 14)<br>Jewellery, jewelry; jewellery, namely, necklaces, rings, earrings, bracelets, brooches; parts and fittings for the above<br><br>(Int'l Class: 25)<br>Clothing, namely, shirts, t-shirts, dresses, blouses, skirts, trousers, jumpers, pullovers, hooded pullovers, hooded sweatshirts, cardigans, suits, dress suits, ladies' suits, coats, jackets, vests, underwear, lingerie, jeans, pants, swimwear, tights, leggings, collars, scarves, stockings, belts; footwear, namely, shoes, boots, socks; headwear, namely, hats and caps<br><br>(Int'l Class: 35)<br>Retail store services featuring jewellery, necklaces, rings, earrings, bracelets, brooches, handbags, shoulder bags, clothing, namely, shirts, t-shirts, dresses, blouses, skirts, trousers, jumpers, pullovers, hooded pullovers, hooded sweatshirts, cardigans, suits, dress suits, ladies' suits, coats, jackets, vests, underwear, lingerie, jeans, pants, swimwear, tights, leggings, collars, scarves, stockings, belts, footwear, namely, shoes, boots, socks, headwear, namely, hats and caps; advice and information relating to the above |
| ROMWE<br>RN: 5932890<br>SN: 87857264<br><br>Registered 12/10/2019 | (Int'l Class: 16)<br>Posters; printed matter, namely, photographs in the field of fashion; paper; steel pens; drawing materials, namely, brushes; ink, namely, ink for pens, stamping ink, and stamping ink in the nature of stamp pads; stationery; gummed tape for stationery or household use; stamps in the nature of ink stamps; seals; coasters of paper |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| ROMWE<br>RN: 5615832<br>SN: 87857206<br><br>Registered 11/27/2018 | (Int'l Class: 09)<br>Cell phone cases; eyeglasses; digital photo frames; bathroom scales; sunglasses; downloadable computer software in the nature of applications for purchases of clothes and fashion accessories; spectacle cases; spectacle frames; remote control apparatus for the control of televisions which the remote is designed to control; counters, namely, thread counters |
| ROMWE<br>RN: 6278314<br>SN: 87857286<br><br>Registered 2/23/2021 | (Int'l Class: 24)<br>Bed liners in the nature of mattress covers; table liners in the nature of textile tablecloths; bed sheets; towels of textile; silk fabrics for printing patterns; travelling rugs; lap robes; pillowcases; fitted furniture covers of textile; linen cloth; canvas for tapestry or embroidery |
| ROMWE<br>RN: 5932892<br>SN: 87857268<br><br>Registered 12/10/2019 | (Int'l Class: 20)<br>Cushions; cupboards; furniture; handling pallets, not of metal; mirrors; looking glasses; pillows; trays, not of metal, namely, computer keyboard trays; sleeping pads; sleeping mats; tool boxes, not of metal, empty |
| ROMWE<br>RN: 5932893<br>SN: 87857272<br><br>Registered 12/10/2019 | (Int'l Class: 21)<br>Battery-powered applicators for applying cosmetics to eyelashes; daily used enamel plastic wares, namely, basins in the nature of receptacles, bowls, plates, pots, cups; daily use glassware, namely, cups, plates, pots, butter crocks; daily use chinaware, namely, basins in the nature of receptacles, bowls, plates, pots, coffee services in the nature of tableware, butter crocks, candle jars, trash cans; basting brushes; beverage glassware for serving liqueur; boxes for dispensing paper towels for household use; toothbrushes; toothpicks; combs |
| ROMWE<br>RN: 5932894<br>SN: 87857278<br><br>Registered 12/10/2019 | (Int'l Class: 26)<br>Hair clips; hair accessories, namely, jaw clips; hair pins; hat pins; belt buckles; bobby pins; hat ornaments not of precious metal, namely, hat trimmings |
| ROMWE<br>RN: 5932891<br>SN: 87857266<br><br>Registered 12/10/2019 | (Int'l Class: 18)<br>Bags, namely, suit bags; pocket wallets; rucksacks; attaché cases; handbags; travelling trunks; key cases; bags for sports; umbrellas; imitation leather; wallets; purses; knapsacks; suitcases; beach bags; allpurpose sports bags; book bags; travel cases made of leather; shopping bags, namely, leather shopping bag, textile shopping bag; Travel kit bags, namely, travel cases sold; string bags for shopping |
| SHEGLAM (Stylized)<br><br>RN: 6323294<br>SN: 88620497 | (Int'l Class: 03)<br>Make-up products, namely, foundation, concealer, primer, setting spray, setting powder, highlighter, contour, mascara, eyeliner, eyeshadow, lipstick, lip gloss, lip balm, blush, bronzer, non-medicated cosmetics; non-medicated skin care products, namely, |

| Mark/Name/AN/RN | Full Goods/Services |
|---|---|
| Registered 4/13/2021 | moisturizers, night creams, face oils, face mists, face lotions, face creams, neck creams, face wash, face cleanser, face exfoliant creams, makeup remover, toner, face serums, eye creams, face masks, sheet masks; non-medicinal toiletry preparations and cosmetics; non-medicinal dentifrices; essential oils for manufacture of perfumed products; cosmetics; cosmetic kits comprised of foundation, concealer, primer, setting spray, setting powder, highlighter, contour, mascara, eyeliner, eyeshadow, lipstick, lip gloss, lip balm, blush, bronzer, non-medicated cosmetics, moisturizers, night creams, face oils, face mists, face essences, neck creams, face wash, face cleanser, face exfoliators, makeup remover, toner, face serums, eye creams, face masks, sheet masts; make-up removing preparations; lipsticks; pencils for cosmetic use; nail varnish; lacquer-removing preparations; tissues impregnated with cosmetic lotions; lotions for cosmetic use; sachets for perfuming linen; nail care products, namely, nail buffing preparations, nail care preparations, nail cream, cuticle remover; false nails; bath preparations for cosmetic use; non-medicated toiletry preparations; oral hygiene products, namely, toothpaste, non-medicated mouthwashes; bath salts other than for medical use; oils for toiletry purposes; sunscreen products, namely, sunscreen preparations, sunscreen cream, sunscreen sticks; eau de cologne; deodorant soaps; beauty masks; eyebrow cosmetics; cosmetic creams; non-medicated bars of soap; scented water, namely, scented linen waters; perfumes; cosmetic preparations for eyelashes; cosmetic products for skin care, namely, cosmetic creams for skin care, wrinkle removing skin care preparations, hand masks for skin care; make-up powder; fragrances, perfumes and colognes; essential oils for personal use |
| LUVLETTE<br>RN: 6748110<br>SN: 90378478<br><br>Registered 5/31/2022 | (Int'l Class: 25)<br>Clothing, namely, underwear; bottoms as clothing; tops as clothing; underwear; nightwear; lingerie; loungewear; swimwear; activewear in the nature of jogging suits and sweat suits; footwear; headwear |
| LUVLETTE (Stylized)<br>RN: 6748109<br>SN: 90378468<br><br>Registered 5/31/2022 | (Int'l Class: 25)<br>Clothing, namely, underwear; bottoms as clothing; tops as clothing; underwear; nightwear; lingerie; loungewear; swimwear; activewear in the nature of jogging suits and sweat suits; footwear; headwear |

63.    Copies of these trademark registrations for the Affiliate Brands are attached as Exhibit 11 ("Affiliate Brand Registrations").

## **TEMU'S UNLAWFUL CONDUCT**

64.     Temu's Website and App compete with the SHEIN Website and SHEIN App. Temu holds itself out as a legitimate online marketplace where independent third-party sellers sell their own goods.  Nothing could be further from the truth.  Since launching in the U.S. less than two years ago, Temu has continuously directed and used unfair and unlawful means to compete with SHEIN.  These unlawful means include stealing valuable trade secrets and blatantly and egregiously infringing its intellectual property, in addition to poaching resources, employees, and suppliers from SHEIN.

