## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROADGET BUSINESS PTE. LTD., | |
| Plaintiff, | |
| v. | Case No. 24-cv-02402 (TJK) |
| PDD HOLDINGS INC., WHALECO, INC., and DOES 1-20, | |
| Defendants. | |

## PLAINTIFF ROADGET BUSINESS PTE. LTD.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PDD HOLDINGS, INC.'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT ......................................................................................................................7

I.      SHEIN PROPERLY ALLEGES THAT PDD IS SUBJECT TO THIS COURT'S
        JURISDICTION ......................................................................................................7

        A.      SHEIN Has Met Its Burden To Make Out A *Prima Facie* Case Of
                Personal Jurisdiction Based On Well-Pled, Non-Conclusory Allegations .............7

        B.      SHEIN's Allegations Satisfy The "Alter Ego" Test ................................................10

                1.      SHEIN's allegations establish a prima facie case of unity of
                        interest and ownership. ................................................................10

                        (a)     PDD fails to rebut or address SHEIN's well-pled alter ego
                                allegations. .................................................................12

                        (b)     PDD's prior public statements are consistent with the
                                Complaint and inconsistent with the evidence presented
                                with PDD's Motion. .....................................................15

                2.      SHEIN's allegations establish equitable considerations sufficient to
                        justify a piercing of the corporate veil. ......................................20

        C.      SHEIN's Allegations Also Satisfy The "Agency" Test ...........................................22

        D.      The Northern District Of Illinois Actions Temu Cites Are Distinguishable ........26

II.     SHEIN PROPERLY ALLEGES THAT PDD IS SUBJECT TO THIS COURT'S
        JURISDICTION UNDER RULE 4(K)(2) ................................................................28

        A.      PDD Does Not Contest Most Of The Requirements Under Rule 4(k)(2) .............29

        B.      SHEIN Alleges PDD Has Sufficient Contacts With The United States ................30

                1.      SHEIN has alleged minimum contacts. .....................................30

                2.      SHEIN has alleged fair play and substantial justice. ................33

III.    AT A MINIMUM, SHEIN IS ENTITLED TO JURISDICTIONAL DISCOVERY ........34

CONCLUSION ..................................................................................................................37

# TABLE OF AUTHORITIES

**Page**

## CASES

*Artis v. Greenspan*,
  223 F. Supp. 2d 149 (D.D.C. 2002) ..................................................................................8

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. Bnkr. 2008) .............................................................................22

*Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*,
  168 F. Supp. 3d 1 (D.D.C. 2016) ...............................................................12, 13, 14, 32

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)........................................................................................29, 32, 33

*C & E Services, Inc. v. Ashland, Inc.*,
  498 F. Supp. 2d 242 (D.D.C. 2007) ...............................................................................23

*Capital Telephone Co. v. FCC*,
  498 F.2d 734 (D.C. Cir. 1974) .......................................................................................20

*Carbone v. Deutsche Bank Nat'l Trust Co.*,
  No. RDB-15-1963, 2016 WL 4158354 (D. Md. Aug. 5, 2016).....................................8

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998) .....................................................................................34

*Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*,
  475 F. Supp. 711 (D.D.C. 1979) ....................................................................................22

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
  230 F.3d 934 (7th Cir. 2000) .........................................................................................35

*Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc.*,
  No. 86-2516, 1987 WL 11085 (D.D.C. May 8, 1987)...................................................24

*Crane v. New York Zoological Soc.*,
  894 F.2d 454 (D.C. Cir. 1990) .............................................................................8, 19, 26

*Diamond Chem. Co. v. Atofina Chems., Inc.*,
  268 F. Supp. 2d 1 (D.D.C. 2003) ...................................................................................34

*Empson & Co., S.R.L. v. Mar-Salle Imports, Ltd.*,
  No. 86-1944, 1987 WL 12793 (D.D.C. June 12, 1987)..................................................21

*Fore River Residents Against the Compressor Station v. FERC*,
  77 F.4th 882 (D.C. Cir. 2023) ................................................................33

*Garcia v. U.S. Citizenship and Immigration Services*,
  168 F. Supp. 3d 50 (D.D.C. 2016) .........................................................22

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) .......................................................34, 35

*Hart v. Department of Agriculture*,
  112 F.3d 1228 (D.C. Cir. 1997) ...............................................................9

*Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.*,
  No. 11-CV-1735 (CRC), 2024 WL 4253142 (D.D.C. Sept. 20, 2024) ..................22

*Ilustrata Servicos Design, LTDA v. PDD Holdings, Inc.*,
  No. 23-CV-04824, 2024 WL 3177901 (N.D. Ill. June 26, 2024) ................27, 28

*IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) ............................................................7

*IMark Marketing Services, LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010) ....................................................14, 15

*Int'l Shoe Co. v. State of Wash., Off. Of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945) ...............................................................................29

*Johnson-Tanner v. First Cash Fin. Servs., Inc.*,
  239 F. Supp. 2d 34 (D.D.C. 2003) ...........................................................9

*Kareem v. Haspel*,
  986 F.3d 869 (D.C. Cir. 2021) ...........................................................8, 27

*Kenneda v. United States*,
  880 F.2d 1439 (D.C. Cir. 1989) ...............................................................9

*Lewis v. Mutond*,
  568 F. Supp. 3d 47 (D.D.C. 2021), *aff'd*, 62 F.4th 587 (D.C. Cir. 2023) ..........28, 34

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*,
  62 F. Supp. 2d 13 (D.D.C. 1999) ........................7, 9, 10, 11, 14, 20, 22, 24, 32

*McKesson Corp. v. Islamic Republic of Iran*,
  52 F.3d 346 (D.C. Cir. 1995) ............................................................23, 26

*McWilliams Ballard, Inc. v. Broadway Management Co., Inc.*,
  636 F. Supp. 2d 1 (D.D.C. 2009) .....................................................12, 15, 21

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ................................................................28, 29

*NBC-USA Hous., Inc. Twenty-Six v. Donovan*,
    741 F. Supp. 2d 55 (D.D.C. 2010) ...........................................................34

*Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs., LTD.*,
    902 F. Supp. 2d 87 (D.D.C. 2012) ...........................................................10

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
    253 F.3d 865 (5th Cir. 2001) .....................................................................8

*Richard v. Bell Atlantic Corp.*,
    946 F. Supp. 54 (D.D.C. 1996) ...........................................11, 14, 23, 25

*Roadget Business PTE Ltd. v. PDD Holdings, Inc.*,
    Civil Action No. 1:22-cv-07119 (N.D. Ill. 2022) ...................................33

*Schwartz v. CDI Japan, Ltd.*,
    938 F. Supp. 1 (D.D.C. 1996) ...........................................................22, 25

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*,
    24 F. Supp. 2d 66 (D.D.C. 1998) ..............................................................9

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*,
    90 F. Supp. 2d 15 (D.D.C. 2000) .......................................................11, 20

*Valley Finance, Inc. v. U.S.*,
    629 F.2d 162 (D.C. Cir. 1980) .................................................................11

*In re Vitamins Antitrust Litig.*,
    94 F. Supp. 2d 26 (D.D.C. 2000) .......................................................34, 35

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .............................................................33

## STATUTES

D.C. Code § 13-423(a)(1) ..................................................................................9

D.C. Code § 13-423(a)(3) ..................................................................................9

D.C. Code § 13-423(a)(4) ..................................................................................9

## RULES & OTHER AUTHORITIES

Fed. R. Civ. P. 4(k)(2)................................................................2, 28, 29, 32, 36

Fed. R. Civ. P. 12(b)(2)...........................................................................................8, 27

Fed. R. Civ. P. 12(b)(6)................................................................................................12

Fed. R. Civ. P. 30(b)(6)...............................................................................................35

Restatement (Second) of Agency § 26 (1957)............................................................23

U.S. Const. amend. V.............................................................................................29, 30

## INTRODUCTION

Defendant PDD Holdings, Inc.'s ("PDD") Motion to Dismiss for lack of personal jurisdiction ("Motion" or "Mot.") should be denied because it fails to rebut the *prima facie* showing of personal jurisdiction established in the Complaint. Plaintiff Roadget Business PTE. LTD. (hereinafter "Plaintiff" or "SHEIN") has plausibly alleged personal jurisdiction over PDD by virtue of the alter ego and agency relationship it has with Defendant WhaleCo Inc. ("WhaleCo"). Unsurprisingly, PDD seeks to hide behind the corporate form, claiming it is merely a holding company that "does not operate any substantive business" and has nothing to do with Temu's operation. But PDD ignores the detailed and specific factual allegations underpinning SHEIN's allegations that PDD effectively controls and operates the Temu e-commerce platform and is ultimately responsible for the tortious and fraudulent conduct described in the Complaint. Indeed, PDD's supporting declaration raises more questions than answers, especially when compared to inconsistent and contradictory statements PDD has made publicly to its investors and the Securities and Exchange Commission ("SEC"). Those public statements make clear that PDD has a significant role in directing WhaleCo's operations and that WhaleCo operates as an alter ego, agent or mere division of the larger PDD business.

PDD uses the bulk of its Motion to argue that PDD does not have sufficient contacts with the forum—here, the District of Columbia—to support personal jurisdiction. But this misses the mark. Because SHEIN alleges that PDD operates WhaleCo as its alter ego and agent, and WhaleCo does not contest jurisdiction, the proper inquiry is whether the allegations demonstrate a *prima facie* case that WhaleCo is the alter ego and/or agent of PDD. Based on the well-pled allegations in the Complaint, SHEIN has made this showing.

Additionally, SHEIN alleges that PDD owns or controls property in and has directed substantial business towards the United States as whole and that PDD has harmed SHEIN by

directing tortious and fraudulent conduct towards the United States. These contacts, which PDD's declaration does not rebut, further support the exercise of personal jurisdiction over PDD pursuant to Federal Rule 4(k)(2).