**A.     Temu Has Stolen Valuable Trade Secrets Relating to SHEIN's Business Operations**

65.     Temu has stolen the SHEIN Best Seller Data and has used this valuable trade secret to compete unfairly with SHEIN in the U.S. market.

66.     At least one employee of PDD-affiliated entities stole the SHEIN Best Seller Data at the direction of their PDD-affiliated employer and shared it with hundreds of people, including Temu's sellers and suppliers, via WeChat.

67.     The SHEIN Best Seller Data is a highly sensitive data set containing tremendously valuable information about the popular SHEIN products that Temu has used to gain an unfair competitive advantage.

68.     On information and belief, Temu knew that the Best Seller Data was confidential, proprietary, and considered a trade secret, yet distributed it to hundreds of sellers and suppliers anyway, explaining on WeChat that the data was internal SHEIN data and that Temu sellers should create and sell the same products.

69.     Temu taught suppliers how to copy SHEIN's most popular products and incentivized them to do so by providing them rewards.

27

70.     Temu's suppliers confirmed that they would sell knock-offs of the best-selling SHEIN products.

71.     In addition, Temu directed Temu's sellers and suppliers to use SHEIN's copyrighted photographs in their product listings, instead of taking their own photographs.

72.     Temu also circulated a file which contained SHEIN's photographs of the SHEIN merchandise for sellers and suppliers to use in their listings on Temu.

73.     Temu directed the Temu employees to access or acquire the SHEIN Best Seller Data and share it with Temu's seller and supplier partners.

74.     On information and belief, when Temu received the Best Seller Data, Temu knowingly, willfully, and intentionally used this information without authorization for its own economic benefit, including to directly compete with SHEIN by manufacturing and selling counterfeit versions of SHEIN's most popular products.

75.     SHEIN has been damaged, and Temu unjustly enriched, by the misappropriation of this information in the form of lost profits for sales that have been directed to Temu, the lost value of the significant investment SHEIN made to develop this valuable information for its own use, the loss of market share in the United States, and sales unjustly derived from Temu's exploitation of the misappropriated information.

76.     SHEIN is still investigating other instances in which Temu may have stolen valuable trade secrets and expects discovery will reveal additional incidents of trade secret theft.[20]

---

[20]     Temu has complete access to communications with its suppliers on their self-developed communication platform, Knock, so SHEIN expects that all of these communications have been maintained and preserved and are available for discovery.

**B.      Temu Is Not A Legitimate Marketplace**

77.      Temu is not a legitimate marketplace.  To squeeze prices to rock bottom levels, it exercises ironclad control over every aspect of its so-called marketplace business, including over the sellers and the goods.  Temu directs every phase and aspect of its business—including the design, manufacturing, pricing, marketing, shipping, sale, customer service, returns and removal of products on its platform.  It attempts to hide behind the legal protections of a marketplace platform because otherwise it is directly liable for infringing activity and other product safety and quality issues related to its business practices.

78.      Unlike *bona fide* online marketplaces that allow independent sellers to decide what products they want to sell and at what prices, Temu tells its sellers what products they can sell and at what price.  All product pricing must be approved by Temu, often at below-cost prices that result in minimal profit to the sellers and losses to Temu, which are absorbed by its alter ego PDD.  If the sellers do not agree to reduce their prices, Temu will divert traffic away from their listings to lower-priced listings, effectively reducing or eliminating the sales from the non-cooperative seller.

79.      Temu also regularly docks payments to sellers as penalties but does not give sellers information about which orders generated the docked payments or what issues or customer complaints led to those deductions.  The penalties have become so severe and opaque that they prompted hundreds of sellers to repeatedly rally at PDD's offices to protest the unfair practices. One supplier is reported to have incurred 279 fines totaling RMB 114 million ($16 million).

80.      Temu has recently launched a semi-consignment or "semi-hosting" option for sellers, which makes it possible for them to handle the warehousing and distribution of products. But unlike other platforms that offer this option to third-party sellers, Temu retains the power to

set the price of products.  Sellers therefore do not have a meaningful choice as to the prices at which their products sold to consumers.

81.     Further, sellers cannot opt to discontinue the sale of infringing products on Temu because there is no account deactivation option.  When sellers list infringing goods on the Temu Website, they do so at Temu's encouragement and direction, and with Temu's full knowledge and approval.  Worse, when sellers request that Temu remove product listings because of admitted infringement of SHEIN's copyrights, Temu refuses.   Sellers cannot discontinue the sale of infringing goods already warehoused with Temu.  Temu employees specifically tell their sellers that they will not remove product listings based on claims that they infringe on SHEIN's copyrights. Thus, Temu is not only inducing infringement but actively requiring it.

82.     Temu also actively encourages and directs sellers to (1) copy popular styles on SHEIN as quickly as they can, (2) list products with SHEIN's photographs first (and take their own photos later), (3) remove SHEIN's watermarks before using SHEIN's photographs, and (4) ignore and not worry about SHEIN's copyright complaints.  Temu actively provides files listing SHEIN's photographs for the suppliers to copy, and instructs the suppliers to search for certain keywords on SHEIN's website.

83.     Temu benefits directly from the infringing activity, while exercising the right and ability to control it.

84.     Temu has the right and ability to control the infringement by removing infringing listings.  Temu further has the right and ability to control the infringement on the Temu Website and App by terminating, delisting, or otherwise penalizing infringing sellers, or by revoking or altering policies that have allowed infringement and counterfeiting to flourish on the Temu Website and App.

85.     Temu fails to monitor or investigate sellers that have a history or pattern of posting infringing content.  On information and belief, Temu (1) inadequately staffs its content review team that reviews product listings prior to publication; (2) inadequately staffs the team responsible for reviewing and assessing intellectual property complaints; (3) inadequately trains employees to identify infringement or take down infringing listings; and (4) assigns content and intellectual-property complaint review to unsophisticated automated systems.

86.     On information and belief, Temu has even instructed suppliers that after a ruling in the United Kingdom related to takedown notices issued by SHEIN, there is no need to worry about SHEIN complaints going forward.  On information and belief, Temu is also funding litigation activity on behalf of its sellers who are accused of infringing SHEIN's intellectual property rights. Indeed, another federal court recently noted that SHEIN's evidence "strongly suggest[s]" Temu's coordination with its sellers accused of infringing SHEIN's intellectual property rights and that "[s]uch coordination would also make the alleged infringement here more like a 'swarm' – 'injuries in the aggregate' that harm [SHEIN] in the same way . . ." *Roadget Bus. Pte. Ltd. v. The Individuals, Corps., Ltd. Liab. Companies, Partnerships, and Unincorporated Associations Identified on Schedule A Hereto*, No. 24-cv-00607 2024 WL 3338942, at *8 (N.D. Ill. July 9, 2024).

87.     As a result of Temu's blatant direction, encouragement, and tolerance of infringement, SHEIN has had to invest extensive time and effort investigating and addressing copyright violations on Temu.  SHEIN has identified tens of thousands of infringing product listings on Temu for which it has sent takedown notices, but, in many instances, Temu has failed to take prompt action to remove them or implement appropriate measures to satisfy the safe-harbor requirements of the DMCA.

**C.      Temu Has Infringed SHEIN's Copyrights**

88.     Temu has blatantly infringed SHEIN's copyrights by copying, displaying, refusing to take down, and encouraging partner sellers to copy the Asserted Photographs and Asserted Designs without permission on Temu's platforms to sell goods that directly compete with those sold by SHEIN on the SHEIN Website and SHEIN App.