Although SHEIN has alleged sufficient jurisdictional facts to support the Court's exercise of jurisdiction over PDD under an alter ego theory, an agency theory, or pursuant to Rule 4(k)(2), to the extent there is any question about those jurisdictional facts, SHEIN should be permitted to conduct limited jurisdictional discovery to supplement its allegations under the D.C. Circuit's liberal standards permitting such discovery.

## STATEMENT OF FACTS

### *Relevant Allegations in the Complaint*

SHEIN alleges that PDD operates WhaleCo as its alter ego and/or agent. As alleged in the Complaint, "PDD [] operates and controls the Temu-branded e-commerce platform in the United States, including its website, temu.com (the 'Temu Website') and corresponding mobile application (the 'Temu App')." Compl. ¶ 18. "PDD operates and controls the Temu Website and App directly and indirectly through agents and alter-egos, including WhaleCo, as well as other direct and indirect affiliates, subsidiaries, and variable interest entities for which PDD is a primary beneficiary." *Id.* These affiliates, the "Temu Group Defendants," are "an interrelated corporate web of parents, subsidiaries, sister companies, offshore holding companies, variable interest entities, and other affiliated entities." *Id.* ¶ 20. As alleged, PDD "operates the Temu Website and App through the Temu Group Defendants in order to provide goods and services to U.S. customers." *Id.* ¶ 26. SHEIN alleges that WhaleCo "and the Temu Group Defendants are alter egos of PDD" (*id.* ¶ 28), and that PDD "operates Temu as its agent and a mere instrumentality of PDD, insofar as Temu offers for sale and sells products to consumers in the United States and District of Columbia on behalf of PDD." *Id.* ¶ 39. SHEIN has alleged numerous specific

jurisdictional facts, many of which are ignored by PDD's Motion, to support its allegations that WhaleCo and the other Temu Group Defendants are alter egos and/or agents of PDD.  *See id.* ¶¶ 20, 22, 24, 29-31, 33, 41, 43.

Given PDD's dominance over its subsidiaries, its role in operating the Temu Website and App, and the fact that each subsidiary operates more as a department in a single business rather than distinct businesses, the Complaint alleges that "[c]ontinued observance of the fiction of corporate separateness between PDD, Temu, the Temu Group Defendants, and certain of their individual officers and directors . . . would permit a fraud on SHEIN and consumers, as well as promote injustice in U.S. legal proceedings."  *Id.* ¶ 32.  SHEIN alleges that PDD uses WhaleCo and the Temu Group Defendants "as mere instrumentalities . . . to defraud and mislead U.S. consumers and infringe the rights of intellectual property owners in the United States, while remaining functionally impervious to enforcement of judgments obtained in the United States."  *Id.*  PDD should not be permitted to hide behind the corporate form while controlling and directing substantial business (in addition to tortious and fraudulent conduct) towards the United States and the District of Columbia.

### The Zhang Declaration Submitted By PDD

PDD responded to the Complaint with a motion to dismiss and a short declaration purporting to rebut SHEIN's well-pleaded factual allegations related to jurisdiction.  *See generally* Mot.; Zhang Decl., ECF No. 38-2.  But the Zhang Declaration raises more questions than answers. For example, Mr. Zhang states that he is "Director of Investor Relations for PDD[]" and that he has "held this position since August 2023."  Zhang Decl. ¶ 2.  Despite declaring his employment position with PDD, just two paragraphs later Mr. Zhang states that PDD "has no employees."  *Id.* ¶ 4.  Mr. Zhang broadly asserts that PDD has no operations and conducts no business in the United

States or the District of Columbia. *See, e.g.*, *id.* ¶¶ 4, 7, 9, 13. Mr. Zhang further asserts that PDD has nothing to do with WhaleCo's business or the operation of the Temu platform. *See, e.g.*, *id.* ¶¶ 22-25.

Mr. Zhang states that "PDD[] has never maintained a bank account, telephone number, or mailing address in the District of Columbia" (*id.* ¶ 11), but notably does not make the same assertion for the United States as a whole. Similarly, Mr. Zhang states that "PDD[] does not contract to supply services in the District of Columbia" (*id.* ¶ 12), but says nothing about contracts to supply services in the United States generally. Mr. Zhang also says that "PDD[] has not taken payment from residents of the District of Columbia in connection with sales on Temu" (*id.* ¶ 14), but does not make the same representation for other residents of the United States.

In similar vague terms, Mr. Zhang states that PDD "is not responsible for WhaleCo's debts or operating expenses" (*id.* ¶ 21), but stops short of rebutting the allegations that PDD, in fact, covers all of WhaleCo's debts and operating expenses. *See* Compl. ¶ 24. Whether PDD is "responsible" for WhaleCo's debts and expenses does not address whether PDD is, in fact, covering these debts and expenses. Mr. Zhang claims that "PDD[] does not share any directors, officers, or employees with Whaleco," (Zhang Decl. ¶ 19), but does not address any of the specific individuals raised in the Complaint or the allegation that current WhaleCo employees have worked for PDD or another Temu Group Defendant. *See* Compl. ¶¶ 20, 31. The Zhang Declaration also fails to rebut the allegations that WhaleCo relies on "PDD Holdings' vast and deep network of merchants, logistic partners, and its established ecosystem built over the years" (*id.* ¶ 22), or the specific allegations that other PDD subsidiaries are integral to the operation of Temu such that they cannot be considered separate corporate entities. *See, e.g.*, *id.* ¶¶ 29, 41-43. Further, the

Zhang Declaration ignores the allegation that PDD directed the theft of SHEIN's trade secrets, "which it then used to jump-start its U.S. operations." *Id.* ¶ 29.

***PDD's Relevant Public Statements***

PDD's public statements to its investors and the SEC further undermine the Zhang Declaration's credibility. Although Mr. Zhang states that PDD "does not operate any substantive business" (Zhang Decl. ¶ 4), PDD has made numerous representations regarding its business operations in its 2023 Form 20-F filed with the SEC. For example, PDD has stated that it "is a multinational commerce group that ***owns and operates a portfolio of businesses***." *See* SHEIN's Request for Judicial Notice ("RJN"), Ex. 1 (PDD Holdings, Inc. Form 20-F at 63, dated Dec. 31, 2023, and hereinafter, "PDD's 2023 20-F") (emphasis added); *see also id.* at 4, 10, F-12. As another example, although Mr. Zhang states that PDD "has no employees" (Zhang Decl. ¶ 4), PDD told the U.S. government and investors that "[a]s of December 31, 2023, we had a total of 17,403 employees. We had a total of 9,762 and 12,992 employees as of December 31, 2021 and 2022, respectively." PDD's 2023 20-F at 108.[1]

Mr. Zhang, on behalf of PDD, broadly disclaims any control over or involvement with Temu's operations (*see* Zhang Decl. ¶¶ 22-25), but PDD has publicly stated that "[c]onsumers primarily access *our services* through the Pinduoduo and Temu mobile apps." PDD's 2023 20-F at 19 (emphasis added); *see also id.* at 1, 21, 43-44, 66, 88. Mr. Zhang also states that "PDD[] and Whaleco do not comingle funds" (Zhang Decl. ¶ 18), and that "PDD[] is not responsible for Whaleco's debts or operating expenses." *Id.* ¶ 21. But PDD's public disclosures reveal the

---

[1]  Mr. Zhang also claims that PDD does not hold property or leases in the United States or the District of Columbia (Zhang Decl. ¶ 10), and does not "own, operate, maintain, or contract for Temu web servers." *Id.* ¶ 25. But in its SEC filings, PDD has stated that www.temu.com is one of its registered domain names, (PDD's 2023 20-F at 66) and that it "maintain[s] offices in North America[.]" *Id.* at 87.

significant financial support provided to and among its subsidiaries (*see* PDD's 2023 20-F at 11 (describing loans among subsidiaries)), and the fact that PDD has no policy with respect to fund transfers among PDD and its subsidiaries. *See id.* ("we do not have any cash management policies that dictate how funds are transferred among PDD Holdings Inc., our subsidiaries, the VIE and its subsidiaries and investors").

Mr. Zhang's representation that PDD "does not derive revenue from the sale of goods or services in the District of Columbia or anywhere in the United States" (Zhang Decl. ¶ 13), is particularly misleading given that PDD has publicly stated that it "currently generate[s] revenues primarily from online platform services that we provide to merchants through our platforms." PDD's 2023 20-F at 88. Indeed, PDD has told the SEC that it is, in fact, the operator of the Temu platform. *Id.* at 24 ("[i]n the case of the Temu platform, we as the operator of the e-commerce platform . . . ."). What is more, PDD reported that for 2022 and 2023 it enjoyed 100% share of all profits generated by its subsidiaries, which necessarily includes profits generated from sales on the Temu Website and App to consumers in the United States. The subsidiaries received no share of profits:

*Selected Condensed Consolidated Statements of Income Information*

| | PDD Holdings Inc. (Primary beneficiary of the VIE) | Hangzhou Weimi* | VIE and Its Subsidiaries | Other Subsidiaries of PDD Holdings Inc.** | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | For the Year Ended December 31, 2023 | | | | | |
| | (RMB in thousands) | | | | | |
| Revenues | — | 892,863 | 131,868,973 | 194,028,064 | (79,150,695) | 247,639,205 |
| Total costs and operating expenses | (156,391) | (835,691) | (110,080,065) | (157,018,991) | 79,150,695 | (188,940,443) |
| Share of profit from subsidiaries, the VIE and subsidiaries of the VIE | 60,112,989 | — | — | — | (60,112,989) | — |
| Net income | 60,026,544 | 64,191 | 23,398,906 | 36,649,892 | (60,112,989) | 60,026,544 |
| | For the Year Ended December 31, 2022 | | | | | |
| | (RMB in thousands) | | | | | |
| Revenues | — | 837,973 | 103,631,702 | 66,770,734 | (40,682,820) | 130,557,589 |
| Total costs and operating expenses | (660,216) | (803,066) | (68,152,664) | (71,222,542) | 40,682,820 | (100,155,668) |
| Share of profit from subsidiaries, the VIE and subsidiaries of the VIE | 32,238,254 | — | — | — | (32,238,254) | — |
| Net income/(loss) | 31,538,062 | 47,567 | 33,595,051 | (1,404,364) | (32,238,254) | 31,538,062 |

*Id.* at 12.  Further demonstrating that PDD's subsidiaries are merely divisions of the same business, PDD's disclosure makes clear that one entity under its control, Shanghai Xunmeng, is "the main operating entity which provides platform service to third-party merchants for their sales of products." *Id.* at 69.[2]  PDD collectively offers merchants "training resources and merchant support, which are easily accessible through the main merchant dashboard and are frequently updated to guide merchants through the various tools available to them on [PDD's] platforms." *Id.* at 64.