89.     Temu and its supplier and seller partners offer products on the Temu platform that are near identical copies of products sold on the SHEIN Website and SHEIN App.  Some of these products bear infringing designs that are identical to the Asserted Designs:

| <u>**SHEIN Asserted Design**</u> | <u>**Temu Infringing Product/Listing**</u> |
|:---:|:---:|
|  |  |
|  |  |
|  |  |

90.     In addition, instead of taking their own photographs of the counterfeit products, Temu and its partners use unauthorized copies of the Asserted Photographs owned by SHEIN in

the product listings on its platform without permission.  The egregiousness of infringement on the
Temu Website and App is apparent in the examples below:

**SHEIN Asserted Photograph**  **Temu Infringing Listing**

 

 

 

91.     Temu does little to hide the fact that these images are copies of the Asserted
Photographs.  In some cases, the images are slightly modified or enlarged, but even then, it is
obvious to a casual observer that they are derivatives of the Asserted Photographs.

92.     A compilation of listings on the Temu Website and App that infringe the Asserted
Photographs and/or the Asserted Designs is attached as Exhibit 12 (the "Infringing Listings").

93.    By stealing and using the Asserted Photographs and Asserted Designs, Temu has violated SHEIN's exclusive reproduction and display rights, and/or has created unauthorized derivative works by displaying and/or modifying the Asserted Photographs and Asserted Designs.

94.    Temu purposefully employs inadequate and obstructive copyright take-down practices, which stymie efforts of rightsholders to remove infringing listings from Temu's website.

95.    The International AntiCounterfeiting Coalition named "PDD Holdings (Including both Pinduoduo and Temu)" in its 2023 Review of Notorious Markets for Counterfeiting and Piracy presented to the U.S. Trade Representative.[21]  Brands reported to the Coalition widespread lack of seller regulation and delays in addressing takedown requests:

> Brands from a variety of product *sectors cited Temu as one of their most rapidly growing brand protection concerns*, noting the proliferation of counterfeit items appearing on the site. This is perhaps unsurprising given the reported *lack of seller vetting or screening, and the rudimentary enforcement mechanisms provided*. One brand discussed its frustration at having to submit takedown requests via email, and the relatively protracted timeframe (approximately 3-5 days) for resolving even simple issues. This *approach is simply not scalable* to address the volume of illicit trafficking on the platform.[22]

96.    Brand owners have widely reported to the U.S. Trade Representative "unwillingness [of Pinduoduo] to engage with brand owners to resolve issues or develop improved processes…a lack of proactive measures to screen sellers and listings…onerous evidentiary requirements and excessive delays in takedowns of up to two weeks… lack of transparency with penalty mechanisms and decisions rejecting takedown requests[,]…[and] a further deterioration of Pinduoduo's already ineffective seller vetting" as well as "difficulties in receiving information and

---

[21] Excerpt of the Submission of the International Anti-Counterfeiting Coalition to the U.S. Trade Representative 2023 Review of Notorious Markets for Counterfeiting and Piracy (Oct. 6, 2023), at 18, attached as Exhibit 13 at 18.

[22] *Id.* at 18–19.

support from Pinduoduo in pursuing follow-on investigations to uncover the manufacturing and distribution channels of the counterfeit goods."[23]  As the International Counterfeiting Coalition observed, "[r]ights-holders' complaints are said to have largely fallen on deaf ears, and the platform has shown little interest in working with IP owners to resolve these concerns."[24]

97.     Temu itself actively orchestrates the copyright infringement on its platform by providing sellers with (1) copies of the Asserted Photographs and Asserted Designs; (2) image modification software that enables sellers to modify pre-existing copyrighted images for their listings (and thereby create infringing derivative images); and (3) guidance on how to use the software to modify the copyrighted works.

98.     Temu knows its copyright enforcement practices are deficient, but it actively encourages, or, at the very least, turns a blind eye to the rampant infringement because it benefits from the infringement.

### D.     Temu Infringed The Famous SHEIN Mark

99.     To gain a foothold in the U.S. market, Temu unlawfully trades on the tremendous brand equity of the SHEIN trademark to attract consumers to the Temu platform, which does not sell genuine SHEIN or Affiliate Branded merchandise.

### i.     Temu's Use of Infringing Ads

100.     Temu uses the SHEIN trademark in its advertisements to create an association between Temu and SHEIN in the minds of consumers and thereby drive consumer traffic to the

---

[23] Excerpt of Office of the United States Trade Representative, *2023 Review of Notorious Markets for Counterfeiting and Piracy*, at 28, https://ustr.gov/sites/default/files/2023_Review_of_Notorious_Markets_for_Counterfeiting_and _Piracy_Notorious_Markets_List_final.pdf (last accessed Aug. 12, 2024), attached as Exhibit 14.

[24] Ex. 13 at 18.

Temu website.  Specifically, Temu runs advertising containing the SHEIN trademark—or close variations thereof—in online sponsored advertising.  When consumers click on the ads containing the SHEIN trademark, they are directed to the Temu Website, where no genuine SHEIN-branded products are offered for sale.

101.    An example of one such advertisement is depicted below:



102.    Another advertisement, shown below, uses "She/in" as a substitute for SHEIN, leveraging the fact that the SHEIN brand is pronounced "she-in." The text of the ad states, among other things, "come and check She/in at a surprisingly low price," suggesting to consumers that authentic SHEIN merchandise is sold on the Temu site—when it is not.

103.    Copies of ads run by Temu that infringe the SHEIN trademark (the "Infringing Ads") are attached as Exhibit 15.

104.    Consumers who see the Infringing Ads incorporating the SHEIN mark are likely to be deceived into believing that Temu is SHEIN, is associated with SHEIN, or that SHEIN-branded products are offered for sale through the Temu Website, when they are not.

105.    Adding to the confusion, Temu's Infringing Ads are highly similar to genuine advertisements for the SHEIN brand run by SHEIN and/or its affiliates or licensees.  A comparison of Temu's Infringing Ads and a Genuine SHEIN Advertisement is shown below and attached as Exhibit 16.

| **Genuine SHEIN Advertisement** | Ad · https://us.shein.com/  ⋮<br><br>**SHEIN Official Online Store - Free Shipping**<br>New Trends in Clothes. High Quality. Up to 85% Off. Free Shipping Available! Free Return. Browse a wide range of Hot Sale Clothes. Big Savings, Limited Time Only. Free Return. Size Guide. 15% Off First Order. Customer Service Focused. Quick & Secure Checkout. |
|---|---|
| **Infringing Temu Advertisements** | Ad · https://www.temu.com/<br><br>**SHEIN - Starting From $0.99**<br>Awesome Price With Good Quality Here On Temu. New Users Can Enjoy Free Shipping As A Plus. Unbelievably Low Price For High-Quality Storage On Temu. Free 90-Day Returns...<br>The Treat-Yourself Sale · Tools & Home Improvement · Jewelry And Accessories<br>Deal: 30% off For Everything<br><br>广告 · https://www.temu.com/ ▾<br><br>**SHEIN - Don't Miss These Great Deals**<br>Awesome Price With Good Quality Here On Temu. New Users Can Enjoy Free Shipping As A Plus. Unbelievably Low Price For High-Quality Storage On Temu. Free 90-Day Returns...<br>The Treat-Yourself Sale · Kids' Fashion · Kids' Collection · Jewelry And Accessories<br>Deal: 30% off For Everything |

106.    When consumers click on the Infringing Ads, the links direct them to the Temu Website, where no genuine SHEIN-branded products are offered for sale.

**ii.    Temu's Fraudulent X (formerly Twitter) Accounts**

107.    In addition to using the SHEIN trademark in sponsored advertising, Temu and/or its agents have brazenly impersonated SHEIN on the social media platform X, formerly known as Twitter, at the time of the infringements alleged herein.