## ARGUMENT

## I.    SHEIN PROPERLY ALLEGES THAT PDD IS SUBJECT TO THIS COURT'S JURISDICTION

### A.    SHEIN Has Met Its Burden To Make Out A *Prima Facie* Case Of Personal Jurisdiction Based On Well-Pled, Non-Conclusory Allegations

To survive a motion to dismiss for lack of personal jurisdiction, SHEIN need only make out a *prima facie* showing of the pertinent jurisdictional facts by alleging specific acts connecting PDD to this forum.  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 109 (D.D.C. 2018).  In deciding this Motion, as PDD acknowledges, the Court must regard SHEIN's well-pleaded, non-conclusory allegations as true and afford SHEIN the benefit of all inferences reasonably derived from the facts alleged.  *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 19 (D.D.C. 1999); *see* Mot. 5.  "A court may consider material outside of the pleadings in ruling on

---

[2]  PDD's investor website, https://investor.pddholdings.com/, contains additional inconsistencies with the Zhang Declaration.  For example, the Zhang Declaration states that PDD does not share "bylaws" with WhaleCo and that PDD does not "manage WhaleCo's employees."  Zhang Decl. ¶¶ 18, 20.  But PDD's investor website contains a "Code of Business Conduct and Ethics" that applies to "Pinduoduo Inc. and its subsidiaries and affiliates."  *See* RJN, Ex. 2 (Pinduoduo Code of Business Conduct and Ethics).  The website also contains an audit committee charter that relates to PDD's "legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the ***Company and its subsidiaries*** . . . ."  *See* RJN, Ex. 3 (Pinduoduo Audit Committee Charter) (emphasis added).

a motion to dismiss for lack of . . . personal jurisdiction[.]" *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). When weighing the evidence, the Court should resolve any "factual discrepancies . . . in favor of the plaintiff." *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990) ("factiual discrepancies appearing in the record must be resolved in favor of the plaintiff").

Not only does PDD's Motion ignore the well-pleaded factual allegations in the Complaint, it also misstates the law. Contrary to PDD's repeated misrepresentations in its Motion (*see* Mot. 5, 17), courts in this Circuit regularly credit allegations made "on information and belief" to determine if a plaintiff has set forth a *prima facie* case for personal jurisdiction. *See, e.g.*, *Kareem v. Haspel*, 986 F.3d 869, 866 (D.C. Cir. 2021) ("We have recognized that pleadings on information and belief are permitted when the necessary information lies within defendants' control") (internal quotation marks omitted). Indeed, no case in the D.C. Circuit and none of PDD's cited out-of-circuit cases support the proposition that such allegations are insufficient to plead personal jurisdiction as a matter of law or that they should be ignored as PDD suggests.[3] Courts merely require allegations based on information and belief to "be accompanied by a statement of the facts upon which the allegations are based." *Kareem*, 986 F.3d at 866. Accordingly, dismissal for lack

---

[3]    The two cases PDD cites for this proposition and heavily relies upon throughout its Motion merely stand for the long-established principle—one SHEIN does not dispute—that "the law does not require [courts] to credit conclusory [jurisdictional] allegations or draw farfetched inferences," **not** that allegations "on information and belief" may be disregarded for the purposes of a 12(b)(2) motion. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (finding lack of jurisdiction where plaintiffs' *sole* piece of jurisdictional evidence was the single, conclusory allegation that, "on information and belief," plaintiff knew defendants were Texas residents and that its actions would intentionally cause harm to plaintiff in Texas); *Carbone v. Deutsche Bank Nat'l Trust Co.*, No. RDB-15-1963, 2016 WL 4158354, *7 (D. Md. Aug. 5, 2016) (finding lack of jurisdiction where plaintiffs offered *only* "on information and belief" allegations as support for a holding company's alleged involvement in the underlying events with no factual allegations in support).

of personal jurisdiction is proper only if "it appears beyond doubt that the [plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Material Supply*, 62 F. Supp. 2d at 19 (citing *Kenneda v. United States*, 880 F.2d 1439, 1442 (D.C. Cir. 1989)).

"[W]hen the party contesting jurisdiction is found to be nothing more than the alter ego [or principal] of an affiliated corporation over which the court does have jurisdiction . . . the affiliated corporation's jurisdictional contacts may be extended to reach the other corporate entity." *Johnson-Tanner v. First Cash Fin. Servs., Inc.*, 239 F. Supp. 2d 34, 38 (D.D.C. 2003). In determining whether a parent corporation is liable for the acts of its subsidiary, D.C. courts endeavor to determine whether the parent corporation "so dominated the [subsidiary] as to negate its separate personality." *Hart v. Department of Agriculture*, 112 F.3d 1228, 1231 (D.C. Cir. 1997) (citation and internal quotation marks omitted).[4] Notably, WhaleCo does not contest personal jurisdiction over it in the United States or the District of Columbia. *See* WhaleCo's 12(b)(6) Motion to Dismiss, ECF No. 36 (failing to raise, and thus waiving, a personal jurisdiction argument). Thus, if the Court finds that WhaleCo's contacts are properly imputed to PDD, the Court will have personal jurisdiction over PDD too. *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 70 (D.D.C. 1998) ("[P]laintiff may demonstrate the Court's jurisdiction over [Defendants] if it proves that they are 'alter egos' of [the other Defendants] (which do not contest jurisdiction).").[5]

---

[4]  PDD acknowledges a court may exercise jurisdiction over a foreign defendant "based upon the contacts of its subsidiary with the forum," including where there is an alter ego relationship between them and "inequity would result if corporate separateness is maintained," or where there is an agency relationship. Mot. 17-18.

[5]  SHEIN alleges WhaleCo and PDD are also subject to personal jurisdiction in this forum pursuant to D.C. Code Sections 13–423(a)(1), 13–423(a)(3), and 13–423(a)(4). *See* Compl. ¶¶ 37-38.

SHEIN's allegations concerning PDD's domination and control of WhaleCo as its alter ego and/or agent that carries out unlawful activity on PDD's behalf in this forum sufficiently state a *prima facie* case for this Court to exercise personal jurisdiction over PDD. PDD's evidence purporting to rebut SHEIN's allegations lacks credibility given its inconsistencies and contradictions with PDD's public statements, and those inconsistencies must be resolved in SHEIN's favor.

**B.      SHEIN's Allegations Satisfy The "Alter Ego" Test**

The Court should undertake a two-pronged analysis to determine whether a subsidiary should be treated as the alter ego of its parent: (1) whether there is "such unity of interest and ownership that the separate personalities of [parent] and [subsidiary] no longer exist"; and (2) whether an inequitable result will follow if the court treats the subsidiary's allegedly wrongful acts as those of the subsidiary alone. *Material Supply Int'l*, 62 F. Supp. 2d at 19.

SHEIN alleges "PDD operates and controls the Temu Website and App directly and indirectly through agents and alter-egos, including WhaleCo, as well as other direct and indirect affiliates, subsidiaries, and variable interest entities for which PDD is a primary beneficiary." Compl. ¶ 18. The specific factual allegations made in support of this claim are sufficient to establish a *prima facie* case of personal jurisdiction under the alter ego test given the unity of interest and ownership between PDD and WhaleCo and the equitable considerations justifying a piercing of the veil.

**1.      SHEIN's allegations establish a prima facie case of unity of interest and ownership.**

As PDD acknowledges in its Motion, "[u]nity of ownership and interest may [] be established by showing [a parent corporation's] domination and control of [its subsidiary]." Mot. 19 (citing *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs., LTD.*, 902 F. Supp.

2d 87, 97 (D.D.C. 2012)).  To demonstrate the requisite unity of interest and ownership under the alter ego test, SHEIN must allege that PDD's control over WhaleCo is "active and substantial," though the control "need not be exclusive in a hypertechnical or day-to-day sense." *Valley Finance, Inc. v. U.S.*, 629 F.2d 162, 172 (D.C. Cir. 1980).  "The test is a practical one, based on a reading of the circumstances," and courts may consider, for example, "the nature of the corporate ownership and control; failure to maintain corporate minutes or records; failure to maintain corporate formalities; commingling of funds and assets; diversion of one corporation's funds to the other's uses; and use of the same office or business location."  *Material Supply*, 62 F. Supp. 2d at 20; *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 23 (D.D.C. 2000).