108.    Temu and/or third parties acting at Temu's direction and on its behalf created and operated or controlled, directly or indirectly, false, fake, and fraudulent X (formerly Twitter) accounts that incorporate the SHEIN mark and that have pretended to be SHEIN in the eyes of

consumers, such as @SHEIN_DC, @SHEIN_USA_, and @SHEIN_NYC (the "Imposter X (formerly Twitter) Accounts"), as shown below, and attached as Exhibit 17:







109.    None of the accounts depicted above is run by SHEIN, or any of its affiliates or licensees.  Rather, the use of the SHEIN brand on these accounts is unauthorized and infringing.

110.    Temu has used the Imposter X (formerly Twitter) Accounts to falsely suggest that it is associated with the SHEIN brand or that it *is* "SHEIN" (i.e., the official X (formerly Twitter) outlet/handle for SHEIN), by using marks that are identical to or substantially indistinguishable from the SHEIN mark.

111.    Temu has also used the SHEIN mark in the handles for the Imposter X (formerly Twitter) Accounts, provided links in the profile sections of the Imposter X (formerly Twitter) Accounts to authentic domain names owned by SHEIN, such as <u>shein.com</u>, and used the same profile icons and profile photos that appear on the genuine SHEIN X (formerly Twitter) Account, attached as Exhibit 18.

112.    In its efforts to impersonate SHEIN, Temu has even gone so far as to intentionally and deliberately create the false impression that the Imposter X (formerly Twitter) Accounts have as many followers as the genuine SHEIN X (formerly Twitter) Account.  Temu displayed in the

profile section of the Imposter X (formerly Twitter) Accounts a similar number of followers that the genuine SHEIN X (formerly Twitter) Account had at the time, using the same formatting that X (formerly Twitter) uses to display follower statistics for real accounts—even though the Imposter X (formerly Twitter) Accounts only have a few followers.   An example of this is highlighted below in a side-by-side comparison chart:



| Genuine SHEIN X (formerly Twitter) Account As Of December 17, 2022 (Exhibit 18) | Temu's Imposter X (formerly Twitter) Account As Of October 10, 2022 (Exhibit 17) |
|---|---|

113.   Temu has deliberately sown consumer confusion by retweeting authentic posts from the genuine SHEIN X (formerly Twitter) Account and using authentic hashtags associated with the SHEIN brand, such as #SHEIN, #SHEINforall, and #SHEINSS22:



114.    Temu created and has used the Imposter X (formerly Twitter) Accounts and counterfeit SHEIN marks to unlawfully promote its own website and mobile application and to trick consumers into downloading the Temu mobile application.

115.    Temu has lured consumers, including customers or potential customers of SHEIN, into viewing and interacting with the Imposter X (formerly Twitter) Accounts through the unauthorized use of the SHEIN trademark.  Temu then took advantage of this attention with posts on the Imposter X (formerly Twitter) Accounts intended to divert consumers from buying SHEIN-branded products to using Temu instead for their purchases.  In some cases, these deceptive posts have told consumers to join Temu while prominently using and displaying the SHEIN trademark, while "winking" at those consumers through emojis on social media about its appreciation for "supporting the new twitter [account] of SHEIN"[25]:

---

[25]  Ex. 17 at 5.



116.   Other posts have deceived consumers into downloading the Temu App by embedding innocuous links that only display the SHEIN trademark.  Those posts, which do not have any Temu branding, direct consumers to "Download APP from link"[26]:



117.   Those links, however, do not direct consumers to download the SHEIN App, but instead direct them to ***Temu's*** website to download ***the*** Temu ***App***, as shown in the screen capture below:

---

[26]   *See* Ex. 17 at 12.



118.   The use of the SHEIN trademarks by Temu creates the false impression that Temu is SHEIN, or at a minimum, that the brands are affiliated, when they are not.

119.   Temu created and used the Imposter X (formerly Twitter) Accounts to trade on the recognition and goodwill of the SHEIN trademark in order to capture the attention of actual and potential customers of SHEIN-branded goods, and to divert those people into becoming customers of Temu.

### iii.   Temu's Use Of Product Photos Displaying The SHEIN Label

120.   To bolster its association with SHEIN, Temu has displayed on its website images of clothing with the SHEIN label, even though Temu does not sell genuine SHEIN-branded goods. Examples of this are shown below[27]:

---

[27] *See* Compilation of screenshots and associated internet addresses for listings on the Temu Website containing SHEIN labels, attached as Exhibit 19.











121.    The products offered by Temu under these listings are not genuine SHEIN-branded products.  A consumer who orders a product from these listings will not receive a product that bears the word "SHEIN" on the hangtag as advertised.  The below images show the actual products that were delivered in Temu packaging after purchasing the products shown in the listings above:









### iv. Temu's Infringing Use of the SHEIN Mark and Affiliate Brand Marks on Temu Webpages

122.    To further promote consumer confusion and a false association with SHEIN, Temu has embedded the SHEIN mark into the titles of webpages on the Temu website, implying that genuine SHEIN-branded goods are sold by Temu, when they are not.

123.    Specifically, consumers who entered the term "shein" into the search bar on the Temu Website were shown a page titled "Shein – Buy Shein Plus Size Dresses, Shein Clothing And Shein Bathing Suits Online With Free Shipping On Temu" as depicted below and attached as Exhibit 20.



124.    As a result, consumers are likely to believe that genuine SHEIN merchandise can be purchased on the Temu website when that is not the case.

125.    Temu has also displayed SHEIN's Affiliate Brands in its page titles, page tabs and hover cards, namely SHEIN CURVE, SHEGLAM, DAZY, ROMWE, and LUVLETTE, when consumers search those or other terms on the Temu Website.

126.    Consumers who see the SHEIN and Affiliate Brands used on the Temu Website are likely to be deceived into believing that Temu is SHEIN, is associated with the SHEIN brand, or that genuine SHEIN-branded and/or Affiliate-Branded products are offered for sale through the Temu Website.

127.    Consumers are likely to be deceived and/or confused by the use of SHEIN and the Affiliate Brands on the Temu Website, including because of the frequency with which Temu uses the SHEIN mark and Affiliate Brand marks and because the SHEIN mark and Affiliate Brand marks are prominently displayed in the webpage titles in a manner that suggests consumers can find great deals or low prices for SHEIN-branded or Affiliate Branded products on the Temu Website.

128.    Visitors to Temu's Website received no indication from Temu that the products offered for sale and the services Temu was providing are not affiliated with the SHEIN brand or Affiliate Brands.  Many products offered for sale on the SHEIN Website and/or through the SHEIN App do not prominently display a SHEIN mark or Affiliate Brand in the product listing or product name.  Thus, visitors to the Temu Website see exactly what they would expect to see—clothing and accessory listings that do not prominently display a SHEIN mark or Affiliate Brand.  Visitors to the Temu Website will accordingly expect the same quality that consumers have come to associate with genuine SHEIN products, though that is not what they will receive.

129.    On information and belief, even if consumers who search for "shein," "sheglam," "dazy," "romwe" and/or "luvlette" on the TEMU Website somehow eventually deduce, despite Temu's misleading page titles and failure to identify its sellers, that Temu does not offer genuine SHEIN-branded or Affiliate Branded products and has no affiliation with SHEIN, those consumers will have already spent significant time on the Temu Website and will be more likely to purchase

products offered by Temu than had the Infringing Webpages not actively misled or confused these consumers.

### v.  Temu's Listing and Sale of Counterfeit ROMWE Jackets

130.    SHEIN discovered that the Temu Website and App were offering for sale a product entitled "Men's Plus Size Jacket, Spring Casual Streetwear With 'Romwe Limited' Print, Oversized Clothing."  Attached as Exhibit 21 and depicted below are screenshots of this counterfeit jacket as they appeared on Temu.[28]



---

[28]  Ex. 21 at 5–10.



131.    The product images depict a jacket bearing a counterfeit ROMWE mark on the back and lapel.

132.    The physical product offered through this listing in multiple color combinations bears a counterfeit ROMWE mark.  Attached as Exhibit 21 and depicted below is a photograph of the counterfeit jacket and the Temu branded packaging in which it was delivered.[29]

---

[29]  Ex. 21 at 2–3.