Courts in the District of Columbia have acknowledged that many jurisdictional facts may be relevant for evaluating the nature and extent of control a parent exercises over its subsidiary such that a subsidiary's personal jurisdiction is imputable to the parent.  To assess whether PDD so controlled WhaleCo as to render it its alter ago, as SHEIN alleges, the Court should consider the following host of factors, none of which is dispositive:

> [W]hether parent and subsidiary have common business departments; whether the parent finances the subsidiary; whether the parent incorporated the subsidiary; whether the subsidiary is inadequately capitalized; whether parent and subsidiary file consolidated financial statements and tax returns; whether they have a joint accounting and payroll system; whether the subsidiary is operated as a mere division of the parent; whether the subsidiary depends on the parent for substantially all of its business; whether the subsidiary's obligations are assumed to be those of the parent; whether the subsidiary's property is used by the parent as its own; and whether the subsidiary is operated exclusively in the interest of the parent.

*Material Supply Int'l*, 62 F. Supp. 2d at 20; *see also Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54, 62 (D.D.C. 1996) (noting additional factors to evaluate whether a parent and its subsidiary function as an "integrated enterprise" include whether the parent hired, fired, and/or made other employment decisions for subsidiary employees; whether the parent routinely transferred

employees between it and its subsidiary, used the same work force, and/or handled the subsidiary's payroll; whether the parent exercises more than general oversight of the subsidiary's operations by supervising the subsidiary's daily operations; and whether the parent and subsidiary fail to maintain separate bank accounts). This standard does not change simply because many corporate entities are implicated. *McWilliams Ballard, Inc. v. Broadway Management Co., Inc.*, 636 F. Supp. 2d 1, 7 (D.D.C. 2009) (to pierce multiple corporate veils, a plaintiff must generally allege and prove unity of interest and ownership between the corporations and the individuals or entities in control and that an inequitable result would follow if the acts are treated as those of the corporation alone).[6]

(a) <u>PDD fails to rebut or address SHEIN's well-pled alter ego allegations.</u>

Construing the well-pled allegations in the Complaint as true, as one must at this stage, SHEIN pleads numerous facts supporting its claims of an alter ego relationship between PDD and WhaleCo. PDD fails to rebut or address most of them, so they must be taken as true for purposes of PDD's Motion. *See Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 8 (D.D.C. 2016) ("Similar to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, 'the uncontroverted allegations of the complaint must be taken as true, and the court will draw all reasonable inferences in plaintiff's favor.'").

First, PDD "fail[s] to observe corporate formalities, including by sharing the same small group of officers and directors [with WhaleCo and the Temu Group Defendants], sharing employees, failing to maintain separate employment and financial records, sharing office space

---

[6]  Moreover, to the extent there are ambiguities about the entities between PDD and WhaleCo, SHEIN should be permitted to seek jurisdictional discovery to supplement its allegations. *See infra* Section III.

and payroll accounts, and regularly commingling funds." Compl. ¶ 30. Additionally, "PDD, Temu, and one or more Temu Group Defendants keep insufficient corporate records of transactions among the Temu Group Defendants." *Id.*

This web of corporate entities run by the same individuals, though perhaps distinct on paper, support PDD's and WhaleCo's joint operation of the Temu platform as alter egos. Specifically, SHEIN alleges that "Shanghai Yucan and/or its subsidiaries, each of which are indirectly owned and controlled by PDD, package and distribute the products sold on the Temu Website and App in the United States, including in the District of Columbia." *Id.* ¶ 29. SHEIN also alleges that "individuals in charge of Temu's business currently or formerly held key positions at Pinduoduo" (*id.* ¶ 31), and that the various overlapping officers and directors among PDD, WhaleCo, and the Temu Group Defendants include "Lei Chen, Jiazhen Zhao, Zhenwei Zheng, Junyun Xiao, Jun Liu, and Haifeng Lin." *Id.* ¶ 20. PDD ignores these specific allegations in its Motion and supporting declaration, and as a result, they must be taken as true. *See Bazarian*, 168 F. Supp. 3d at 8.

SHEIN further alleges that "PDD owns, leases, operates, or controls, either directly or through direct or indirect subsidiaries, fulfillment centers and/or return centers in the United States for products sold on the Temu Website and App . . . [that] include at least centers located at 301 Grove Rd, Suites #200, West Deptford, Thorofare, NJ 08086 and 9059 Hermosa Avenue, Rancho Cucamonga, CA 91730." *Id.* ¶ 41. Relatedly, SHEIN alleges that "PDD directly or indirectly owns, controls, and operates warehouses where Temu Group Defendants package, ship, and export products supplied by third-party sellers on the Temu Website and App with the express intent and expectation that these products will reach consumers in the United States, including in the District of Columbia" as evidenced by attached shipping labels for Temu products from Shanghai Yucan,

one of the Temu Group Defendants. *Id.* ¶ 43.[7]  PDD makes no reference to these specific allegations, so they, too, must be taken as true.[8]  *See Bazarian*, 168 F. Supp. 3d at 8.

Finally, SHEIN pleads numerous additional allegations demonstrating the inter-related and overlapping operations among PDD and WhaleCo establishing an alter ego relationship between them.  These include that WhaleCo is inadequately capitalized to cover ongoing ordinary business expenses (Compl. ¶ 33); that WhaleCo is being operated as a mere division or instrumentality of PDD (*id.* ¶ 32); that WhaleCo depends on PDD for substantially all of its business because all its costs and losses are subsidized by PDD (*id.* ¶ 24); and that WhaleCo is operated exclusively in the interest of PDD and exists purely as a formality (*id.* ¶ 40).  *See Material Supply Int'l*, 62 F. Supp. 2d at 19; *Richard*, 946 F. Supp. at 62.  PDD tries to dispute certain of these allegations in its Motion, but the Court should not credit PDD's self-serving arguments presented without evidence, and where PDD did present evidence, such evidence directly conflicts with the Complaint (and PDD's own statements previously made to the public and SEC) and must be assessed during the course of jurisdictional discovery.  *See infra* Sections I.B.1.b, III.

Taken together, SHEIN's allegations readily make a *prima facie* showing of an alter ego relationship between PDD and WhaleCo.  *See IMark Marketing Services, LLC v. Geoplast S.p.A.*,

---

[7]  In its Motion, PDD suggests SHEIN "reproduce[d] an unauthenticated and altered photograph" of a shipping label directed to a redacted location in the United States from Shanghai Yucan.  Mot. 22 n. 14 (citing Compl. ¶ 43, Ex. 8).  First, PDD's allegations are without merit, as any information that was redacted was to comply with consumer privacy laws.  Next, contrary to PDD's arguments, SHEIN introduced the shipping label as evidence supporting its *prima facie* case that PDD operates all of its subsidiaries, including Shanghai Yucan, as divisions of the same business.

[8]  PDD's general assertion that it "does not direct or control the sale, sourcing, exportation, importation, packaging, distribution, fulfillment, shipping, or warehousing of products offered for sale or sold on Temu," Zhang Decl. ¶ 24, does not answer the specific factual allegations that PDD uses its web of corporate entities as mere divisions of its larger business and that the Temu Group Defendants are integral to Temu's operations, *see* Compl. ¶¶ 29, 31, 41-43.  In any event, PDD's general assertion cannot be squared with its public statements to investors and the SEC.  *See infra* Section I.B.1.b.

753 F. Supp. 2d 141 (D.D.C. 2010). In *IMark Marketing Services*, the court determined that the plaintiff made out a prima facie case of jurisdiction based on an agency relationship between a parent and its subsidiary with allegations, for example, the subsidiary's sole purpose was to "function as a conduit for [the parent's] products to enter the U.S. market," and "[the subsidiary] does not maintain its own bank account, as [the parent] pays [the subsidiary's] expenses and provides all of [its] assets"). *Id.* at 146; *see also McWilliams Ballard*, 636 F. Supp. 2d at 7 (denying motion to dismiss for lack of jurisdiction based on alter ego theory where plaintiff alleged relevant subsidiaries were grossly undercapitalized, dominated by their parent, and all defendants disregarded corporate formalities and commingled corporate and personal funds and assets).

(b)     <u>PDD's prior public statements are consistent with the Complaint<br>and inconsistent with the evidence presented with PDD's Motion.</u>

Public statements by PDD to the SEC and its investors support the alter ego theory of personal jurisdiction and undermine PDD's declaration.

To begin, although Mr. Zhang states that PDD "does not operate any substantive business," (Zhang Decl. ¶ 4), PDD has made the following representations regarding its business operations in its 2023 Form 20-F filed with the SEC:

- "***We conduct our businesses through a number of operating entities*** incorporated in jurisdictions across the globe." PDD's 2023 20-F (RJN Ex. 1) at 4 (emphasis added).

- "***[W]e conduct our operations through (i) our subsidiaries***, (ii) the VIE, and (iii) the subsidiaries of the VIE." *Id.* (emphasis added).

- "PDD Holdings Inc. is a holding company incorporated in the Cayman Islands with no operations of its own. ***While we carry out our business in the rest of the world primarily through our subsidiaries***, we conduct our operations in mainland China primarily through our mainland China subsidiaries, the VIE and its subsidiaries." *Id.* at 10 (emphasis added).

- "PDD Holdings is a multinational commerce group that ***owns and operates a portfolio of businesses***." *Id.* at 63 (emphasis added).

15

- "***The Company through its consolidated subsidiaries***, variable interest entity (the 'VIE') and the subsidiaries of the VIE (collectively, the 'Group') ***are engaged in the merchandise sales and the provision of online platforms to help merchants leverage the power of the internet to engage with their customers***."  *Id.* at F-12 (emphasis added).

Moreover, while Mr. Zhang, on behalf of PDD, disclaims any control over or involvement with WhaleCo's operation and control of the Temu platform (*see* Zhang Decl. ¶¶ 22-25), PDD has publicly stated:

- "'[O]ur platforms' are to the Pinduoduo platform and the Temu platform."  PDD's 2023 20-F at 1.

- "'Temu' or 'Temu platform' are to our Temu mobile app and website and a variety of related features, functionalities, tools and services that we provide to buyers and merchants via the Temu mobile app and website."  *Id.* at 1.