133.    Temu used a counterfeit mark that is identical to or indistinguishable from the genuine, federally registered ROMWE mark in association with the promotion of its online retail store services and in connection with the sale of a men's jacket, without SHEIN's approval, authorization, or consent.

134.    Temu's unauthorized use of a counterfeit ROMWE mark creates a likelihood of consumer confusion as to the source or origin of the jacket and the affiliation of Temu with the ROMWE brand.

135.    This jacket listing appeared as the first result on the search results page when a user searched for "Romwe" while browsing in "Incognito" Mode on Google Chrome's browser.[30]

---

[30]    *See* Ex. 21 at 16.



E.      **Trade Libel/False Advertisements**

136.    The success of the SHEIN brand is due in part to its savvy use of online marketing strategies for social media platforms and fashion blogs that appeal to consumers who shop online. SHEIN has partnered with thousands of influencers, celebrities, fashion bloggers and contestants on reality shows, and has started viral trends, to promote the SHEIN brand.

137.    Mimicking SHEIN's strategy, Temu also has engaged its own influencers.  But rather than merely promoting Temu, these influencers unlawfully disparage SHEIN products at Temu's direction.

138.    Specifically, Temu has provided influencers with guidelines (the "Influencer Guidelines") that require them to make the following false and disparaging statements about SHEIN (the "Influencer Statements")[31]:

- "Shein is not the only cheap option for clothing! Check Temu.com out, cheaper and way better quality!"; and

- "Looking for clothes better than Shein but cheaper than revolve? Check Temu.com out."

139.    A copy of the Influencer Guidelines is attached as Exhibit 22.

140.    Several influencers, hired by Temu, have published these false statements online.

141.    For example, on October 1, 2022, Catherine Quirico ("Quirico"), a popular influencer, posted the Influencer Statements on Instagram, a platform where she has over 137,000 followers.  The post was liked by over 4,800 people.[32]  Quirico also acknowledges in the post that she has a "Paid partnership with shoptemu".

---

[31]   Ex. 22 at 5.

[32]   A copy of Quirico's Instagram post is attached as Exhibit 23.



142.     Around the same time, Quirico also posted the Influencer Statements on PicNob, a social media platform where she has over 128,000 followers.  This post was liked by over 4,800 users and almost 200 users commented on the post.



143.    As another example, on January 18, 2023, Maureen Rainha ("Rainha"), using the social media account @couponingwithmaureen, with over 2,000 followers on Instagram, posted a similar advertisement featuring the Influencer Statements:[33]



144.    The Influencer Statements are false and misleading because the clothes sold on Temu.com are not less expensive and not of "way better quality" than those sold on the SHEIN Website and/or through the SHEIN App.

145.    The Federal Trade Commission ("FTC") advises influencers who endorse a product through social media to use words such as "advertisement" and "ad" clearly and conspicuously in their posts.[34]   Influencers also "can't talk about [their] experience with a product [they] haven't tried" and "can't make up claims about a product that would require proof the advertiser doesn't have . . . ."[35]

---

[33]  A copy of Rainha's Instagram post is attached as Exhibit 24.

[34] *See* Federal Trade Commission, *Disclosures 101 for Social Media Influencers* (Nov. 2019), at 5,     https://www.bulkorder.ftc.gov/system/files/publications/1001a-influencer-guide-508_0.pdf (last accessed Aug. 12, 2024).

[35] *Id.* at 6.

146.    On information and belief, SHEIN has been harmed by the dissemination of the Influencer Statements because they caused consumers to believe that SHEIN-branded products were inferior in quality to products sold by Temu when this is untrue.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT
### (18 U.S.C. § 1836)

147.    SHEIN relies on certain confidential and proprietary trade secrets, including the SHEIN Best Seller Data, for its success.

148.    The confidential and proprietary SHEIN Best Seller Data trade secret information relates to products and/or services used in, and/or intended for use in, interstate or foreign commerce, namely products and services offered through the SHEIN Website and SHEIN App.

149.    SHEIN derives substantial independent economic value from the fact that the SHEIN Best Seller Data is not generally known to the public.  SHEIN's mastery of leveraging data on the most popular products and latest trends sets it apart, enabling it to outperform competitors and deliver exactly what customers are seeking.  This data informs everything from design to marketing, ensuring that the products sold on SHEIN meet the market pulse and allowing SHEIN to swiftly and continually refine its offerings to adapt to ever-evolving consumer interests.  By enabling SHEIN to react to consumer trends in real-time, reducing instances of excess inventory and waste, and allowing SHIEN to more heavily focus its supply efforts on products that will sell, this data has been a big part of SHEIN's success.

150.    SHEIN takes reasonable measures to maintain the secrecy of the SHEIN Best Seller Data and to protect confidential and proprietary information from disclosures, including, but not limited to (1) restrictions on the dissemination of trade secret information both within and outside the company; (2) restrictions on employee access to trade secret information, including protocols

requiring user logins and passwords to gain access; (3) protocols for the proper destruction of trade secret information; and (4) protocols training for employees about the proper handling of company trade secrets.

151.     Defendants misappropriated these proprietary and confidential trade secrets, including by directing or encouraging Temu employees to steal and distribute the SHEIN Best Selling Data.

152.     Although Temu's theft of the SHEIN Best Selling Data occurred in China, Temu has taken steps in the United States to use these trade secrets and cause harm to SHEIN in the United States.   Defendants used the misappropriated SHEIN Best Selling Data to accelerate the launch of the Temu Website and App in the United States, including by luring SHEIN 's sellers and suppliers to the Temu Website and App utilizing the data to generate internal projections and sales targets for its United States operations, and using the data to create knockoff copies of SHEIN's bestselling items.

153.     Defendants' misappropriation of proprietary and confidential trade secrets was intentional, knowing, willful, and malicious.

154.     As a direct result of Defendants' conduct, SHEIN has been damaged and Defendants have been unjustly enriched by receiving value and profits attributable to the misappropriated trade secrets.

155.     SHEIN  is entitled to recover from Defendants the damages it suffered and the benefits Defendants unjustly derived, in an amount to be determined at trial.  SHEIN is further entitled to recover from Defendants an award of exemplary damages and attorney's fees.

156.    Defendants' conduct and continued misappropriation of proprietary and confidential trade secrets has caused and will continue to cause irreparable harm and injury to SHEIN unless enjoined by the Court.  SHEIN has no adequate remedy at law for these injuries.

**COUNT II**
**Misappropriation of Trade Secrets in Violation of the D.C. Uniform Trade Secrets Act**
**(D.C. Code § 36-401 *et seq.*)**

157.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

158.    SHEIN relies on certain confidential and proprietary trade secrets, including the SHEIN Best Seller Data, for its success.

159.    SHEIN derives substantial independent economic value from the fact that the SHEIN Best Seller Data is not generally known to the public.  SHEIN's mastery of leveraging data on the most popular products and latest trends sets it apart, enabling it to outperform competitors and deliver exactly what customers are seeking.  This data informs everything from design to marketing, ensuring that the products sold on SHEIN meet the market pulse and allowing SHEIN to swiftly and continually refine its offerings to adapt to ever-evolving consumer interests.  By enabling SHEIN to react to consumer trends in real-time, reducing instances of excess inventory and waste, and allowing SHIEN to more heavily focus its supply efforts on products that will sell, this data has been a big part of SHEIN's success.

160.    SHEIN takes reasonable measures to maintain the secrecy of the SHEIN Best Seller Data and to protect confidential and proprietary information from disclosures, including, but not limited to (1) restrictions on the dissemination of trade secret information both within and outside the company; (2) restrictions on employee access to trade secret information, including protocols requiring user logins and passwords to gain access; (3) protocols for the proper destruction of trade

secret information; and (4) protocols training for employees about the proper handling of company trade secrets.