- "Consumers primarily access our services through the Pinduoduo and Temu mobile apps."  *Id.* at 19.

- "In September 2022, we launched Temu, a global online platform that brings together consumers, merchants, manufacturers and brands around the world."  *Id.* at 21.

- "In the case of the Temu platform, we as the operator of the e-commerce platform and merchants that offer to sell products into the jurisdictions where we operate are subject to the consumer protection laws of such jurisdictions, including those relating to health and safety and product liability."  *Id.* at 24.

- "We began our business operations in multiple jurisdictions through the launch of the Temu platform in September 2022."  *Id.* at 43.

- "Despite our global footprint, we are still in the early stages of operating the Temu platform.  There can be no assurance we will be able to continue to generate revenue from the Temu platform.  We have devoted, and will need to continue to devote, substantial managerial, financial and human resources to devise and implement monetization strategies and product and service offerings that are suitable for diverse global markets with different user needs, competitive landscapes and operational requirements."  *Id.* at 44.

- "As of December 31, 2023, we had 144 registered computer software copyrights relating to various aspects of our operations. As of the same date, we had approximately 2,349 trademark registrations and 964 trademark applications in China, the United States and other jurisdictions. Our registered domain names

16

include www.pddholdings.com, www.pinduoduo.com and www.temu.com, among others." *Id.* at 66.

- "We believe that increasing the value and variety of our online platform services and the consequent return on investment to merchants from utilizing these services will increase demand for our services. We aim to enhance the value of our online platform services through such means as broadening our service offerings, increasing the size and engagement of our buyer base, improving recommendation features, developing innovative marketing services, and improving the measurement tools available to merchants." *Id.* at 88.

Further, Mr. Zhang's representation that PDD "does not derive revenue from the sale of goods or services in the District of Columbia or anywhere in the United States" (Zhang Decl. ¶ 13), is directly contradicted by PDD's 2023 Form 20-F:

- "We currently generate revenues primarily from online platform services that we provide to merchants through our platforms." PDD's 2023 20-F at 88.

- "We believe our business model has significant operating leverage and enables us to realize structural cost savings. We achieve economies of scale in our operation as a wider selection of merchandise attracts and retains a larger number of buyers, which in turn drives an increase in our scale and attracts more merchants to our platforms. In addition, our scale creates value for our merchants by providing an effective channel for selling large volumes of products. We believe this value proposition will make our platforms more attractive to merchants and further increase their sales and spending on our platforms." *Id.* at 88.

Indeed, and as discussed above, in 2022 and 2023, PDD received 100% share of all profits generated by Temu, while WhaleCo received none. *See id.* at 12. As is clear from the above table (*see supra* pg. 6), PDD prepared and disclosed to its investors and the SEC that PDD takes all the profits generated by its subsidiaries, suggesting that the subsidiaries operate as mere divisions of PDD's larger business. Additionally, PDD's disclosure that Shanghai Xunmeng is "the main operating entity which provides platform service to third-party merchants for their sales of products[,]" (PDD's 2023 20-F at 69), suggests that merchants who sell products through Temu use services provided by a PDD subsidiary other than WhaleCo to sell those products. Indeed, PDD's SEC filings state that merchants can access a "main merchant dashboard" that serves to

"guide merchants through the various tools available to them on **our platforms**"—*i.e.*, both Pinduoduo and Temu. *Id.* at 64 (emphasis added). These disclosures demonstrate that WhaleCo and the Temu Group Defendants are merely divisions of the larger PDD business.

Continuing, Mr. Zhang next states that PDD "has no employees" (Zhang Decl. ¶ 4), but PDD has made the following representations regarding employees in its 2023 Form 20-F:

- "As of December 31, 2023, we had a total of 17,403 employees. We had a total of 9,762 and 12,992 employees as of December 31, 2021 and 2022, respectively." PDD's 2023 Form 20-F at 108.

- PDD also disclosed the following table regarding the function of current employees:

| Function: | December 31, 2023 |
|---|---|
| Sales, marketing and fulfillment | 7,158 |
| Product development | 7,332 |
| Platform operation | 1,339 |
| Management and administration | 1,574 |
| **Total** | **17,403** |

*Id.* at 108.[9]

Mr. Zhang also states that PDD does not hold property or leases in the United States or the District of Columbia (Zhang Decl. ¶ 10), and does not "own, operate, maintain, or contract for Temu web servers" (*id.* ¶ 25), but PDD has publicly stated:

- "Our registered domain names include www.pddholdings.com, www.pinduoduo.com and www.temu.com, among others." PDD's 2023 20-F at 66.

- "Our principal executive offices are located in Dublin, Ireland. We also maintain offices in North America, Asia and Europe. As of December 31, 2023, our main office facilities worldwide had an aggregate gross floor area of approximately 89,727 square meters. We lease all of the office premises that we currently occupy, and we plan to renew our leases from time to time as needed." *Id.* at 87.

- "Our servers are hosted in internet data centers in different geographic regions and countries around the world, including Europe, the U.S. and China. We typically enter into leasing and hosting service agreements with internet data center providers

---

[9]  PDD also disclosed that it has "entered into employment agreements with each of [its] executive officers." *Id.* at 103.

that are renewed periodically.  In addition, we occupy logistics warehouses in different areas across our markets to support merchants on our platforms.  We enter into leasing agreements for these logistics facilities and plan to renew our leases as needed." *Id.* at 87.

Finally, Mr. Zhang states that "PDD[] and Whaleco do not comingle funds" (Zhang Decl. ¶ 18), and that "PDD[] is not responsible for Whaleco's debts or operating expenses." *Id.* ¶ 21. But PDD's public disclosures reveal the significant financial support provided to and among its subsidiaries and the fact that PDD has no policy with respect to fund transfers among PDD and its subsidiaries:

- "For the years ended December 31, 2021, 2022 and 2023, (i) PDD Holdings Inc. provided loans to our subsidiaries in an aggregate principal amount of RMB15,520.1 million, RMB21,991.6 million, and RMB1,754.5 million (US$247.1 million), respectively, (ii) our subsidiaries repaid loans to PDD Holdings Inc. in an aggregate principal amount of RMB9,664.8 million, RMB22,057.3 million and RMB10,570.6 million (US$1,488.8 million), respectively, (iii) the VIE and its subsidiaries provided loans to our subsidiaries in an aggregate principal amount of RMB47,711.8 million, RMB5,443.7 million and RMB206,353.0 million (US$29,064.2 million), respectively, (iv) our subsidiaries repaid loans to the VIE and its subsidiaries in an aggregate principal amount of RMB29,999.3, RMB16.0 million and RMB171,391.6 million (US$24,140.0 million), respectively, (v) our subsidiaries provided loans to the VIE and its subsidiaries in an aggregate principal amount of RMB7,729.5 million, RMB62,753.7 million and RMB5,193.0 million (US$731.4 million), respectively, and (vi) the VIE and its subsidiaries repaid loans to our subsidiaries in an aggregate principal amount of RMB7,300.0 million, RMB46,043.4 million and RMB1,802.6 million (US$253.9 million), respectively." PDD's 2023 20-F at 11.

- "As of the date of this annual report, we do not have any cash management policies that dictate how funds are transferred among PDD Holdings Inc., our subsidiaries, the VIE and its subsidiaries and investors." *Id.*

SHEIN's specific factual allegations, taken together with PDD's public filings to the SEC, demonstrate an alter ego relationship between PDD and WhaleCo sufficient to justify the exercise of personal jurisdiction over PDD.  Given the discrepancies between the Zhang Declaration and PDD's previous public statements, the Court should not credit the Zhang Declaration and should resolve any factual discrepancies in SHEIN's favor.  *See Crane*, 894 F.2d at 456 ("factual

19

discrepancies appearing in the record must be resolved in favor of the plaintiff"). Alternatively, as discussed below, the Court should permit jurisdictional discovery on these issues.

### 2.    SHEIN's allegations establish equitable considerations sufficient to justify a piercing of the corporate veil.

Once unity of interest and ownership is shown, as it is here, equity counsels piercing the veil whenever "adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." *Material Supply*, 62 F. Supp. 2d at 21 (citations omitted); *Capital Telephone Co. v. FCC*, 498 F.2d 734, 738 (D.C. Cir. 1974). "Because piercing the corporate veil is a doctrine of equity, the factor which predominates will vary in each case, and the decision to pierce will be influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of the corporation." *Hazard*, 90 F. Supp. 2d at 23.