161.    Defendants misappropriated these proprietary and confidential trade secrets, including by directing or encouraging Temu employees to steal and distribute the SHEIN Best Selling Data.

162.    Although Temu's theft of the SHEIN Best Selling Data occurred in China, Temu has taken steps in the United States to use these trade secrets and cause harm to SHEIN in the United States.   Defendants used the misappropriated SHEIN Best Selling Data to accelerate the launch of the Temu Website and App in the United States, including by luring SHEIN's sellers and suppliers to the Temu Website and App utilizing the data to generate internal projections and sales targets for its United States operations, and using the data to create knockoff copies of SHEIN's bestselling items.

163.    Defendants' misappropriation of proprietary and confidential trade secrets was intentional, knowing, willful, and malicious.

164.    As a direct result of Defendants' conduct, SHEIN has been damaged and Defendants have been unjustly enriched by receiving value and profits attributable to the misappropriated trade secrets.

165.    SHEIN is entitled to recover from Defendants the damages it suffered and the benefits Defendants unjustly derived, in an amount to be determined at trial.   SHEIN is further entitled to recover from Defendants an award of exemplary damages and attorney's fees.

166.    Defendants' conduct and continued misappropriation of proprietary and confidential trade secrets has caused and will continue to cause irreparable harm and injury to SHEIN unless enjoined by the Court.   SHEIN has no adequate remedy at law for these injuries.

## COUNT III
## COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 101 *et seq.*)

167.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

168.    The Asserted Photos and Asserted Designs are original works and copyrightable subject matter under 17 U.S.C. § 101 *et seq*.

169.    SHEIN is the exclusive owner of the following registered copyrights for various images and designs: VA 2-374-645, VA 2-374-649, VA 2-374-650, VA 2-375-585, VA 2-375-589, VA 2-375-591, VA 2-375-593, VA 2-376-329, VA 2-376-423, VA 2-376-425, VA 2-378-715, VA 2-378-733, VA 2-378-736, VA 2-378-746, VA 2-378-749, VA 2-379-644, VA 2-380-252, VA 2-380-261, VA 2-380-262, VA 2-380-264, VA 2-380-268, VA 2-380-269, VA 2-380-271, VA 2-381-077, VA 2-381-189, VA 2-381-191, VA 2-387-188, VA 2-387-252, VA 2-387-336, VA 2-387-337, VA 2-387-338, VA 2-387-343, VA 2-387-347, VA 2-387-348, VA 2-387-349, VA 2-387-350, VA 2-387-352, VA 2-387-353, VA 2-387-355, VA 2-387-357, VA 2-387-358, VA 2-387-359, VA 2-387-360, VA 2-387-361, VA 2-387-617, VA 2-372-555, and VA 2-379-344 (collectively the "SHEIN Registered Copyrights").[36]  The SHEIN Registered Copyrights are valid and enforceable.

170.    At all relevant times, SHEIN has owned and still owns all exclusive rights in the SHEIN Registered Copyrights, including the right to reproduce, prepare derivative works, and distribute copies.

---

[36]  Ex. 9.

171.   SHEIN has never assigned or licensed the rights to the Asserted Photos or Asserted Designs to any party unaffiliated with SHEIN itself.  In particular, SHEIN has never granted any license or rights in the Asserted Photos or Asserted Designs to Defendants.

172.   Defendants had access to the Asserted Photos and Asserted Designs through the publicly available SHEIN Website and/or SHEIN App.

173.   Without SHEIN's consent, Defendants deliberately copied, manufactured, displayed, reproduced, created derivative works of, adapted, marketed, sold, and/or distributed the Asserted Photos and Asserted Designs on products and in listings for products offered for sale on the Temu Website and App.

174.   Without SHEIN's consent, Defendants also deliberately encouraged, induced, caused, or directed its partner sellers to copy, manufacturer, display, reproduce, create derivative works of, adapt, market, sell, and/or distribute the Asserted Photos and Asserted Designs on products and in listings for products offered for sale on the Temu Website and App.

175.   Defendants also refused to remove infringing product listings and to discontinue the sale of infringing products even after notified that the listings and products are infringing.

176.   Defendants' actions constitute willful copyright infringement in violation of 17 U.S.C. §§ 106 and 501(a).

177.   Pursuant to 17 U.S.C. § 504, SHEIN is entitled to actual damages and any additional profits attributable to Defendants' acts in an amount to be determined at trial, as well as statutory damages, enhanced for Defendants' willful infringement.

178.   Defendants have caused, and if not enjoined will continue to cause, SHEIN irreparable injury for which there is no adequate remedy at law.

## COUNT IV
## CONTRIBUTORY COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 101 *et seq.*)

179.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

180.    Temu is contributorily liable for copyright infringement.

181.    On information and belief, sellers have posted images and sold products on the Temu Website and App that infringe the SHEIN Registered Copyrights.

182.    On information and belief, Temu had actual knowledge that the images and product designs posted by sellers, including sellers, infringe the SHEIN Registered Copyrights.

183.    SHEIN sent Temu copyright infringement notices under the DMCA, thereby informing Temu that the images and product designs posted by sellers, including sellers, infringe the SHEIN Registered Copyrights.

184.    Despite receiving these notices, Temu did not take down the infringing content or instruct sellers to do so.  Some of the infringing content remains available on the Temu Website and App.

185.    Temu has consciously avoided learning about infringement on the Temu Website and App.

186.    Temu has failed to monitor or investigate sellers who have a history or pattern of posting infringing content, including by inadequately staffing content review teams, inadequately training employees to identify infringement and remove infringing listings, and/or by assigning content review to unsophisticated automated systems that Temu knows will fail to identify infringing content.

187.    On information and belief, Defendants knowingly contributed to sellers' copyright infringement by failing or delaying to remove infringing content and by failing to monitor and maintain adequate records regarding seller activities on the Temu Website and App.

188.    Pursuant to 17 U.S.C. § 504, SHEIN is entitled to actual damages and any additional profits attributable to Defendants' acts in an amount to be determined at trial, as well as statutory damages, enhanced for Defendants' willful infringement.

189.    Defendants have caused, and if not enjoined will continue to cause, SHEIN irreparable injury for which there is no adequate remedy at law.

## COUNT V
## VICARIOUS COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 101 *et seq.*)

190.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

191.    Temu is vicariously liable for copyright infringement.

192.    On information and belief, sellers have posted images and sold products on the Temu Website and App that infringe the SHEIN Registered Copyrights.  Temu selects, supervises, and controls sellers' product designs and listings of products, including promotional images, on the Temu Website and App.

193.    SHEIN has informed Temu that product designs and images posted by sellers infringe the SHEIN Registered Copyrights by sending Temu copyright infringement notices under the DMCA.

194.    Despite receiving these notices, Temu did not take down all of the sellers' infringing content.  Some of the infringing content remains posted on the Temu Website and App.

195.    Defendants receive a direct financial benefit from sellers' offering for sale and selling products that infringe the SHEIN Registered Copyrights.  The infringing products and listings draw consumers to the Temu Website and App and increase sales of both infringing and non-infringing products.  On information and belief, Temu collects a portion of the revenues from products sold by sellers on the Temu Website and App.

196.    Pursuant to 17 U.S.C. § 504, SHEIN is entitled to actual damages and any additional profits attributable to Defendants' acts in an amount to be determined at trial, as well as statutory damages, enhanced for Defendants' willful infringement.

197.    Defendants have caused, and if not enjoined will continue to cause, SHEIN irreparable injury for which there is no adequate remedy at law.

**COUNT VI**
**INDUCEMENT OF COPYRIGHT INFRINGEMENT**
**(17 U.S.C. § 101 *et seq.*)**

198.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

199.    On information and belief, Temu distributed image editing software and/or provided image editing services to sellers.