Allowing PDD to sidestep this Court's jurisdiction while controlling WhaleCo and operating the Temu Website and App through its U.S. subsidiaries and engaging in the tortious and fraudulent conduct alleged in the Complaint "would sanction a fraud or promote injustice." *Material Supply*, 62 F. Supp. 2d at 21 (citations omitted). As alleged in the Complaint, SHEIN alleges that PDD uses WhaleCo and the Temu Group Defendants "as mere instrumentalities . . . to defraud and mislead U.S. consumers and infringe the rights of intellectual property owners in the United States, while remaining functionally impervious to enforcement of judgments obtained in the United States." Compl. ¶ 32. PDD has purposely set up WhaleCo in a manner in which it is severely undercapitalized (*id*. ¶ 33), and siphoning-off all of WhaleCo's profits each year, leaving it without sufficient funds to cover its ordinary operating debts and expenses. *Id*. ¶ 30, Ex. 6 at 4. Further, PDD publicly touts that it is beyond the reach of U.S. laws, including any judgments that may be entered against it (*Id*. ¶ 34, Ex. 3 at 47-48, 55), thus leaving those harmed by its unlawful

conduct to be left with no recourse against the undercapitalized WhaleCo. *See McWilliams Ballard*, 636 F. Supp. 2d at 9 (finding a parent's deliberate undercapitalization of its subsidiary is important factor in veil piercing determination); *Empson & Co., S.R.L. v. Mar-Salle Imports, Ltd.*, No. 86-1944, 1987 WL 12793, *4 (D.D.C. June 12, 1987) (same). PDD's cited cases merely stand for the proposition that unintentional undercapitalization or "mere insolvency" may not suffice—on its own—to pierce the veil. Mot. 24-25. But that is a far cry from the facts here, where the allegations and public disclosures establish that PDD's undercapitalization of WhaleCo is intentionally designed, as evidenced by the fact that PDD must subsidize ongoing operating expenses and debt, while at the same time, syphoning off all of WhaleCo's profits. *See supra.*

When taken together, SHEIN's allegations and the publicly available evidence establish that PDD operates a web of entities solely and collectively for its own interest and profit. PDD's subsidiaries, including WhaleCo, do not function as separate businesses, depending instead on PDD's global management of its "vast and deep network of merchants, logistic partners, and its established ecosystem[.]" Compl. ¶ 22. It is telling that PDD has tried to cover up its prior public statements about its control over WhaleCo and the Temu Website and App, after being sued in the United States by SHEIN. *Id.* ¶ 25 ("PDD has deleted all references to Temu from the PDD website including the fact that it shares its sourcing, logistics, and fulfillment networks with Temu now stating that it 'owns and operates a portfolio of businesses'"). As a result, "[c]ontinued observance of the fiction of corporate separateness between PDD, Temu, the Temu Group Defendants, and certain of their individual officers and directors . . . would permit a fraud on SHEIN and consumers, as well as promote injustice in U.S. legal proceedings." *Id.* ¶ 32. PDD should not be permitted to

reap the benefits of its fraudulent and unlawful business practices in the United States while avoiding liability for those practices based on the fiction of its separateness from WhaleCo.[10]

### C.    SHEIN's Allegations Also Satisfy The "Agency" Test

Similar to the alter ego theory, SHEIN alleges numerous, specific jurisdictional facts supporting its assertion of an agency relationship between PDD and WhaleCo.

To determine if a subsidiary is the agent of its parent for jurisdictional purposes, "the court looks to the entire relationship for evidence of mutual consent and a sufficient degree of control exercised by the principal." *Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996). SHEIN may establish agency by demonstrating PDD's ownership of WhaleCo was not "a mere investment," but rather "an alternative means of transacting business by the parent corporation." *Material Supply*, 62 F. Supp. 2d at 21 (citing *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*, 475 F. Supp. 711, 718 (D.D.C. 1979)).

Specifically, courts consider whether the parent has manifested its desire for the subsidiary to act upon its behalf, the subsidiary has consented to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control directly (as opposed to, for example, merely appointing members of the board). *See Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.,* No. 11-CV-1735 (CRC),

---

[10]    PDD erroneously states SHEIN cannot make the required showing of injustice because veil-piercing is an equitable remedy and "Shein is acting inequitably." Mot. 25. SHEIN denies it has engaged in any such conduct, there has been no determination of such conduct in this action or elsewhere, and the determination of whether such conduct occurred cannot be resolved on a motion to dismiss. Nor do PDD's cited cases support its position. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 333 (S.D. Tex. Bnkr. 2008) (analyzing a reverse-veil-piecing claim under Delaware law and refusing to apply the "unclean hands" doctrine where, as here, "its application would work an inequitable result); *Garcia v. U.S. Citizenship and Immigration Services*, 168 F. Supp. 3d 50, 70 (D.D.C. 2016) (the plaintiff himself admitted he had acted fraudulently or misleadingly and was therefore not permitted equitable relief).

2024 WL 4253142, *13 (D.D.C. Sept. 20, 2024); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351 (D.C. Cir. 1995).  Relevant factors include: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."  *C & E Services, Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 264 (D.D.C. 2007).  Courts in this District have recognized that other relevant factors include "interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control."  *Richard*, 946 F. Supp. at 70 (citation omitted).  The D.C. Circuit has long held that a principal may manifest the agency relationship through "through a pattern of conduct and policy statements that caused the agent to believe that the principal desired it to act on the principal's account."  *McKesson*, 52 F.3d at 352 (cleaned up) (citing Restatement (Second) of Agency § 26 (1957).  Ultimately, the principal's power to control the agent is the "determinative" factor.  *C & E Services*, 498 F. Supp. 2d at 264.

SHEIN alleges numerous, specific jurisdictional facts supporting its assertion of an agency relationship between PDD and WhaleCo.  These allegations make a *prima facie* showing of PDD's power to control WhaleCo.

First, the Complaint makes a *prima facie* showing of PDD's total management and operational control over WhaleCo for the purpose of conducting PDD's business, as well as WhaleCo's consent to such control.  SHEIN alleges that WhaleCo "operates the Temu Website and App in the United States with actual, apparent, and ostensible authority from PDD," and that the Temu platform offers for sale and sells products to consumers in the United States and District of Columbia at PDD's direction and on its behalf.  Compl. ¶¶ 22, 39.  SHEIN alleges, quoting PDD's website, that WhaleCo does so by "leverag[ing] parent company PDD Holdings' vast and

23

deep network of merchants, logistic partners, and its established ecosystem built over the years."
*Id.*; *see Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc*., No. 86-2516, 1987 WL 11085,
*6 (D.D.C. May 8, 1987) (denying 12(b)(2) motion where "[foreign parent] created [domestic
subsidiary] to function as a marketing arm in the United States" and "the two corporations
function[ed] as an integrated whole").

Beyond that, SHEIN also alleges that PDD "directs [WhaleCo] to take action in the United
States on PDD's behalf" to conduct PDD's business.  This includes, for example, soliciting social
media influencers and consumers using false and disparaging statements about SHEIN.  Compl. ¶
29.  Per the Complaint, PDD also "promotes the Temu Website and App during major U.S. media
events and holidays, such as the NFL Super Bowl, Memorial Day, and Black Friday,"[11] (*id.*),
"provides sellers with (and instructs them to use) image-editing software that allows third-party
sellers to modify infringing images for use on the Temu Website and App," (*id.*), and "directs
[WhaleCo] and the Temu Group Defendants to source, export, import, and distribute products sold
on the Temu Website and App," (*id*).  In other words, PDD uses WhaleCo as "an alternative means
of transacting business[.]"  *Material Supply*, 62 F. Supp. 2d at 21.  The Complaint further alleges,
and the Zhang Declaration does not rebut, that PDD directed personnel at its subsidiaries to steal
valuable trade secrets from SHEIN, which it then used to jump-start its U.S. operations.  Compl.
¶ 29.  Indeed, SHEIN alleges PDD controls WhaleCo's operation of the Temu platform because
its own Pinduoduo website has been repeatedly recognized by the U.S. government and

---

[11]   PDD's SEC filing does not mention specific advertising campaigns, but does state that "sales
and marketing expenses increased by 51.2% from RMB54,343.7 million in 2022 to RMB82,188.9
million (US$11,576.1 million) in 2023, as we invested in cultivating greater user recognition and
engagement through online and offline advertising campaigns and promotions."  PDD's 2023 20-
F at 20.

International Counterfeiting Coalition as a notorious website for piracy and counterfeiting. *See id.* 1, ¶¶ 15, 18, 96.

Next, the Complaint makes a *prima facie* showing of PDD's pervasive financial control over and exploitation of WhaleCo, and WhaleCo's consent thereto. SHEIN alleges WhaleCo "relies on PDD for its business model . . . because it relies on PDD's supplier network," "all of its costs and losses are subsidized by PDD," and was "undercapitalized to cover ongoing ordinary business expenses in addition to foreseeable risks and liabilities." *Id.* ¶¶ 24, 33. SHEIN further alleges, and PDD's public statements confirm, that PDD takes all profits from its subsidiaries, including WhaleCo. *See id.* ¶¶ 24, 33 n.9; *supra* pg. 6, Section I.B.1. These allegations, too, confirm that WhaleCo is merely acting on behalf of and as the agent for PDD since the costs and benefits of WhaleCo's operation are, respectively, borne by and provided to PDD, the principal. *See Schwartz*, 938 F. Supp. at 7 (denying motion to dismiss where foreign defendant "intended to assume these obligations [negotiated by the purported agent] in order to reap the financial benefits from transacting business in this forum").

Finally, and as noted above, SHEIN alleges PDD is able to carry out this extensive control by virtue of overlapping officers and directors among PDD, WhaleCo, and the Temu Group Defendants. These individuals include "Lei Chen, Jiazhen Zhao, Zhenwei Zheng, Junyun Xiao, Jun Liu, and Haifeng Lin." Compl. ¶ 20; *see Richard*, 946 F. Supp. at 70 (noting "interrelation of operations" and "common ownership or financial control" as relevant factors).