200.    Temu distributed image editing software and provided image editing services so that sellers could, without authorization from SHEIN, copy, manufacture, display, reproduce, create derivative works of, adapt, market, sell, and/or distribute the Asserted Photos and Asserted Designs.

201.    Temu instructed or encouraged sellers to save on product development and marketing costs by copying and altering SHEIN's Asserted Photos and Asserted Designs, infringing on the SHEIN Registered Copyrights.

202.    Pursuant to 17 U.S.C. § 504, SHEIN is entitled to actual damages and any additional profits attributable to Defendants' acts in an amount to be determined at trial, as well as statutory damages, enhanced for Defendants' willful infringement.

203.    Defendants have caused, and if not enjoined will continue to cause, SHEIN irreparable injury for which there is no adequate remedy at law.

**COUNT VII**
**FEDERAL TRADEMARK COUNTERFEITING**
**(15 U.S.C. § 1114)**

204.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

205.    SHEIN owns the SHEIN brand and Affiliate Brands, as well as valid U.S. trademark registrations for the SHEIN brand and Affiliate Brands on the Principal Register.

206.    The SHEIN trademark and Affiliate Brand trademarks are fanciful, arbitrary, and associated with SHEIN in the minds of the public and consumers.

207.    Without SHEIN's approval, authorization, or consent, Defendants have used counterfeit SHEIN and Affiliate Brand marks that are identical to or indistinguishable from genuine SHEIN and Affiliate Brand marks. Defendants have used counterfeit SHEIN and Affiliate Brand marks to promote the Temu Website, App, and products, including in Infringing Ads, on Imposter X (formerly Twitter) Accounts, in product images on the Temu Website and App, on the Infringing SHEIN Webpage, and on counterfeit products.

208.    Defendants' counterfeit marks are likely to cause, and have caused, confusion, mistake, or deception in the minds of the public by leading the public to believe—falsely—that Defendants' products originate from SHEIN and/or that SHEIN has approved, sponsored, or otherwise associated itself with Defendants' platform or the goods offered for sale on Defendants' platform.

209.    Defendants have willfully and intentionally used counterfeit marks calculated to cause confusion, mistake, or deception and take unfair competitive advantage of the SHEIN and Affiliate Brand marks' reputation and goodwill.

210.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

211.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT VIII
## FEDERAL TRADEMARK INFRINGEMENT
## (15 U.S.C. § 1114)

212.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

213.    SHEIN owns the SHEIN brand and Affiliate Brands, as well as valid U.S. trademark registrations for the SHEIN brand and Affiliate Brands on the Principal Register.

214.    The SHEIN trademark and Affiliate Brands trademarks are fanciful, arbitrary, and associated with SHEIN in the minds of the public and consumers.

215.    Without SHEIN's approval, authorization, or consent, Defendants have used infringing marks to promote their own online retail platform and products, including in Infringing Ads, on Imposter X (formerly Twitter) Accounts, in product images on the Temu Website and App, on the Infringing SHEIN Webpage, and on products.

216.    Defendants' infringing marks are likely to cause, and have caused, confusion, mistake, or deception in the minds of the public by leading the public to believe—falsely—that Defendants' products originate from SHEIN and/or that SHEIN has approved, sponsored, or otherwise associated itself with Defendants' platform or the goods offered for sale on Defendants' platform.

217.    Defendants have willfully and intentionally used infringing marks calculated to cause confusion, mistake, or deception and take unfair competitive advantage of the SHEIN and Affiliate Brands marks' reputation and goodwill.

218.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

219.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT IX
## CONTRIBUTORY TRADEMARK INFRINGEMENT
## (15 U.S.C. § 1114)

220.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

221.    Temu is contributorily liable for the infringing acts of sellers on the Temu Website and App and the owners and operators of the Imposter X (formerly Twitter) Accounts.

222. Temu intentionally induced sellers to infringe SHEIN's trademarks by, on information and belief, instructing and encouraging them to upload images of products bearing SHEIN watermarks and SHEIN hangtags to the Temu Website and App.

223. Temu intentionally induced the owners and operators of the Imposter X (formerly Twitter) Accounts to infringe SHEIN's trademarks by, on information and belief, instructing and encouraging them to impersonate genuine SHEIN X (formerly Twitter) Accounts using counterfeit and infringing SHEIN marks.

224. Temu knew of, had reason to know of, or was willfully blind to direct infringement and counterfeiting by sellers and by the owners and operators of the Imposter X (formerly Twitter) Accounts. Nevertheless, Temu continued to allow the sellers to list and offer products on the Temu Website and App, and Temu continued to allow the owners and operators of the Imposter X (formerly Twitter) Accounts to impersonate genuine SHEIN X (formerly Twitter) Accounts and solicit and divert consumers to the Temu Website, App, and products.

225. Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with. SHEIN has no adequate remedy at law for these injuries.

226. As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT X
## VICARIOUS TRADEMARK INFRINGEMENT
## (15 U.S.C. § 1114)

227.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

228.    Temu is vicariously liable for the infringing acts of sellers on the Temu Website and App and of the owners and operators of the Imposter X (formerly Twitter) Accounts.

229.    Temu, on the one hand, and sellers, on the other, are in an apparent or actual partnership and have authority to bind one another in transactions with third parties and/or exercise joint ownership or control over infringing products and infringing images in product listings.  On information and belief, Temu enters into agreements with sellers giving Temu the right to control and monitor sellers' products and product listings on the Temu Website and App.

230.    Temu, on the one hand, and the owners and operators of the Imposter X (formerly Twitter) Accounts, on the other, are likewise in an apparent or actual partnership and have authority to bind one another in transactions with third parties and/or exercise joint ownership or control over the Imposter X (formerly Twitter) Accounts.  On information and belief, Temu entered into agreements with the owners and operators of the Imposter X (formerly Twitter) Accounts that gave Temu the right to control and monitor the posts uploaded to the Imposter X (formerly Twitter) Accounts.

231.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

232.     As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT XI
## FEDERAL TRADEMARK DILUTION
## (15 U.S.C. § 1125(c))

233.     SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

234.     SHEIN has used the SHEIN mark and Affiliate Brand marks for many years to identify its products in the United States.

235.     As a result, the SHEIN mark and Affiliate Brand marks are distinctive and have become famous and widely recognized by the general consuming public in the United States.

236.     Defendants willfully engaged in the acts alleged in the foregoing paragraphs with the intent to trade off SHEIN's reputation and/or to cause dilution of the famous SHEIN mark and Affiliate Brand marks.

237.     Defendants' acts have diminished, and will continue to diminish, the distinctive quality of the SHEIN mark and Affiliate Brand marks.

238.     Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

239.     As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT XII
## FEDERAL UNFAIR COMPETITION AND FALSE DESIGNATIONS OF ORIGIN
### (15 U.S.C. § 1125(a)(1)(A))

240.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

241.    Defendants' uses of the SHEIN mark and Affiliate Brand marks constitute unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

242.    Defendants' uses of the SHEIN mark and Affiliate Brand marks constitute false or misleading descriptions or representations of fact that are likely to deceive customers and prospective customers into believing that Defendants' online retail services, as well as goods offered for sale on the Temu Website and App, originate from, are associated with, or are sponsored by SHEIN.

243.    Upon information and belief, Defendants have willfully used the SHEIN mark and Affiliate Brand marks with the intent to create consumer confusion, mistake, or deception and take advantage of the reputation and goodwill of the SHEIN mark and Affiliate Brand marks.

244.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

245.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT XIII
## UNFAIR COMPETITION
## (DISTRICT OF COLUMBIA COMMON LAW)

246.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

247.    Defendants have unfairly used the SHEIN mark and Affiliate Brand marks to misrepresent that Defendants' online retail services, as well as goods offered for sale on the Temu Website and App, originate from, are associated with, or are sponsored by SHEIN.