Considered in the light most favorable to SHEIN, these allegations and publicly available information reflect PDD's overwhelming control and influence over WhaleCo's operations consistent with the relevant agency factors in this Circuit and make out a *prima facie* case of an agency relationship between PDD and WhaleCo. *See Schwartz*, 938 F. Supp. at 7 (plaintiff

established its *prima facie* case for an agency relationship based on allegations the parent-principal directed and coordinated the agent's operational matters and the agent performed functions for its foreign principal in this District); *McKesson*, 52 F.3d at 352 (finding plaintiff provided sufficient evidence of principal/agent relationship by showing agent had extensive involvement in the day-to-day operations of its agent, including controlling the board, determining when to pay out dividends, and enforcing its own policies the agent was forced to implement).[12]

### D.    The Northern District Of Illinois Actions Temu Cites Are Distinguishable

PDD relies heavily on a series of cases from the Northern District of Illinois.  *See* Mot. 1 n.1.  These out-of-circuit cases are non-precedential and distinguishable in significant ways.[13]

First, although PDD characterizes the alter ego and agency allegations in those cases as "similar," Mot. 17, the jurisdictional allegations in the Northern District of Illinois cases were limited and conclusory.  The plaintiffs in Illinois—artists suing WhaleCo and PDD for copyright infringement of their works—alleged that "PDD operates an e-commerce platform known as Temu[,]" Compl. ¶ 11, that "WhaleCo is and holds itself out to consumers as an agent of PDD in the United States and Illinois when providing services through Temu," *id.* ¶ 13, that "WhaleCo has the actual and apparent authority to act on behalf of PDD," *id.*, and that WhaleCo "acts as an agent of [PDD and] the other Defendants so as to make them directly contributorily and vicariously

---

[12]  PDD's supporting declaration is similarly undermined by PDD's remaining inconsistent public statements with respect to PDD and WhaleCo's agency relationship.  *See supra* Section I.B. (summarizing PDD's and WhaleCo's lack of separation and consolidated operations and revenue). PDD has publicly stated that it operates through its subsidiaries and controls both the Pinduoduo and Temu e-commerce platforms, and that it retains 100% of its subsidiaries' profits, including WhaleCo's.  *Id.*  The incomplete and contradictory conclusions in the Zhang Declaration related to this analysis must be disregarded and resolved in SHEIN's favor.  *See Crane*, 894 F.2d at 456 (courts must resolve factual discrepancies appearing in the record in favor of the plaintiff).

[13]  The jurisdictional allegations and court's analyses in each of these cases are identical.

liable[,]" *id.* ¶ 17.  Here, SHEIN offers more than mere conclusions, alleging specific facts about the way PDD controls its subsidiaries, including WhaleCo, and directs substantial business towards the United States.  *See* Compl. ¶¶ 20, 22, 24, 29-31, 33, 41, 43.  PDD attempts to sidestep this important distinction and the more detailed factual allegations by again repeating the misstatement of law that allegations on information and belief are not taken as true on a Rule 12(b)(2) motion.  *See* Mot. 17; *Kareem*, 986 F.3d at 866 ("We have recognized that pleadings on information and belief are permitted when the necessary information lies within defendants' control.").

Second, the court in Illinois considered only a narrow set of PDD's public statements and did not make any comparisons between the public statements and the submitted declaration.  The court considered "'we' statements" made in PDD's 2022 20-F, but no other statements from PDD's SEC filings and no statements from PDD's 2023 20-F.  *See Ilustra Servicos Design, LTDA v. PDD Holdings, Inc.*, No. 23-CV-04824, 2024 WL 3177901, *3 (N.D. Ill. June 26, 2024).[14]  And the court there made no comparisons between PDD's submitted declaration and its public statements.  *See id.*  Here, the Court has before it numerous examples of public statements that are inconsistent with PDD's submitted declaration and which clearly support SHEIN's alter ego and agency arguments.  *See supra* Sections I.A-C.

Third, the court in Illinois considered only limited factors when evaluating whether jurisdiction over WhaleCo justified exercising jurisdiction over PDD.  *See Ilustra*, 2024 WL 3177901, *2.  Under the test applicable in this District, many more factors should be considered for purposes of this analysis.  *Compare Ilustra*, 2024 WL 3177901, *2 (listing six factors to be considered) *with Material Supply Int'l*, 62 F. Supp. 2d at 20 (listing the thirteen non-dispositive

---

[14]   The court also considered two news articles that were not statements made by PDD.  *See id.*

factors to be considered when evaluating a potential alter ego relationship).  And notably, the Illinois court did not consider at all Illinois's traditional test to pierce the corporate veil because it was not raised in those cases.  *See id.* (noting that the plaintiff failed to raise "the traditional test for piercing the corporate veil" and therefore waived the argument).

Finally, the court in Illinois denied jurisdictional discovery under a standard not applicable in this Circuit.  The court there applied the standard used by courts in the Seventh Circuit, which, although still lenient, requires the plaintiff at minimum to "establish a colorable or prima facie showing of personal jurisdiction over the defendant."  *Ilustrata*, 2024 WL 3177901, *5 (quotation omitted).  As explained below, this Circuit's standard is different, allowing for jurisdictional discovery "so long as a party demonstrates that it can supplement its jurisdictional allegations."  *Lewis v. Mutond*, 568 F. Supp. 3d 47, 54 (D.D.C. 2021), *aff'd*, 62 F.4th 587 (D.C. Cir. 2023) (quotations omitted).  This Court should not follow the court in the Northern District of Illinois because different precedent applies.

## II.    SHEIN PROPERLY ALLEGES THAT PDD IS SUBJECT TO THIS COURT'S JURISDICTION UNDER RULE 4(K)(2)

Federal Rule of Civil Procedure 4(k)(2) permits a federal court to exercise personal jurisdiction over a defendant if the claim arises under federal law, process was properly served, the defendant is not subject to jurisdiction in any state court of general jurisdiction, and jurisdiction "is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2); *see Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005).[15]  "Whether the exercise of jurisdiction is 'consistent

---

[15]   The alter ego and agency analyses above would permit the Court to use Rule 4(k)(2) as well because if WhaleCo's contacts are imputed to PDD, then PDD has sufficient contacts with the United States as a whole to satisfy personal jurisdiction.  SHEIN argues here that the Court can alternatively exercise jurisdiction over PDD based on its own contacts with the United States as whole.

with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11.  Where a plaintiff makes a prima facie showing that the defendant "purposefully directed [its] activities at residents of the United States . . . and that this litigation results from injuries to the plaintiff[] that arise out of or relate to those activities," the exercise of jurisdiction is consistent with the Due Process Clause of the Fifth Amendment. *Id.* at 13 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, (1985)) (cleaned up).  A plaintiff must also show that "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe Co. v. State of Wash., Off. Of Unemployment Comp. & Placement*, 326 U.S. 310, 320 (1945))).  If a "defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Mwani*, 417 F.3d at

## A.    PDD Does Not Contest Most Of The Requirements Under Rule 4(k)(2)

As an initial matter, many of SHEIN's claims arise under federal law, *see* Compl. Counts I, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIV, XV, and PDD was properly served, *see* Affidavit of Service, ECF No. 18 (describing service on PDD in the Cayman Islands).  PDD does not dispute that these requirements for Rule 4(k)(2) have been met.  *See* Mot. 15-16.  Moreover, PDD has not identified another forum in the United States where it could be sued.  *See id.*  Because all the other requirements for Rule 4(k)(2) are met, the Court may use Rule 4(k)(2) as long the Court's exercise of jurisdiction comports with the United States Constitution.  *See Mwani*, 417 F.3d at 10-11.

### B.    SHEIN Alleges PDD Has Sufficient Contacts With The United States

### 1.    SHEIN has alleged minimum contacts.

Exercise of jurisdiction comports with the Fifth Amendment Due Process Clause because SHEIN's allegations show sufficient contacts between PDD and the United States as a whole given that PDD directs substantial business towards the United States.  SHEIN alleges that "PDD [] operates and controls the Temu-branded e-commerce platform in the United States, including its website, temu.com (the 'Temu Website') and corresponding mobile application (the 'Temu App')[.]"  Compl. ¶ 18; *see also id.* ¶ 22 ("Temu operates the Temu Website and App in the United States as an agent of PDD, with actual apparent, and ostensible authority from PDD."); ¶ 23 (PDD "owns and operates a portfolio of businesses, including, Temu, an e-commerce marketplace for North American consumers"); ¶ 26 (PDD "operates the Temu Website and App through the Temu Group Defendants in order to provide goods and services to U.S. customers"); ¶ 29 (PDD owns and controls entities that "package and distribute the products sold on the Temu Website and App in the United States").  SHEIN alleges that PDD promotes Temu in the United States "during major U.S. media events and holidays, such as the NFL Super Bowl, Memorial Day, and Black Friday (*id.* ¶ 29) and "uses advertisements targeting consumers in the United States" (*id.* ¶ 39). PDD's substantial business in the United States demonstrates its "purposeful engagement with and purposeful availment of United States-based regulatory agencies, intellectual property registration, tariff regulations and ports of entry, social media advertising, social media influencers, app stores, payment processors, and the use, control, lease, and/or ownership of real property, including fulfillment centers, to support the sale, advertisement, and transportation of products offered on the Temu Website and App to U.S. customers." *Id.* ¶ 40.  As alleged, "PDD owns, leases, operates, or controls . . . fulfilment centers and/or return centers in the United States for products sold on

the Temu Website and App throughout the United States" (*id.* ¶ 41) and "controls the process for selecting the vendors who are allowed to sell products on the Temu Website and App and specifically prefers vendors with experience selling to U.S. consumers" (*id.* ¶ 42).

SHEIN's allegations demonstrate that the claims at issue arise out of PDD's contacts with the United States.  As alleged, PDD "operates and controls the Temu-branded e-commerce platform" (*id.* ¶ 23) on which the infringing products were sold (*see id.* ¶¶ 88-92, 120-35).  Further connecting PDD's U.S. contacts with the infringement claims at issue, SHEIN alleges that PDD "provides sellers with (and instructs them to use) image-editing software that allows third-party sellers to modify infringing images for use on the Temu Website and App and promote the sale of infringing products to U.S. customers."  *Id.* ¶ 29.   SHEIN also alleges that PDD "directs Temu to take action in the United States on PDD's behalf, including soliciting social media influencers and consumers using false and disparaging statements about SHEIN[,]" (*id.* ¶ 29), which serves as the basis for the trade libel and false advertising claims (*see id.* ¶¶ 136-46).  And SHEIN alleges that "PDD directed personnel located at the offices of Shanghai Yucan, Guangzhou Yucan, and other Temu Group Defendants to steal valuable trade secrets from SHEIN, which it then used to jump-start its U.S. operations[,]" (*id.* ¶ 29), which supports its trade secret claims (*see id.* ¶¶ 65-76).