248.    Defendants have also induced influencers to disparage SHEIN's goods and services.

249.    The acts described above constitute unfair competition under District of Columbia common law.

250.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill, including because SHEIN has no control over the quality of the goods or services marketed and sold by Defendants that the public is likely to erroneously believe, and has believed, SHEIN created, approved, sponsored, or is otherwise associated with.  SHEIN has no adequate remedy at law for these injuries.

251.    Defendants have derived, and continue to derive, unfair and illicit profits from their wrongful conduct.

252.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages, including for lost sales, in an amount to be proven at trial.

253.    Defendants' conduct was oppressive, fraudulent, and malicious, entitling SHEIN to an award of punitive damages.

## COUNT XIV
## FEDERAL FALSE ADVERTISING
### (15 U.S.C. § 1125(a)(1)(B))

254.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

255.    Defendants disseminated Influencer Guidelines to social media influencers instructing them to falsely claim that the products sold on the Temu Website and App are less expensive and of "way better quality" than products sold on the SHEIN Website or SHEIN App.

256.    These statements were false or misleading and had the capacity to, and did in fact, deceive consumers.

257.    These statements had a material effect on purchasing decisions by persuading consumers to purchase products from Defendants and/or persuading consumers not to purchase products from the SHEIN Website or SHEIN App.

258.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill.  SHEIN has no adequate remedy at law for these injuries.

259.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT XV
## CONTRIBUTORY FALSE ADVERTISING
### (15 U.S.C. § 1125(a))

260.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

261.    On information and belief, Quirico, Rainha, and others published statements from Defendants' Influencer Guidelines, including statements that the products sold on the Temu

Website and App are less expensive and of "way better quality" than products sold on the SHEIN Website or SHEIN App.

262.    These statements were false or misleading and had the capacity to, and did in fact, deceive consumers.

263.    These statements had a material effect on purchasing decisions by persuading consumers to purchase products from Defendants and/or persuading consumers not to purchase products from the SHEIN Website or SHEIN App.

264.    Defendants contributed to the third-party influencers' conduct by drafting the statements contained in the Influencer Guidelines, contracting with influencers to publish the statements, and otherwise knowingly inducing and encouraging the third-party influencers to publish false and misleading representations of fact.

265.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill.  SHEIN has no adequate remedy at law for these injuries.

266.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## COUNT XVI
## PRODUCT DISPARAGEMENT AND TRADE LIBEL
## (MASSACHUSETTS COMMON LAW)[37]

267.    SHEIN realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

---

[37]    SHEIN asserts trade libel under Massachusetts law because Temu is headquartered in Massachusetts and, on information and belief, created the Influencer Guidelines containing the libelous statements in Massachusetts.

268.    Defendants have contracted with and induced influencers to publish false statements of fact that disparage the quality of the goods and services offered by SHEIN, as well as the overall reputation of SHEIN's business.

269.    Defendants knew, or should have known, that the statements in the Influencer Guidelines were false, yet contracted with and induced influencers to publish the statements with reckless disregard of their truth or falsity.

270.    Defendants' conduct has caused, and continues to cause, irreparable harm to SHEIN's reputation and goodwill.  SHEIN has no adequate remedy at law for these injuries.

271.    As a result of Defendants' actions, SHEIN has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

SHEIN respectfully requests that this Court enter judgment against Defendants as follows:

1.    Finding in SHEIN's favor against Defendants on all claims alleged herein;

2.    Enjoining Defendants, and their agents, servants, employees, attorneys, successors, and assigns, and any and all persons acting in concert or participating with them, from directly or indirectly:

    a.    using the SHEIN mark and Affiliate Brand marks, or any reproduction, counterfeit, copy, or colorable imitation of said marks, in any manner likely to cause the public to believe that Defendants' goods and services are connected with SHEIN or the SHEIN brand;

    b.    making any false or misleading statements regarding SHEIN, SHEIN-branded or Affiliate-Branded goods and services, or the relationship between SHEIN and Defendants or SHEIN's affiliates and Defendants;

    c.    infringing the SHEIN Registered Copyrights;

     d.      further using or misappropriating trade secrets related to SHEIN's business operations; and

     e.      assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above subparagraphs (a) through (d).

3.      Finding that Defendants have unlawfully, and without authorization, infringed upon and counterfeited the SHEIN mark and Affiliate Brand marks, committed false designation of origin, engaged in unfair competition, false advertising, contributory false advertising, and dilution, all in violation of the Lanham Act, 15 U.S.C. § 1125, et seq.

4.      Ordering Defendants to certify their compliance with any order granting preliminary and/or permanent injunctive relief pursuant to 15 U.S.C. § 1116.

5.      Finding that Defendants have unlawfully, and without authorization, infringed the SHEIN Registered Copyrights.

6.      Finding that Defendants have misappropriated  trade secrets related to SHEIN's business operations.

7.      Entering an Order:

     a.      prohibiting Defendants from using or disclosing any of SHEIN's confidential information for any purpose anywhere in the world;

     b.      requiring Defendants to return all copies of any files or documents containing SHEIN's confidential information or derivatives thereof; and

    c.     requiring Defendants to provide a full accounting of how Defendants used any of SHEIN's confidential information, and which of Defendants' employees and agents have had access to the information.

8.     Finding that Defendants engaged in unfair competition in violation of the common law of the District of Columbia.

9.     Finding that Defendants engaged in product disparagement and trade libel in violation of the common law of the State of Massachusetts.

10.    Finding that Defendants have been unjustly enriched.

11.    Ordering Defendants to account to SHEIN for Defendants' revenues and profits derived from the Imposter X (formerly Twitter) Accounts, influencer statements, Infringing Ads, Infringing Webpages, or any other unlawful use of the SHEIN mark or Affiliate Brand marks.

12.    Finding this case exceptional and awarding SHEIN its attorney's fees pursuant to 15 U.S.C. § 1117(a).

13.    Awarding SHEIN damages arising out of Defendants' wrongful acts in a sum equal to three times the actual damages suffered by SHEIN, as provided in 15 U.S.C. § 1117(b).

14.    Finding that Defendants have intentionally used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, and awarding SHEIN its attorney's fees pursuant to 15 U.S.C. § 1117(b).

15.    Entering judgment Awarding statutory damages in lieu of actual damages, as provided in 15 U.S.C. § 1117(c).

16.    Ordering Defendants to disgorge its profits and other ill-gotten gains.

17.    Ordering accounting and judgment rendered for damages sustained by SHEIN on account of Defendants' false designation of origin, trademark infringement, and unfair competition.

18.    Awarding SHEIN, pursuant to 17 U.S.C. § 504, its actual damages for Defendants' copyright infringement and any of Defendants' profits attributable to the infringement, and any statutory damages to which SHEIN is entitled, including for willful copyright infringement for timely registered works.

19.    Awarding SHEIN taxable costs of this action and interest.

20.    Awarding SHEIN reasonable attorney's fees and interest.

21.    Awarding SHEIN punitive damages for Defendants' wanton and deliberate illegal acts committed with oppression, fraud, or malice.

22.    Awarding SHEIN such other and further relief as this Court deems just and proper.

## JURY DEMAND

SHEIN requests a trial by jury as to all issues triable to a jury.

Dated: August 19, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

William Burck
williamburck@quinnemanuel.com
Michael D. Bonanno
mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
(202) 538-8000


John B. Quinn (*pro hac vice* application
forthcoming)
johnqunn@quinnemanuel.com
Michael E. Williams (*pro hac vice* application
forthcoming)
michaelwilliams@quinnemanuel.com
Kevin Y. Teruya (*pro hac vice* application
forthcoming)
kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Andrew H. Schapiro (*pro hac vice* application
forthcoming)
andrewschapiro@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

*Attorneys for Defendants ROADGET
BUSINESS PTE. LTD.*