PDD's declaration fails to rebut many of SHEIN's specific allegations about PDD's contacts with the United States.  For example, Mr. Zhang states that "PDD[] has never maintained a back account, telephone number, or mailing address in the District of Columbia" (Zhang Decl. ¶ 11), but notably does not make the same assertion for the United States as a whole.  Similarly, Mr. Zhang states that "PDD[] does not contract to supply services in the District of Columbia" (*id.* ¶ 12), but does not say anything about contracts to supply services in the United States generally. Mr. Zhang also says that "PDD[] has not taken payment from residents of the District of Columbia

in connection with sales on Temu" (*id.* ¶ 14), but does not make the same representation for other residents of the United States. Given that for each of these representations Mr. Zhang opted not to make any claims about the United States as a whole even though PDD's Motion addresses Rule 4(k)(2), it is reasonable to infer that PDD: (i) does, in fact, have a back account, telephone number, or mailing address in the United States; (ii) does, in fact, contract to supply services in the United States; and (iii) has, in fact, taken payment from residents in the United States in connection with sales on Temu. *See Material Supply*, 62 F. Supp. 2d at 19. Mr. Zhang also makes no reference whatsoever to the specific allegations that PDD instructs third-party sellers to infringe SHEIN products offered to U.S. customers, that PDD solicited social media influencers to make false and disparaging statements, and that PDD directed the theft of SHEIN's trade secrets to jump-start its operations in the United States. *See Bazarian*, 168 F. Supp. 3d at 8 ("the uncontroverted allegations of the complaint must be taken as true").

Further, as explained above, the Zhang Declaration lacks credibility given its numerous inconsistencies with PDD's public statements regarding PDD's business in the United States as a whole. *See supra* I.B. For example, Mr. Zhang claims that PDD has nothing to do with operating Temu (*see* Zhang Decl. ¶¶ 22-25), but PDD has repeatedly indicated that it operates the e-commerce platform in its SEC filings. *See* PDD's 2023 20-F at 19 ("Consumers primarily access our services through the Pinduoduo and Temu mobile apps."); *id.* at 21 ("In September 2022, we launched Temu, a global online platform . . . ."); *id.* at 24 ("we as the operator of the e-commerce platform [Temu]"). These public statements, coupled with SHEIN's well-pled jurisdictional facts tying PDD to the United States, suggest that, far from contacts that are "random", "fortuitous," or "attenuated," *Burger King*, 471 U.S. at 475, PDD has purposefully directed business operations at

the United States.  PDD's financial statements make clear that it has enjoyed significant profits from sales on Temu, while WhaleCo has retained none.  *See* PDD's 2023 Form 20-F at 12.

### 2.    SHEIN has alleged fair play and substantial justice.

Exercising personal jurisdiction over PDD would also comport with "fair play and substantial justice."  Courts consider a number of factors when evaluating whether the exercise of personal jurisdiction comports with "fair play and substantial justice," including "the burden on the defendant, the forum State's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief."  *Burger King*, 471 U.S. at 476–77 (cleaned up).  PDD ignores these factors entirely and offers no argument that it would be burdensome or difficult to defend itself here.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 37 ("[B]y not raising its [] concerns in its original motion, [the defendant] has waived those concerns."); *Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023) ("Arguments raised for the first time in a reply brief are forfeited.").

Nevertheless, these factors weigh in favor of exercising jurisdiction.  First, the burden on PDD to answer in this forum is low.  PDD actively litigated against SHEIN in the Northern District of Illinois for well over a year without any complaints or problems, and without even bringing a motion to dismiss for lack of personal jurisdiction in that case.  *See Roadget Business PTE Ltd. v. PDD Holdings, Inc.*, Civil Action No. 1:22-cv-07119 (N.D. Ill. 2022).  Litigating in the United States plainly imposes no significant burden on PDD.  Furthermore, this forum has an interest in adjudicating the dispute because SHEIN seeks to vindicate its rights under both federal and District of Columbia law and alleges numerous and egregious violations of its intellectual property rights pursuant to those laws.  *See* Compl. ¶¶ 147-271.  And exercising jurisdiction over PDD here in this related action will be the most efficient way to resolve the disputes between the parties as

WhaleCo, which PDD controls, chose to litigate against SHEIN in this District prior to SHEIN's filing of this lawsuit. The related lawsuits will necessarily require both overlapping and extraterritorial discovery and the Court and the parties have an interest in having all of these issues adjudicated in the same proceeding to avoid the risk of inconsistent rulings. The exercise of jurisdiction over PDD would allow these related actions to proceed towards an efficient resolution of all issues in this District.

## III.    AT A MINIMUM, SHEIN IS ENTITLED TO JURISDICTIONAL DISCOVERY

The D.C. Circuit's "standard for permitting jurisdictional discovery is quite liberal." *See NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55, 60 (D.D.C. 2010) (quoting *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003)). "[I]n order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Id.* (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Jurisdictional discovery "is proper 'so long as a party demonstrates that it can supplement its jurisdictional allegations.'" *Lewis*, 568 F. Supp. 3d at54 (quoting *Diamond Chem.*, 268 F. Supp. 2d at 15). *See also GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351-52 (D.C. Cir. 2000). *See also GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000); *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000) (noting that the *GTE* court permitted jurisdictional discovery even though "plaintiffs had failed to establish a prima facie case of personal jurisdiction").

Based on the well-pled allegations, the gaps and inconsistencies in the Zhang Declaration, and PDD's public statements, SHEIN has a good faith belief that jurisdictional discovery would reveal supplemental jurisdictional facts. That is all that is required in the D.C. Circuit to seek jurisdictional discovery. *See NBC-USA*, 741 F. Supp. 2d at 60. Although SHEIN believes it has

sufficiently established personal jurisdiction over PDD, to the extent there is any question about that showing, SHEIN requests, in the alternative, the opportunity to supplement its jurisdictional allegations based on limited discovery into certain discrete issues.

*GTE* is instructive with respect to the liberal standard used in the D.C. Circuit for jurisdictional discovery. There, the court considered a request by the plaintiff to supplement its allegations through jurisdictional discovery. *See GTE*, 199 F.3d at 1351. Contrary to the robust record here, the court in *GTE* noted that "[t]he record before this court is plainly inadequate" and that "as the record now stands, there is absolutely no merit to GTE's bold claim that the parent companies and subsidiaries involved in this lawsuit should be treated identically." *Id.* at 1352. Even where the plaintiff had failed to make a *prima facie* case for personal jurisdiction—which, as explained above, is ***not*** the case here—the court permitted jurisdictional discovery because "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *Id.* at 1351; *see also In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d at 35. Here, the standard announced in *GTE* is easily met. Given the gaps and the inconsistencies in the Zhang Declaration and PDD's public statements, this is a case where "[j]urisdictional discovery will help to sort out these matters." *GTE*, 199 F.3d at 1352.[16]

SHEIN would seek jurisdictional discovery—in the form of targeted Requests for Production, Interrogatories, and a Rule 30(b)(6) deposition—on the following issues related to the

---

[16] Notably, the standard used by the D.C. Circuit, as described by the *GTE* court, is significantly more liberal than the standard employed by the Seventh Circuit, which is what the court used in the cases pending in the Northern District of Illinois. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (finding that, before jurisdictional discovery should be permitted, a plaintiff must, at minimum, "establish a colorable or prima facie showing of personal jurisdiction" over the defendant).

alter ego and agency theories of personal jurisdiction and the inconsistencies and contradictions in

the Zhang Declaration when compared with PDD's public statements:

- The accuracy and supporting documentation for PDD's statements to the SEC in its annual filings;

- Whether PDD fails to maintain separate corporate minutes or records for its subsidiaries;

- Whether PDD fails to maintain corporate formalities with respect to its subsidiaries;

- Whether and to what extent PDD has operations of its own, including its oversight and authority over its subsidiaries;

- Whether PDD has employees and the oversight and authority those employees have over PDD's subsidiaries;

- Whether PDD commingles funds or other assets with WhaleCo or its other subsidiaries and the extent to which PDD funds or subsidizes WhaleCo's operations;

- Whether PDD has diverted the funds of one subsidiary to another for purposes of operating Temu;

- Whether WhaleCo and the other PDD subsidiaries are operated as mere divisions of the parent, specifically with respect to how merchants interact with PDD's platforms, the role that PDD's subsidiaries besides WhaleCo play in Temu's operations, and how orders placed on Temu are fulfilled;

- Whether PDD's subsidiaries are operated exclusively in the interest of the parent, including with respect to PDD's share of profits generated by its subsidiaries and whether PDD has caused its subsidiaries to become undercapitalized;

- The transfer of personnel back and forth between PDD and its subsidiaries and affiliates, specifically with respect to, but not limited to, the individuals identified in the Complaint;

- Whether there has been sharing of officers between PDD and its subsidiaries or the presence of interlocking directorates.

SHEIN would also seek jurisdictional discovery related to PDD's dealings in the United

States generally to supplement its argument that PDD is subject to this Court's jurisdiction

pursuant to Rule 4(k)(2).

## CONCLUSION

For the foregoing reasons, SHEIN respectfully requests that PDD's Motion to Dismiss be denied or, in the alternative, that SHEIN be permitted to seek jurisdictional discovery to supplement its allegations.

Dated:  November 20, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


*/s/ Michael E. Williams*
William Burck
williamburck@quinnemanuel.com
Michael D. Bonanno
mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
(202) 538-8000

Michael E. Williams (*pro hac vice*)
michaelwilliams@quinnemanuel.com
John B. Quinn (*pro hac vice*)
johnqunn@quinnemanuel.com
Kevin Y. Teruya (*pro hac vice*)
kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Andrew H. Schapiro (*pro hac vice*)
andrewschapiro@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

*Attorneys for Plaintiff*

*ROADGET BUSINESS PTE. LTD.*