**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROADGET BUSINESS PTE. LTD.,

     *Plaintiff*,

     v.

PDD HOLDINGS INC. et al.,

     *Defendants*.

Civil Action No. 24-2402 (TJK)

<u>**MEMORANDUM OPINION**</u>

Plaintiff, known as Shein, operates an online marketplace that offers low-priced fashion and lifestyle products through a website and mobile application. Defendant WhaleCo Inc. runs a competing, discount-driven online platform—Temu—selling similar consumer goods. Each platform has accused the other of engaging in unlawful, multifaceted campaigns to interfere with the other's competitive posture. After WhaleCo sued Shein in a separate case before this Court, Shein now countersues WhaleCo and its corporate parent, PDD Holdings Inc. ("PDDH") for various claims under federal and District of Columbia law. On Shein's telling, Temu owes its rapid commercial success in the United States to its relentless pursuit of low prices, made possible only by a scheme of trade secret theft, intellectual property right infringement, false advertising, and other unlawful acts. PDDH moves to dismiss for lack of personal jurisdiction, and WhaleCo moves to dismiss a sliver of Shein's 16-count complaint for failure to state a claim. For the reasons below, the Court will grant PDDH's motion and grant in part and deny in part WhaleCo's.

## I.    Background

### A.    Factual Background

According to the complaint, Shein is a global online fashion and lifestyle retailer that "has

spent years" building its SHEIN brand into an international e-commerce platform offering a variety of fashion and other products through its website and mobile application, including in the United States. ECF No. 1 ("Compl.") ¶¶ 1, 17. In May 2022, Shein's mobile app allegedly was the most downloaded app in the United States, *id.* ¶ 1, and as of the filing of the complaint, Shein had over 33 million followers on Instagram and nearly 10 million followers on TikTok, *id.* ¶ 57. Shein says it is "one of the most popular" online fashion and "lifestyle brands" worldwide. *Id.* ¶ 55.

Shein attributes much of its "success" to its ability to "anticipate and create consumer demand." Compl. ¶ 45. It uses a "data-driven approach" to design and market its products, testing small batches of design items, monitoring customer feedback, and restocking products in high demand. *Id.* ¶ 2. That model, facilitated by a carefully cultivated supplier network, permits Shein to "quickly identify" and respond to "emerging trends" and "to keep prices low by minimizing excess inventory." *Id.* ¶¶ 2–3. Shein allegedly captures information about its top-selling and most popular styles, along with internal pricing information, in a "highly confidential" dataset—its "Best Seller Data." *Id.* ¶ 46–47. Shein also employs various creators who design its "on-trend, stylish products," along with photographers who photograph them for display on its website and app, and Shein owns copyrights in both the photographs and the designs. *Id.* ¶¶ 50–52. And although Shein began by selling "affordable" clothing under the SHEIN brand only, it has since expanded its offerings to include accessories, beauty products, and home goods, which it sells both under the SHEIN brand and under "increasingly popular" affiliate brand names like ROMWE and LUVLETTE. *Id.* ¶ 56. Shein owns several trademark registrations for the SHEIN brand and its affiliate brands, *see id.* ¶¶ 60–62, and consumers allegedly associate all these brands with "the sale of high-quality fashion and home goods at a fair price," *id.* ¶ 58.

In the fall of 2022, Defendant WhaleCo, Inc. launched its Temu-branded rival platform in the United States. Compl. ¶¶ 5, 64.[1] Temu functions as an "online marketplace" where independent third-party sellers sell their own goods. *Id.* ¶ 64. Within two years, Temu gained 150 million users and generated a gross merchandise volume of $20 billion in just the first half of 2024. *Id.* ¶¶ 5–6. But according to the complaint, it did not *earn* its "foothold" in the U.S. market. *Id.* ¶ 6. Instead, it has allegedly "ripped off the SHEIN brand" and used a variety of "unlawful means" to compete with Shein. *Id.* ¶¶ 4, 64.

For example, Shein alleges that Temu has "stolen" Shein's Best Seller Data, shared it with hundreds of suppliers in an online chat, and then "directed" them "to copy" Shein's "most popular products" and sell knock-off versions on Temu. Compl. ¶¶ 9, 65, 69. It allegedly also used or "instructed" its sellers to use copyrighted images of Shein products as promotional images on the Temu website and app, *id.* ¶ 10, and "refuses" to let sellers "discontinue the sale of infringing products" on Temu, even when sellers request such removal, *id.* ¶ 81. Shein alleges, moreover, that Temu uses the SHEIN trademark (or close variations, like "She/in") in online advertisements, including sponsored advertising on Google, which suggest that "authentic" Shein merchandise is sold on Temu, but when consumers click on the ads, they are directed to Temu's website, which offers no SHEIN-branded products for sale. *Id.* ¶¶ 11–12, 100–102. Thus, Temu purportedly misleads consumers to believe that it is associated with Shein—or, at a minimum, that Shein-branded products are sold on Temu. *Id.* ¶ 104. And at the same time, Temu drives consumer traffic away

---

[1] WhaleCo is a Delaware corporation doing business under the brand name Temu and is a wholly-owned, indirect subsidiary of PDDH. Compl. ¶ 19 & n.1. Although the complaint refers to WhaleCo as Temu, it also notes that "Temu is the name of the website and mobile application as well," and the allegations do not distinguish between Temu, the defendant, and Temu, the platform. *Id.* n.1. The parties in their briefing refer to the defendant as WhaleCo, so the Court does so as well when referencing the parties' arguments. But in this section, the Court recites the allegations as they appear in the Complaint.

from Shein's platform. *Id.* ¶¶ 100, 106. Temu allegedly also "impersonat[es]" Shein on the social media platform X (formerly Twitter), creating "fake" accounts that use the SHEIN mark—for instance, by using the handle @SHEIN_USA—to "promote its own website" and to "trick consumers" into downloading its mobile app. *Id.* ¶¶ 107–08, 114–117. On top of that, Temu allegedly tries to "mimick[]" Shein's online marketing strategies—partnering with influencers and fashion bloggers to promote its brand. *Id.* ¶ 136–37. But "rather than merely promoting" its own brand, Temu has "instructed its paid" influencers to "disparage" Shein's products. *Id.* ¶¶ 13, 137. It has provided its influencers with "guidelines" requiring them to claim that Temu's products "are cheaper and of higher quality" than Shein's, which Shein says is "false." *Id.* ¶¶ 13, 138. And "several" of them have allegedly followed those instructions. *Id.* ¶ 140. For example, one influencer (with over 137,000 followers) allegedly posted a series of pictures of herself wearing different Temu apparel with the caption, "Shein Alternatives, cheaper but way better quality! Check Temu.com out! So freakin cute and so freakin cheap!" *Id.* ¶¶ 141–42; ECF No. 1-23.

According to the complaint, Temu's business model depends on "squeez[ing] prices to rock bottom levels." Compl. ¶ 77. It does so, says Shein, by effectively forcing its sellers to set below-cost prices, resulting not only in "minimal profit" to the sellers but also in losses to Temu. *Id.* ¶ 78. Temu allegedly "minimizes these losses by selling infringing, counterfeit, and sub-standard products." *Id.* ¶ 7. And, according to Shein, any remaining losses are "absorbed" by WhaleCo's parent company, PDDH—a Cayman Island corporation with its principal place of business in Ireland. *Id.* ¶¶ 18, 22, 78. Indeed, Shein alleges that PDDH not only "subsidize[s]" Temu's unprofitable business model but also "operates and controls" Temu. *Id.* ¶¶ 18, 24. That is, on Shein's account, WhaleCo operates the Temu platform in the United States "under the direction and control and as an agent and alter ego of PDD." *Id.* ¶ 19. PDD also "own[s]" and "control[s],"

directly or indirectly, a large web of other companies ("Temu Group Defendants"), *id.* ¶¶ 20, 26 and, according to the complaint, PDD "operates the Temu Website and App through" these companies, *id.* ¶ 26; *see id.* ¶ 29.  Temu, Shein says, "relies" on PDDH "for its business model"; its product pricing does not "reflect the cost of marketing and shipping" its products, and the only reason it can offer "very low prices" is that PDDH swoops in to cover its "massive" losses.  *Id.* ¶ 24; p. 2.

### B.    Procedural Background

In December 2023, WhaleCo sued Shein and one of its subsidiaries in this Court, asserting claims for, among other things, copyright infringement, trade secret misappropriation, trade dress infringement, and various antitrust violations.  *See WhaleCo Inc. v. Shein Tech. LLC*, No. 23-cv-3706 (D.D.C. Dec. 13, 2023), ECF No. 1.

Soon after, Shein sued WhaleCo, PDDH, and the Temu Group Defendants, to hold these defendants "accountable" for a systematic campaign of allegedly unlawful conduct designed to unfairly compete with Shein in the U.S. market.  ECF No. 1 at 1.[2]  Shein asserts federal claims for misappropriation of trade secrets under 18 U.S.C. § 1381 et seq. (Count 1); copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement under 17 U.S.C. § 101 et seq. (Counts 3–6); trademark counterfeiting, trademark infringement, contributory trademark infringement, and vicarious trademark infringement under 15 U.S.C. § 1114 (Count 7–10); trademark dilution under 15 U.S.C. § 1125(c) (Count 11); unfair competition and false designations of origin under 15 U.S.C. § 1125(a)(1)(A) (Count 12);

---

[2] The Temu Group Defendants, named in the complaint as Does 1-20, "are an interrelated corporate web of parents, subsidiaries, sister companies, offshore holding companies, variable interest entities, and other affiliated entities," the operations of which PDDH allegedly "controls." Compl. ¶ 20.  Shein identifies by name several of these entities which it suspects belong to this group, *see id.*, but—as best the Court can tell—none has been served.

and false advertising and contributory false advertising under 15 U.S.C. § 1125(a)(1)(B) (Counts 14–15). Compl. ¶¶ 147–56, 167–245, 254–66. Shein also brings claims for trade-secret misappropriation and unfair competition under D.C. law (Counts 2 and 13). *Id.* ¶¶ 157–66, 246–53. Finally, it asserts one claim for product disparagement and trade libel under Massachusetts law (Count 16). *Id.* ¶¶ 267–71.

PDDH and WhaleCo each move to dismiss. *See* ECF Nos. 36, 38. PDDH moves under Federal Rule of Civil Procedure 12(b)(2) to dismiss the complaint for lack of personal jurisdiction. WhaleCo, for its part, moves under Rule 12(b)(6) to dismiss six of the counts—those for false advertising and contributory false advertising, product disparagement, misappropriation of trade secrets (under federal and D.C. law), and trademark dilution.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of making a "prima facie showing of the pertinent jurisdiction facts" to establish personal jurisdiction. *Md. Dig. Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 86 (D.D.C. 2019) (emphasis removed and citation omitted). Conclusory allegations are not enough to satisfy that burden—"the plaintiff 'must allege specific acts connecting [each] defendant with the forum.'" *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 107–08 (D.D.C. 2018) (citation omitted). When evaluating a 12(b)(2) motion, "the Court is not limited to the four corners of the operative complaint" and "may receive and weigh affidavits and other relevant matter to assist in determining jurisdictional facts." *Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 37 (D.D.C. 2017) (citation omitted). If a defendant's "affidavits contradict the plaintiff's prima facie case that personal jurisdiction exists, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Flynn v. R.D. Masonry, Inc.*, 736 F. Supp. 2d 54, 58 n.3 (D.D.C. 2010) (cleaned up). And though the Court must resolve factual disputes in the plaintiff's favor, it need not accept inferences unsupported by

the facts. *IMAPizza*, 334 F. Supp. 3d at 108.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though "a court must accept as true all of the allegations contained in a complaint," "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Rather, a claim is "plausible when it contains factual allegations that, if proved, would 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration in original) (quoting *Twombly*, 550 U.S. at 556). And the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.    Analysis

### A.    PDDH's Motion to Dismiss

PDDH moves to dismiss under Rule 12(b)(1), arguing that the Court lacks personal jurisdiction over it based on its own contacts with the District or the United States, and that WhaleCo's contacts cannot be imputed to it. The Court agrees.

In cases involving a foreign defendant like PDDH, courts may not exercise personal jurisdiction unless that defendant has "minimum contacts with the relevant forum," such that maintaining "the suit does not offend traditional notions of fair play and substantial justice." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 817 (D.C. Cir. 2012) (citation omitted); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Personal jurisdiction can be either general or specific. General jurisdiction exists "when a defendant is 'essentially at home' in the State." *Ford Motor Co. v.*

*Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (cleaned up).  And specific jurisdiction turns on whether the defendant's purposeful actions toward the forum sparked the litigation.  *See id.* at 359; *Burger King v. Rudzewicz*, 471 U.S. 462, 480 (1985).  Additionally, if the plaintiff's claim "arises under federal law" and "the defendant is not subject to jurisdiction in any state's court of general jurisdiction, a court may exercise personal jurisdiction under the federal long-arm statute, Rule 4(k)(2), if "due process requirements are met."  *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 21 (D.D.C. 2017), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018).

Shein does not contend that the Court has general jurisdiction over PDDH.  Nor could it, as PDDH is incorporated in the Cayman Islands and has its principal place of business in Ireland.  Compl. ¶ 18; ECF No. 44-1 at 23.  And while, at first blush, Shein's complaint appears to assert specific jurisdiction based on PDDH's *own* contacts with the District of Columbia, *see* Compl. ¶ 38, Shein disavows that theory in response to PDDH's motion to dismiss, which argues, among other things, that Shein fails to establish jurisdiction under D.C.'s long-arm statute based on PDDH's contacts with this forum.  *See* ECF No. 38-1 at 15–19.  Shein says those arguments "miss[] the mark."  ECF No. 43 at 7.  As such, the Court "treats the issue of [specific] jurisdiction" based on PDDH's *own* contacts with this District "as conceded."  *Mills v. Anadolu Agency NA, Inc.*, 19-cv-3061 (EGS), 2022 WL 2374669, at *3 (D.D.C. Apr. 28, 2022), *rev'd and remanded on other grounds*, 105 F.4th 388 (D.C. Cir. 2024).

Instead, to show specific jurisdiction, Shein relies mainly on a theory of imputed contacts, an "exception" to the "general rule" that a "corporation's contacts with a given forum may not be attributed to an affiliated corporation."  *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 31 (D.D.C. 2012) (citation omitted).  Indeed, imputing a subsidiary's contacts—here, WhaleCo's— to a parent is proper only in "special circumstances," as courts "presume the separateness of legally

distinct entities." *Id.* Shein says this case fits that narrow exception because, on its account, PDDH is WhaleCo's "alter ego" or its "agent." As a fallback, Shein argues for specific jurisdiction under Rule 4(k)(2). But the Court agrees with PDDH that Shein fails to carry its burden of establishing personal jurisdiction under any of these theories.

### 1.    Shein Has Not Shown that WhaleCo is PDDH's "Alter Ego"

Shein acknowledges that PDDH is a Cayman Island holding company and that two intermediary subsidiaries separate it from WhaleCo. *See* Compl. ¶¶ 18, 26; PDDH Apr. 25, 2024, Annual Report, ECF No. 44-1 at 10. So for the Court to disregard their separate identities under an alter ego theory, Shein must show that the "corporate veil" between these two companies "should be pierced, at least for jurisdictional purposes." *Glycobiosciences, Inc. v. Vichy Lab'ys, S.A.*, No. 22-cv-1264 (BAH), 2023 WL 157322, at \*4 (D.D.C. Jan. 11, 2023). That "burden" is a "heavy" one. *Sapieyevski v. Live Nation Worldwide, Inc.*, No. 18-cv-830 (TJK), 2020 WL 4432119, at \*3 (D.D.C. July 31, 2020). Indeed, the steep climb Shein faces is steeper still because "it is generally improper to impute the contacts of a subsidiary to a corporate parent that is a holding company," as "the subsidiary is not performing a function that the parent would otherwise have to perform itself." *Khatib*, 846 F. Supp. 2d at 33. To prevail, Shein must show "(1) unity of ownership and interest between the entities and (2) either use of the corporate form to perpetrate a fraud or wrong, or other considerations of justice and equity" that justify veil-piercing. *Khatib*, 348 F. Supp. 2d at 31 (quoting *Doe v. United States*, 797 F. Supp. 78, 85 (D.D.C. 2011)). Put another way, Shein must show that PDDH "so dominate[s]" WhaleCo "as to negate its separate personality, making the exercise of jurisdiction" over PDDH "fair and equitable." *Atlantisgas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 48 (D.D.C. 2003). To evaluate whether this standard is met, courts consider several factors, including whether "corporate formalities have been

disregarded" or "corporate funds and assets . . . extensively intermingled," whether the subsidiary is undercapitalized, and whether it is "fraudulent[ly] use[d]" to "protect" the parent "from the claims of creditors." *Doe*, 797 F. Supp. 2d at 85 (citation omitted).

Shein has not made the "strong showing" required. *Sapieyevski*, 2020 WL 4432119, at *3. On the first prong of the alter-ego inquiry about unity of ownership and interest, Shein's allegations are conclusory, refuted by PDDH's declarations, or insufficient as a matter of law—some all the above. On the second prong—use of the corporate form to perpetrate a fraud or wrong—Shein fails to allege specific facts to show that dismissing PDDH would sanction a fraud or promote injustice.

Start with the unity of ownership and interest inquiry. *See* ECF No. 43 at 18–19. The complaint alleges that PDDH "owns and operates" the Temu "marketplace," Compl. ¶ 38, and "dominates its subsidiary"—WhaleCo—whose "existence is simply a formality," *id.* ¶ 40. It states that PDDH "is heavily involved in directing the operations of Temu and the Temu Group Defendants." *Id.* ¶ 29. "On information and belief," Shein says, PDDH and these entities "fail to observe corporate formalities, including by sharing the same small group of officers and directors, failing to maintain separate employment and financial records, sharing office space and payroll accounts, and regularly commingling funds." *Id.* ¶ 30. It also alleges that "PDD, Temu, and one or more Temu Group Defendants keep insufficient corporate records of transactions among the Temu Group Defendants," *id.*, and that "[i]ndividuals in charge of Temu's business" either "hold or formerly held key positions at Pinduoduo," which Shein alleges PDDH "previously operated as," *id.* ¶¶ 18, 31. The complaint also says that "PDD owns, leases, operates, or controls, either directly or through direct or indirect subsidiaries," certain "fulfillment centers and/or return centers in the

United States for products sold on" Temu along with "warehouses where Temu Group Defendants package, ship, and export products supplied by third-party sellers" on Temu.  *Id.* ¶¶ 41, 43.

These allegations are insufficient.  For starters, most just recite the factors relevant to the unity-of-ownership-and-interest prong without alleging specific facts in support.  *See* Compl. ¶¶ 29, 30–31, 37.  But "simply parrot[ing]" pertinent "factors" is not enough to survive a motion to dismiss.  *Thompson v. RCX, LLC*, No. 21-cv-03386 (CJN), 2023 WL 2162626, at *2 (D.D.C. Feb. 22, 2023) (citing *Iqbal*, 556 U.S. at 678).  That aside, PDDH supports its motion with a sworn declaration from its Director of Investor Relations, Kairu Zhang, that refutes Shein's allegations.  *See* ECF No. 38-2 ("Zhang Decl.").  Zhang states that PDDH, as a holding company, "does not operate any substantive business" and, in fact, "has no employees."  Zhang Decl. ¶¶ 3–4.  Nor does PDDH "operate the Temu e-commerce marketplace" or "any other e-commerce business," let alone manage WhaleCo's "day-to-day operations" or "make decisions regarding the operation of Temu."  *Id.* ¶¶ 6, 22.  Instead, he states, WhaleCo "operates Temu" and does its "marketing, advertisements, and decision-making" in the United States.  *Id.* ¶ 16.  WhaleCo also "directly hires, pays, and manages its employees in the United States" and "leases its own office space."  *Id.* ¶ 17. PDDH, on the other hand, "does not—and has never contracted with another to—lease, own, control, or operate any real property" or other "place of business" anywhere in the United States.  *Id.* ¶ 10.  Nor does PDDH "share" with WhaleCo any "articles of incorporation, bylaws, annual reports, board meetings, bank accounts, payroll accounts, office space, financial records, employment records, [or] accounting records."  *Id.* ¶ 18.  The two entities also do "not share any directors, officers, or employees."  *Id.* ¶ 19.

Thus, PDDH's declaration rebuts the allegations in the complaint that a "unity of interest and ownership" exists between it and WhaleCo.  *See Blount v. U.S. Sec. Assocs.*, 930 F. Supp. 2d

191, 196 (D.D.C. 2013) (concluding that "the record does not support" exercising alter-ego juris-diction where defendant submitted "declaration" contradicting plaintiffs' allegations).   In re-sponse, Shein points to "statements" PDDH made "in its 2023 Form 20-F filed with the SEC" that purportedly "undermine" PDDH's declaration and "support [its] alter ego theory of personal juris-diction."  ECF No. 43 at 21; *see id.* at 9–13, 21–26.[3]  But nothing in the SEC filing contradicts the declaration or otherwise bolsters Shein's alter-ego allegations.  Shein cherry-picks statements from the form that supposedly undermine Zhang's representation that PDDH "does not operate any substantive business," does not "operat[e] and control" the Temu platform, and "has no employ-ees."  ECF No. 43 at 11, 21–22.  For example, Shein says that the Form 20-F states that "*we* conduct *our* business through a number of operating entities incorporated across the globe," that "consumers primarily access *our services* through Pinduoduo and Temu mobile apps," and that PDDH "is a multinational commerce group that *owns and operates a portfolio of businesses*."  ECF No. 43 at 21–22 (emphases altered); *see* ECF No. 44-1 at 9, 36, 208.  The form also states that "*we* had a total of 17,403 employees" in 2023.  ECF No. 44-1 at 208.

But none of these statements gets Shein far because they merely reflect the "common busi-ness practice" of consolidating affiliated entities' activities in SEC filings.  *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 50 (D.D.C. 2018).  Indeed, as PDDH points out, the SEC mandates that publicly traded companies file financial statements consistent with Generally Ac-cepted Accounting Principles, and these rules "require parent corporations to consolidate subsidi-aries" in SEC filings.  *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117,

---

[3] A Form 20-F must be submitted to the SEC once a year by all foreign private issuers of equity shares listed on a U.S. exchange.  *See Accessing the U.S. Capital Markets – A Brief Over-view for Foreign Private Issuers*, SEC.gov, https://perma.cc/CDZ8-UKCJ (last accessed Sept. 9, 2025).

121 (2d Cir. 1984) (citation omitted); ECF No. 49 at 16.  That is why PDDH's Form F-20 expressly defines "PDD Holdings," "we," "us," "our," "the Company," and "our company" to include "PDD Holdings, Inc." *and* "its direct and indirect subsidiaries."  ECF No. 44-1 at 6.  And that is also why "courts routinely find that such collective descriptions are insufficient to impute the contacts of a subsidiary to its corporate parent."  *Khatib*, 846 F. Supp. 2d at 33; *see, e.g.*, *Vasquez*, 302 F. Supp. 3d at 49–51 (D.D.C. 2018) (statement in SEC form that "*we* operated 456 stores" did not show parent company's alleged "direct control of stores," as such consolidation is "common business practice" and form "expressly" noted that "we" included subsidiaries).  So these statements in the Form 20-F do not, as Shein suggests, undermine the statements in PDDH's declaration.  If anything, it bolsters them; the form is replete with references to PDDH's status as a "holding company" that has "no operations of its own" and "does not conduct operations directly."  ECF No. 44-1 at 10, 316.[4]

Shein also contends that the Form 20-F contradicts Zhang's representation that PDDH "does not derive revenue from the sale of goods or services," Zhang Decl. ¶ 13, because PDDH "disclosed" that it "takes all the profits generated by its subsidiaries, suggesting that the

---

[4] In a similar vein, Shein cannot rest on the statement sourced from PDDH's website that it "owns and operates a portfolio of businesses, including Temu."  Compl. ¶ 23; ECF No. 1-5 at 3. As another court has explained in rejecting an attempt to impute WhaleCo's contacts to PDDH, personal jurisdiction "must be 'based on actual evidence of control'" and Shein cannot carry its burden of showing that PDDH substantially controls WhaleCo by citing "nothing more than . . . promotional statements from a public website [that] do not precisely convey the operative corporate structure."  *Wang v. PDD Holdings, Inc.*, No. 23-cv-4760, 2024 WL 3177892, at *4 (N.D. Ill. June 26, 2024); *see also LaSalle Nat. Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000) ("general" statements on parent company's website "are not evidence of how the corporation actually operates"); *Payoda, Inc. v. Photon Infotech, Inc.*, No. 14-cv-4103, 2015 WL 4593911, at *3 (N.D. Cal. July 30, 2015) (website "marketing puffery carries no weight in establishing whether a parent and its subsidiary are in fact alter egos").

subsidiaries operate as mere divisions of [its] larger business." ECF No. 43 at 22. But Shein again ignores that PDDH has to consolidate subsidiaries in SEC filings, and nothing in the income statement table it cites shows any profit transfer from WhaleCo to PDDH. *See* ECF No. 49 at 26. Plus, Zhang attests in a supplemental declaration that WhaleCo has never paid a dividend or transferred any profits to PDDH. ECF No. 49-4 ("Supp. Zhang Decl.") ¶ 10. In any event, "own[ing]" shares and "receiving profits in the form of dividends . . . does not alone create an alter-ego relationship." *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 717 F. Supp. 3d 1, 11 (D.D.C. 2023), *rev'd and remanded on other grounds*, 143 F.4th 496 (D.C. Cir. 2025). The same goes for intercompany loans or "financial support"—which Shein also claims PDDH provides, and which Zhang also disclaims. *See* ECF No. 43 at 25; Supp. Zhang Decl. ¶ 10. Any such "financial transfers," even if they had occurred, "are part and parcel with normal parent-subsidiary behavior." *Holland v. Cardem Ins. Co., LTD*, 2021 WL 7448018, at *11 (D.D.C. Dec. 7, 2021), *report and recommendation adopted*, No. 19-cv-2362 (TSC), 2023 WL 5846673 (D.D.C. Sept. 11, 2023); *see also Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) ("The existence of intercorporate loans does not establish the requisite dominance" for purposes of piercing the corporate veil).

Shein's remaining allegations do not move the needle either. It alleges that PDDH "controls and dominates its subsidiary Temu," whose "existence is simply a formality," and that PDDH "[o]perat[es] Temu and the Temu Group Defendants as mere instrumentalities and alter egos." Compl. ¶¶ 32, 40. But conclusory allegations like these are not "presum[ed]" true and cannot support "a plausible claim of alter ego liability." *Kelleher v. Dream Catcher*, 221 F. Supp. 3d 157, 159 (D.D.C. 2016). Shein's allegation that "Temu leverages" PDDH's "vast and deep network of merchants[] and logistic partners" falls equally short. Compl. ¶ 22. As another court held in

dismissing PDDH on jurisdictional grounds, that statement (which is found on Temu's website) reflects "the typical parent-subsidiary relationship, as the parent 'may provide administrative services for its subsidiary' without diminishing 'the separateness of the two entities for purposes of personal jurisdiction.'"  *Wang*, 2024 WL 3177892, at *4 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000)).  And as for Shein's claim that PDDH, directly or through unidentified subsidiaries, owns or operates certain "fulfillment centers" or "warehouses" involved in processing orders for Temu customers, Compl. ¶¶ 41, 43, the Zhang declaration contradicts these allegations, *see* Zhang Decl. ¶ 4–5, 10.  Besides, it is unclear how other PDDH-affiliates' role in fulfilling and shipping products to Temu customers is relevant to showing that *WhaleCo* is PDDH's alter ego.  *See* Compl. ¶ 29 ("Shanghai Yugan and/or its subsidiaries . . . package and distribute the products sold on" Temu).[5]

At bottom, Shein fails to allege sufficient level of control by PDDH over WhaleCo, and the uncontradicted declarations submitted by Zhang explain that PDDH does not exercise any control over WhaleCo's activities.  So the Court need not reach the second prong of the alter-ego test.  But even if Shein did not stumble at step one, it would do so at step two because the complaint fails to allege specific facts showing that dismissing PDDH from this case "would sanction a fraud

---

[5] Shein also takes a shot at Zhang's credibility, arguing that he "raises more questions than [he] answers" by identifying himself as PDDH's Director of Investor Relations while attesting that PDDH "has no employees."  ECF No. 43 at 9.  But as Zhang explains in response, he is not employed by PDDH, and the company must have a designated relations contact.  Supp. Zhang Decl. ¶ 4; ECF No. 49 at 20 n.1.  Nor is it inconsistent for Zhang to state that PDDH and WhaleCo do not share bylaws even though "PDD's investor website contains a 'Code of Business Conduct and Ethics' that applies to 'Pinduoduo Inc. and its subsidiaries and affiliates.'"  ECF No. 43 at 13 n.2.  Indeed, shared codes of ethics are typical of parent-subsidiary relationships.  ECF No. 49 at 23 (citing cases); *see Triple S Farms, LLC v. DeLaval, Inc.*, No. 22-cv-1924, 2024 WL 1308822, at *13 (D. Minn. Mar. 27, 2024) (explaining that a "parent's implementation . . . of a code of conduct, and code of ethics governing its subsidiaries" is "consistent with sound business judgment rather than alter ego" (citation omitted)).

or promote injustice." *Shapiro, Lifschitz & Scharm, P.C. v. Hazard*, 90 F. Supp. 2d 15, 23 (D.D.C. 2000).

WhaleCo, as noted, is not challenging jurisdiction and remains a defendant. So dismissing PDDH does not leave Shein without a path to pursue its claims. Nor does Shein plead sufficient facts to show that it would be unable to recover a judgment against WhaleCo. *See United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 37 (D.D.C. 2016). Although Shein says that "PDDH has purposely set up WhaleCo in a manner in which it is severely undercapitalized" such that treating them as separate entities would be unjust, ECF No. 43 at 26 (citing Compl. ¶ 33), PDDH has filed under seal a copy of WhaleCo's balance sheet that contradicts that allegation, ECF No. 48-2; *see also* Zhang Decl. ¶ 21 ("PDDH has not caused WhaleCo to become inadequately capitalized or insolvent."). Nor can Shein rely on its claim that PDDH allegedly "subsidiz[es]" WhaleCo's "costs and losses." Compl. ¶ 7, 24, 30. Putting aside that Zhang refutes that allegation, *see* Zhang Decl. ¶ 21, such conduct "would not operate to [Shein's] detriment" and so would not demonstrate fraud or injustice, *Bd. of Trs., Sheet Metal Workers' Loc. Union 102 Health Ben. Fund. v. Gibson Bros.*, No. 82-cv-329, 1982 WL 2079, at *6 (D.D.C. Oct. 27, 1982).

Trying a different angle, Shein says that PDDH "publicly touts that it is beyond the reach of U.S. laws, including any judgments that may be entered against it." ECF No. 43 at 26–27; Compl. ¶ 34. It selectively quotes language from PDDH's Form 20-F advising American Depository Share ("ADS") holders that it "may be difficult . . . to enforce" judgments "obtained in U.S. courts based on the civil liability provisions of the *U.S. federal securities laws*" because "most of our current directors or officers" and their "assets" are located outside the United States. ECF No. 44-1 at 92 (emphasis added). PDDH also cautions that Cayman Islands and Chinese courts may not enforce judgments "predicated upon" violations of U.S. securities laws. *Id.* Shein does not

explain why these standard risk disclosures—which on their face relate only to securities claims brought against PDDH by ADS holders—are relevant at all.

In sum, Shein has failed to allege sufficient facts to show that WhaleCo is PDDH's alter ego, so the Court has no basis to exercise personal jurisdiction over PDDH under that theory.

### 2.    Shein Has Not Shown that WhaleCo is PDDH's "Agent"

Alternatively, Shein argues PDDH can be haled into court based on WhaleCo's contacts because WhaleCo is PDDH's "agent." ECF No. 43 at 28. But this theory of personal jurisdiction is just as weak. "An agency relationship" generally exists when one person "authorize[s] another to act on his behalf subject to his control and the other consent[s] to do so." *Penick v. Frank E. Basil, Inc. of Delaware*, 579 F. Supp. 160, 165 (D.D.C.), *aff'd*, 744 F.2d 878 (D.C. Cir. 1984) (citation omitted). But "all corporations must necessarily act through agents." *Khatib*, 846 F. Supp. 2d at 32 (citation omitted). So to impute a subsidiary's contacts to its parent for jurisdictional purposes, a plaintiff must show that the subsidiary's "activities" effectively "amount to doing business of the parent." *Id.* (citation omitted). And that in turn requires "showing that the subsidiary functions as the corporation's representative," meaning "it performs services that are sufficiently important to the foreign" parent such that its "own officials would undertake to perform" them if the parent had no "representative" to do so. *Id.* (citation omitted). But for many of the same reasons Shein's alter-ego theory fails, this one does too.

Shein's agency theory rests mostly on a series of allegations mimicking the legal standard. The complaint alleges that "WhaleCo operates the Temu Website and App" "as an agent and alter ego of PDD[H], with actual, apparent, and ostensible authority from" its parent, Compl. ¶ 19; ECF No. 43 at 29, and variations of that allegation abound, *see* Compl. ¶ 32 (PDDH "operat[es] Temu and the Temu Group Defendants as mere instrumentalities"); ¶ 39 (PDDH "operates Temu as its

agent and a mere instrumentality insofar as Temu . . . sells products . . . on behalf of PDD"); *id.*
¶¶ 18, 22, 40 (more of the same).  Although PDDH's declarant states that PDDH "has not author-
ized or directed WhaleCo to act on [its] behalf" or to "legally bind it," and that PDDH "makes" no
"decision regarding the operation of Temu," Zhang Decl. ¶ 22, Shein's "bare" agency allegations
cannot "establish jurisdiction" in any event, *Khatib*, 846 F. Supp. 2d at 33.  And Shein alleges no
specific facts to back up its assertion that WhaleCo is PDDH's agent subject to its control.  To the
extent it relies on its alter-ego allegations about PDDH's purported control over WhaleCo, *see*
ECF No. 43 at 29–32, the Court has already explained why—even if they were legally sufficient—
it need not accept them as true: PDDH has refuted them.[6]

More to the point, Shein alleges no facts suggesting that PDDH could not carry on its busi-
ness absent WhaleCo's presence in the United States.  *Khatib*, 846 F. Supp. 2d at 32.  And how
could it?  Even on Shein's own account, PDDH is a holding company.  Compl. ¶ 18.  And the
unrebutted evidence shows that, "as a holding company," PDDH "does not operate" "*any* substan-
tive business" anywhere and "has no employees," nor does it "operate the Temu e-commerce mar-
ketplace"—WhaleCo does.  Zhang Decl. ¶¶ 4, 6, 16.  So it is hard to see how PDDH "would

---

[6] For example, Shein rehashes its allegations that PDDH subsidizes WhaleCo and "takes
[its] profits," and that WhaleCo is undercapitalized.  ECF No. 43 at 31.  But these allegations are
refuted by the Zhang declaration and, in any event, "that a parent corporation finances" its subsid-
iary's "operations" is insufficient "to support a finding that the subsidiary is a mere agent of the
parent."  *Finjan LLC v. Trustwave Holdings, Inc.*, No. 20-cv-371, 2021 WL 5051147, at *12 (D.
Del. Oct. 29, 2021).

Shein also points to allegations that PDDH "promotes the Temu Website and App" during
certain U.S. holidays and "provides sellers with (and instructs them to use) image-editing soft-
ware" used to "modify infringing images," ECF No. 43 at 30 (citing Compl. ¶¶ 29), but PDDH has
refuted all these allegations as well, *see* Zhang Decl. ¶¶ 23–24.  And as for Shein's allegation that
PDDH "directed personnel located at the offices" of certain "Temu Group Defendants to steal
valuable trade secrets from Shein," Compl. ¶ 29; ECF No. 43 at 30, that has nothing to do with
any agency relationship between PDDH and WhaleCo.

undertake the activities or functions" WhaleCo "currently performs in the United States" if WhaleCo did not exist. *Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 985 (C.D. Cal. 2013) (insufficient allegations to support agency theory where subsidiary "offer[ed] services distinct from those provided" by its parent company). Instead, PDDH "could simply hold another type of subsidiary." *Khatib*, 846 F. Supp. 2d at 33. Put simply, WhaleCo "is not performing a function that" PDDH "would otherwise have to perform itself." *Id.* Thus, Shein fails to allege sufficient facts to support agency jurisdiction over PDDH.

### 3.    PDDH Is Not Subject to Jurisdiction under Rule 4(k)(2)

With no theory of imputed contacts to establish jurisdiction over PDDH, Shein falls back on Rule 4(k)(2). ECF No. 43 at 34–40. That rule allows courts to exercise personal jurisdiction over a foreign defendant if four requirements are met: (1) the plaintiff's claim arises under federal law; the defendant (2) was properly served and (3) is not subject to the jurisdiction of any single state court; and (4) "the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005); *see* Fed. R. Civ. P. 4(k)(2). But courts "rare[ly]" invoke jurisdiction under this rule. *Peters v. Est. of Qadhafi*, 2024 WL 4603907, at *4 (D.D.C. Aug. 28, 2024), *report and recommendation adopted*, No. 21-cv-516 (CKK), 2025 WL 833206 (D.D.C. Mar. 17, 2025) (citation omitted).

PDDH does not dispute that the first three predicates to invoke Rule 4(k)(2) are met here. ECF No. 38-1 at 22; ECF No. 49 at 28–31. But, it argues, Shein has not cleared the final and most important hurdle, which requires a showing that PDDH "has sufficient contacts with the United States as a whole," *Mwani*, 417 F.3d at 11, such that it had fair warning that it could be "haled into court" here, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This inquiry turns on the familiar requirement that the foreign defendant must have "purposefully directed" its

activities at the United States, and that the plaintiff's alleged injuries "arise out of or relate to" those activities." *Mwani*, 417 F.3d at 12 (citations omitted).

The Court agrees that Shein fails to meet that standard, as any relevant jurisdictional facts—most of which the Court has already discussed above—are refuted by PDDH. So while the complaint states that PDDH "owns and operates" Temu "for Northern American consumers" and "owns" or "leases" fulfillment centers or warehouses in the United States, Compl. ¶¶ 23, 1, 43, PDDH's unrebutted evidence shows that PDDH does none of these things, Zhang Decl. ¶¶ 6, 16, 24. Shein also alleges that PDDH "has purposely directed its business activities" at the United States, "including by encouraging influencers to make false and deceptive statements on social media to promote Temu's goods and services to U.S. residents," *id.* ¶ 41, by "promot[ing] the Temu Website and App during major U.S. media events and holidays," *id.* ¶ 29, and by "us[ing] advertisement targeting consumers in the United States," *id.* ¶ 39. But again, PDDH refutes these claims. According to Zhang, PDDH "is not involved in advertising or marketing for Temu," "does not direct or operate social media accounts or other websites related to Temu," and "has never promoted Temu." Zhang Decl. ¶ 23. Nor is PDDH "involved in communications with social media influencers to promote Temu." *Id.* PDDH, Zhang states, does not even have a U.S. bank account or mailing address, nor does it take payments from U.S. residents in connection with sales on Temu. Supp. Zhang Decl. ¶¶ 5–7, 9.

Shein simply recites the allegations in its complaint, *see* ECF No. 43 at 36–37, but offers nothing to rebut the Zhang declaration or even hint that it is wrong. Instead, it repeats its claim that the declaration "lacks credibility given" the purported "inconsistencies" with PDDH's SEC filing, ECF No. 43 at 38, but as explained, there are none. Thus, Shein has not shown that PDDH has purposely directed any activities at the United States.

Apart from flunking the minimum-contacts requirement, Shein also fails to show how exercising specific jurisdiction over PDDH would comport with traditional notions of fair play and substantial justice. *Glycobiosciences*, 2023 WL 157322, at *4. The Court weighs the "forum state's interest in adjudicating the dispute" against "the defendant's burden of litigating in a distant forum." *Bancoult v. McNamara*, 214 F.R.D. 5, 13 n.8 (D.D.C. 2003) (citing *World-Wide Volkswagen*, 444 U.S. at 297). As neither Shein nor PDDH are from here, the United States' interest in the dispute is slight (to say the least). *See* Compl. ¶ 17. On the other hand, PDDH would face the "severe burden of litigating in a foreign legal system." *Bancoult*, 214 F.R.D. at 13 n.8.

Shein claims that PDDH would face no such "burden" because it "actively litigated against" Shein in Illinois district court "for well over a year without any complaints or problems" and without moving to dismiss on personal-jurisdiction grounds. ECF No. 43 at 39 (citing *Roadget Business PTE Ltd. v. PDD Holdings, Inc.*, No. 22-cv-7199 (N.D. Ill. 2022)). That appears incorrect. As best the Court can tell, PDDH maintained that the Illinois court lacked jurisdiction over it, *see* Dkt. 50, and, in fact, declined to "participate in . . . TRO proceedings" to "preserve its objection to personal jurisdiction." Dkt. 70 at 1 n.1. And Shein then voluntarily dismissed the suit. *See* Dkt. 201. Moreover, in five other cases before the same court, PDDH *did* move to dismiss on personal-jurisdiction grounds, and successfully so. *See* ECF No. 38-1 at 8 n.1 & No. 49 at 22 n.3 (citing cases). All told, the record does not support the exercise of personal jurisdiction over PDDH under Rule 4(k)(2) either.

### 4.    The Court Will Deny Jurisdictional Discovery

Shein contends that the Court should allow jurisdictional discovery rather than dismiss PDDH from this suit. ECF No. 43 at 40–42. But discovery is unwarranted even under the "quite

liberal" standard for granting such a request. *App Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 329 (D.D.C. 2015) (citation omitted). Although a plaintiff need only show "that it can supplement its jurisdictional allegations through discovery," *id.* (citation omitted), courts "can" deny discovery "when the plaintiff has failed to present facts that could establish jurisdiction." *Id.* (citation omitted). So Shein must, at minimum, show that it has "a good faith belief that such discovery will enable it to show that the court has personal jurisdiction" over PDDH. *Id.* (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)). Returning to an empty well, Shein grounds its good-faith belief in the "gaps and inconsistencies in the Zhang declaration[] and PDD's public statements." ECF No. 43 at 40. As explained, though, Shein has not actually identified any inconsistencies; if anything, PDDH's SEC filing bolsters the Zhang declaration along with PDDH's arguments that jurisdiction is lacking here.

Shein likens this case to *GTE New Media Services v. BellSouth Corporation*, 199 F.3d 1343 (D.C. Cir. 2000), but that case is inapt. There, the D.C. Circuit "agree[d]" that the plaintiff was entitled to jurisdictional discovery to "supplement" the "plainly inadequate" record, which "d[id] not even" reveal "which defendants own[ed] and operate[d] which websites" that the plaintiff relied on to establish personal jurisdiction. *Id.* at 1352. Jurisdictional discovery, the Circuit said, would "help sort" that out. *Id.* And the plaintiff also "claim[ed]" it could "present new facts to bolster" one of its theories for specific jurisdiction under D.C.'s long-arm statute. *Id.* But the record here is not so opaque. Indeed, there is no ambiguity at all that PDDH is a foreign holding company that conducts no business itself and that WhaleCo, not its corporate parent, operates Temu. *See App Dynamic*, 87 F. Supp. 3d at 330. Nor has Shein shown that "jurisdictional discovery would help [it] discover anything new." *Atlantisgas Corp.*, 290 F. Supp. 2d at 53 (citation omitted). Its proposed discovery would "target inconsistencies and contradictions in the Zhang

22

Declaration," ECF No. 43 at 41–42, but for the reasons already explained, that claim does not get Shein far—or much of anywhere. Further still, Shein's proposed discovery requests either parrot the factors courts consider when assessing alter-ego or agency jurisdiction or seek information far beyond that relevant to personal jurisdiction. *See id.* at 43. Thus, Shein has "fail[ed] to describe specific ways to supplement" its jurisdictional allegations. *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023).

For all these reasons, the Court will grant PDDH's motion to dismiss and deny Shein's request for jurisdictional discovery.

### B.    WhaleCo's Motion to Dismiss

WhaleCo moves to dismiss six counts under Rule 12(b)(6). For the reasons below, the Court will grant the motion as to Shein's two claims for product disparagement and trademark dilution, but it will deny the motion as to the four claims for false advertising and trade secret misappropriation.[7]

---

[7] WhaleCo also nods to its pending action against Shein, in which Shein Technology LLC (Shein's U.S. subsidiary) moved to dismiss on the basis that WhaleCo's complaint impermissibly pled all allegations against a group of defendants—referring to "Shein" or "Defendants" throughout the complaint—and failed to connect it to the allegedly wrongful conduct. ECF No. 36-1 at 48; *see WhaleCo Inc. v. Shein Tech. LLC*, No. 23-cv-3706, ECF No. 52. Shein Technology LLC argued that it lacked notice of the claims attributable to it, requiring dismissal. The Court agreed and dismissed Shein Technology from that case. WhaleCo now says that the "same legal standard applied to WhaleCo's claims" in that case "should apply equally to Shein's claims" in this case, which—it says—would warrant dismissal of all Shein's claims here because Shein "engages in the very conduct Shein Technology LLC alleged was improper." ECF No. 36-1 at 48 (emphasis in brief). WhaleCo does not go so far as to move for dismissal on that basis. But even if it did, the Court disagrees that the "legal standard invoked" in WhaleCo's suit would require dismissal of Shein's claims against WhaleCo. *Id.* Shein's allegations are not similarly styled as WhaleCo's. Whereas WhaleCo's complaint mentions Shein Technology only four times (including in the case caption) and never explains what that entity did or how it was involved in the alleged conduct, Shein's complaint details defendants' "corporate structure" and describes each defendant's role and their involvement in the claims at issue. Furthermore, Shein's allegations distinguish between "PDD" on the one hand, and "Temu" or the "Temu Group Defendants" on the other, so "Temu" clearly refers to WhaleCo, which is now the only remaining defendant. Unlike WhaleCo's

### 1. Shein Fails to State a Claim for Product Disparagement under Massachusetts Law (Count 16)

First up is Shein's claim for product disparagement (also known as trade libel), which it asserts under Massachusetts law, as it says WhaleCo "is headquartered" there and "created" the materials giving rise to its claim there. Compl. ¶¶ 267–71 & n.37. Shein alleges that WhaleCo provided social media influencers with guidelines requiring them to make allegedly "false" and "disparaging" statements about Shein's products—that WhaleCo's products were "cheaper" and of "way better quality" than Shein's—and that "[s]everal influencers" then "published these false statements online," causing consumers to "believe" that its products "were inferior" to those sold on Temu. *Id.* ¶¶ 138–46. In Massachusetts, a plaintiff bringing a product disparagement claim must plausibly allege that the defendant "(1) published a false statement to a person other than the plaintiff; (2) 'of and concerning' the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interest was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023) (quoting *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 763 (Mass. 2013)). The Court need not wade through all these factors because it agrees with WhaleCo that Shein founders on the fifth. ECF No. 36-1 at 37–39.

Special damages are "essential" to a product-disparagement claim, *HipSaver*, 984 N.E.2d at 771, and must be pled with specificity, Fed. R. Civ. P. 9(g). They "limit[] a plaintiff's recovery to the 'pecuniary loss that results directly or immediately from the effect of the conduct of third

---

complaint, then, Shein's sufficiently "connects" WhaleCo to Shein's claims, which is all Rule 8 requires. *Bonilla-Santiago v. BLB Privatized Hous., LLC*, No. 20-cv-2524 (TSC), 2022 WL 990681, at *3 (D.D.C. Mar. 31, 2022).

persons' acting in response to the alleged disparagement.'" *Conformis*, 58 F.4th at 537 (quoting *HipSaver*, 984 N.E.2d at 772). A plaintiff can show special damages in two ways. Typically, the plaintiff must allege that the disparaging statement caused "specific loss of sales to identifiable customers." *HipSaver*, 984 N.E.2d at 772. But if the statement was so "widely disseminated" that it is impossible to identify specific customers who chose not to buy the plaintiff's products, then the plaintiff may show "that the loss of the market has in fact occurred and that no other factor caused that loss." *Conformis*, 58 F.4th at 537 (cleaned up and citation omitted). At the pleading stage, a plaintiff asserting the second theory must at least allege "facts showing an established business and the amount of sales before and after the disparaging publication, along with [facts supporting] causation." *BBJ, Inc. v. MillerCoors, LLC*, No. 12-cv-11305, 2015 WL 4465410, at *4 (D. Mass. July 21, 2015) (quoting *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002)).

Shein concedes that it identifies no customers that it lost because WhaleCo published the allegedly disparaging statements contained in the Influencer Guidelines. ECF No. 45 at 27–28. Left with the second path, Shein had to plead facts showing that those statements were spread widely and that it suffered losses that "necessarily resulted from the publication" of those statements. *HipSaver*, 984 N.E.2d at 775. Shein musters next to nothing on that score. Even assuming the disparaging remarks were widely distributed—a point of contention between the parties—the only allegation about attendant damages is that Shein was "harmed by the dissemination of the Influencer Statements because they caused consumers to believe that SHEIN-branded products were inferior in quality to products sold by Temu when this is untrue." Compl. ¶ 146. That conclusory allegation of harm is not enough. Indeed, Shein does not even allege that it lost *any* sales, let alone that any such hypothetical losses are solely attributable to WhaleCo's Influencer Statements. *See MillerCoors*, 2015 WL 4465410, at *4 (dismissing claim where plaintiff failed to

"allege facts suggesting widespread dissemination" followed by "diminution in sales").

In opposing the motion, Shein fails to salvage its claim. It argues that it did "allege[]" the requisite "harm: the Influencer Statements caused consumers to believe WhaleCo's false claims about superior quality and lower prices, *resulting in monetary damages and diverted sales*." ECF No. 45 at 28 (emphasis added) (citing Compl. ¶¶ 146, 271). But even if this were enough to plead special damages, the complaint says nothing of the sort. The cited portions state:

- On information and belief, SHEIN has been harmed by the dissemination of the Influencer Statements because they caused consumers to believe that SHEIN-branded products were inferior in quality to products sold by Temu when this is untrue. Compl. ¶ 146;

- As a result of Defendants' actions, Shein has suffered, and will continue to suffer, money damages in an amount to be proven at trial. *Id.* ¶ 271.

Neither of these statements alleges "diverted sales," let alone with the specificity required to plead special damages. *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 57 F.R.D. 528, 530 (D. Mass. 1973) (to plead "diminution" in sales, plaintiff must, among other things, allege "facts showing . . . the amount of sales for a substantial period preceding the publication" and "the amount of sales subsequent to the publication" (citation omitted)); *MillerCoors*, 2015 WL 4465410, at *4 (allegation that defendant's statement "cause[d] Plaintiffs to suffer special and general damages, including the monetary loss of many customers" insufficient).

### 2.    Shein Fails to State a Claim for Trademark Dilution (Count 11)

Next, WhaleCo argues that Shein's trademark-dilution claim fares no better because the complaint fails to allege facts showing that Shein's marks are sufficiently "famous"—the key ingredient in a federal claim for trademark dilution. *See* 15 U.S.C. § 1125(c); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 69 F. Supp. 3d 175, 219–20 (D.D.C. 2014). The Court agrees.

Whether a mark is "famous" is not "a matter of degree"—it's "either/or." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (citation omitted).  Under the federal dilution statute, fame means that a mark "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Put differently, federal law protects only "those trademarks" from dilution "that are firmly established as a 'household name'"—think "Budweiser beer, Camel cigarettes, [and] Barbie Dolls."  *Paleteria La Michoacana*, 69 F. Supp. 3d at 220.  In deciding whether allegations clear that bar, courts consider, among "all [other] relevant factors": (1) "[t]he duration, extent, and geographic reach of advertising and publicity"; (2) "[t]he amount, volume, and geographic extent of sales"; (3) "[t]he extent of actual recognition; and (4) "[w]hether the mark [is] registered."  15 U.S.C. § 1125(c)(2)(A).  The very "nature of a dilution claim itself makes it difficult to state claim to relief that is plausible on its face."  *TrueNorth Cos., L.C. v. TruNorth Warranty Plans of N. Am., LLC*, 292 F. Supp. 3d 864, 873 (N.D. Iowa 2018) (citation modified); *see also Sapieyevski*, 2019 WL 1284302, at *4 ("Proving fame requires a 'stringent showing' and is therefore 'difficult.'" (quoting *Coach Servs.*, 668 F.3d at 1373)).

Shein's complaint fails to meet that rigorous standard for fame.  It alleges that the "SHEIN brand and Affiliate Brands have become famous and widely recognized by the general consuming public throughout the United States," Compl. ¶ 59, but that conclusory assertion is supported only by allegations that do little more than recite the relevant statutory factors.  That allegation alone does not fit the bill.  *See TrueNorth*, 292 F. Supp. 3d at 873–74.[8]

---

[8] Shein's trademark-dilution claim appears to cover not only the SHEIN mark but also the other "brand names" it "owns," including SHEIN CURVE, DAZY, SHEGLAM, ROMWE, and LUVLETTE. Compl. ¶¶ 56, 233–37.  Shein nowhere attempts to show that each "affiliate brand" has become famous; instead, it lumps these brands together.  *See id.* ¶ 56 (alleging that "the

On the first factor, Shein states that it "has invested significant time, effort, and money promoting, advertising, and marketing its business operations across multiple channels," Compl. ¶ 56, and that the "SHEIN brand also enjoys a significant presence on social media," *id.* ¶ 57; *see id.* ¶ 58 (alleging "extensive use and promotion" of marks); *id.* ¶ 59 (referencing "extensive promotional efforts"). But these allegations "are, without more, conclusions, which are not a proper factual basis for a finding of fame." *Walker Wear LLC v. Off-White LLC*, 624 F. Supp. 3d 424, 431 (S.D.N.Y. 2022) (allegation that plaintiff "invested substantial time and money in" its marks insufficient under *Iqbal*). That is, Shein does not allege *how* or since *when* it promoted its marks, or even how much money it invested in any such marketing. *See TrueNorth*, 292 F. Supp. 3d at 873 (dismissing claim where plaintiff alleged it spent $30 million to promote its brand but "provide[d] no further details regarding the extent or geographic reach of its advertising and publicity"). Absent "factual detail" regarding the extent, reach, and duration of its advertising efforts, Shein cannot "plausibly" state that its marks are "famous" among the general consuming public. *Glob. Brand Holdings, LLC v. Church & Dwight Co.*, No. 17-cv-6571, 2017 WL 6515419, at *5 (S.D.N.Y. Dec. 19, 2017).[9]

---

popularity of SHEIN and the Affiliate Brands has skyrocketed among U.S. consumers"); *id.* ¶ 59 ("through extensive promotion efforts, the SHEIN brand and Affiliate Brands have become famous"). These indiscriminate allegations provide no viable basis for the Court to find that Shein has sufficiently alleged that each of its affiliates' trademarks is famous, which is reason enough to dismiss any dilution claim based on those marks. *See H-D U.S.A., LLC v. Affliction Holdings*, No. 20-cv-1642, 2020 WL 5913850, at *5 (C.D. Cal. June 8, 2020) (requiring sufficient allegations of fame for every variation of the mark); *Walker Wear LLC v. Off-White LLC*, 624 F. Supp. 3d 424, 431 (S.D.N.Y. 2022) (requiring allegations for fame of "the mark," not "the brand itself"). Put another way, Shein cannot rely on allegations about the "SHEIN brand" to "bootstrap supposed fame onto" its "Affiliate Brand" marks. ECF No. 47 at 32.

[9] *Compare Plumeus, Inc. v. Intersog LLC*, No. 13-cv-2206, 2013 WL 5609331, at *2 (N.D. Ill. Oct. 11, 2013) (allegations that plaintiff "invested substantial resources" in "numerous national and international marketing campaigns" using its marks since 1996 was insufficient to suggest its mark was a household name (citation omitted)); *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d

Another problem for Shein's claim to fame: its complaint offers no details whatsoever on the "amount, volume and geographic extent of sales" of any products offered under the SHEIN brand, let alone any of its affiliate brands. 15 U.S.C. § 1125(c)(2)(A). Indeed, the complaint skates past that factor entirely. And on the third—the "actual recognition of the mark"—it comes up short again. Shein states only that its marks "have become famous and widely recognized" because of its "extensive promotional efforts," Compl. ¶ 59, and that "the popularity of SHEIN and the Affiliate Brands has skyrocketed among U.S. consumers," *id.* ¶ 56. But a plaintiff cannot "simply allege" that "it has attained widespread and favorable recognition." *Arcsoft*, 153 F. Supp. 3d at 1066 (citation modified). Again, stating a plausible claim requires factual details regarding "the extent of actual recognition." *Id.* at 1065. More, that Shein—as a "brand" or marketplace—allegedly enjoys a large social-media presence with "million[s]" of "followers," Compl. ¶ 57, says little about consumer recognition of the "*trademarks . . . in suit*," *Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757 (S.D.N.Y. 2012) (emphasis added) (allegations about popularity of plaintiff's company, "lacking factual references to the [asserted] trademarks," did not "support the allegation" that marks were "famous"). And tracking trademark law's focus, § 1152 protects "*the mark*," not "the designer" or "the brand itself." *Walker Wear*, 624 F. Supp. 3d at 431 (first quoting 15 U.S.C. § 1125(c)(2)(A)(1), then citing *Luv N' Care*, 841 F. Supp. 2d at 757).[10]

_____

1057, 1066 (N.D. Cal. 2015) (same where plaintiff alleged it "advertised [its app] through multiple electronic platforms" across the United States and "many of the most famous and widely-circulated publications have featured" or "mentioned" it, but plaintiff did "not allege when any of these things occurred" and gave no "details regarding its advertising or promotion" (citation omitted)), *with Visa Int'l Servs. Ass'n v. JSL Corp.*, 590 F. Supp. 2d 1306, 1314 (D. Nev. 2008) (denying motion to dismiss where plaintiff alleged that it promoted and advertised the VISA mark for more than 25 years in print, on the Internet and in other media, spent more than $1 billion on advertising in the United States from 1997 to 2000, and the VISA mark was used in each of the 50 states).

[10] Shein's alleged popularity on social media also says little about consumer recognition among *the general population*. 15 U.S.C. § 1125(c)(2)(A). "Many brands are advertised" on

While Shein does allege that it has numerous registered trademarks with the U.S. Patent and Trademark Office, *see* Compl. ¶¶ 60–62, this factor alone is not enough to plead a plausible trademark dilution claim. As another court put it, "[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the Federal Register." *Coach Servs.*, 668 F.3d at 1374 (citation omitted).

Trying to salvage its claim, Shein repeats the paltry allegations in the complaint and argues that they do, in fact, sufficiently show its marks are famous. ECF No. 45 at 38–41. But for the reasons explained, they do not. Of course, Shein need not do more than what Rule 8 requires. ECF No. 45 at 37. But, as Shein recognizes, it must still plead enough "factual matter" to state a plausible dilution claim. *Id.* And *that* is where the complaint comes up short—stating legal conclusions and reciting relevant factors is insufficient no matter the pleading standard. But especially so when a claim is inherently "difficult" to establish because Congress prescribed a "purposely rigorous" element—in this case, fame. *TrueNorth*, 292 F. Supp. 3d at 873; *see also Glob. Brand Holdings*, 2017 WL 6515419, at *3 (explaining that Congress defined "famous" as "widely recognized by the general consuming public of the United States" to "ensure[] that dilution" claims "are restricted to 'those few truly famous marks'" (citations omitted)).[11]

---

social media and have a significant following there, but "not all are famous." *Cf. Glob. Brand Holdings, LLC v. Church & Dwight Co.*, No. 17-cv-6571, 2017 WL 6515419, at *5 (S.D.N.Y. Dec. 19, 2017) ("[W]hether a mark's fame is general or niche"—and thus not sufficiently famous—"does not turn on the target audience for the goods being sold" but "on the scope and nature of recognition . . . by the general public.") (emphasis omitted)).

[11] Shein's cited (non-binding) authority does not change the Court's conclusion. ECF No. 45 at 39–40. Shein's allegations pale in comparison to those in *Scotts Co. LLC v. SBM Life Sci. Corporation*, 749 F. Supp. 3d 865, 874–75 (S.D. Ohio 2024), where the plaintiff alleged, among other things, that it began marketing and selling products under its trademark "since at least as early as 1995," spent "tens of millions of dollars on promoting" its marks through "social media, in retail stores, and in print and television advertisements," and made "hundreds of millions of dollars in sales" nationwide. Even *Haas Outdoors, Inc. v. Dryshod Int'l LLC*, No. 18-cv-596,

Shein also grasps at *WhaleCo's* assertions in *WhaleCo's* own complaint, arguing they "be-lie[]" WhaleCo's argument here that Shein has not sufficiently pled that its marks are famous. ECF No. 45 at 40–41. But its attempt to shore up its deficient pleading fails because none of WhaleCo's allegations suggest that any of Shein's asserted marks are famous. Shein's alleged global revenue and growing customer base, or the number of downloads of its "shopping app," do not speak to the alleged fame of the SHEIN or any other mark. *Luv N' Care*, 841 F. Supp. 2d at 757; *Walker Wear*, 624 F. Supp. 3d at 431.

In sum, Shein fails to plausibly plead that each of its marks is famous. Courts have dis-missed dilution claims equally short on detail as the one in Shein's complaint, and this Court will do so too.[12]

---

2019 WL 3130231, at *5 (W.D. Tex. July 15, 2019), is distinguishable, because the plaintiff there at least alleged when it began selling goods under its asserted trademark, that products sold under those marks had become "one of the most popular, and best-selling, family of camouflage patterns" in the industry, and that it "licensed its marks and marked patterns to over 1,000 licensees. Equally unpersuasive is Shein's reliance on *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 201, 213–16 (S.D.N.Y. 2015), where the plaintiff-estate sufficiently alleged recog-nition of "Marilyn Monroe" trademarks by pointing to, among other things, "the world-renowned celebrity of Marilyn Monroe" and the "significant publicity related to" her, along with "significant sales of licensed merchandise." *See id.*, 12-cv-4828, Dkt. 133 ¶ 21. It makes sense, then, that the court in that case found plaintiff's dilution claim plausible. And as for Plaintiffs' reliance on *YETI Coolers, LLC v. Imagen Brands, LLC*, the Court respectfully disagrees that the allegations of fame made there—which merely recited the relevant factors—survive a motion to dismiss. No. 16-cv-578, 2017 WL 2199012, at *8 (W.D. Tex. May 18, 2017).

[12] *See, e.g.*, *Fiber-Shield Indus. Inc. v. Fabricshield Holdings, LLC*, No. 22-cv-6059, 2023 WL 2734731, at *6 (E.D.N.Y. Mar. 31, 2023) (plaintiffs failed to "assert[] the 'amount [or] vol-ume' of their sales, their 'advertising budget[,] or the strength of [their] consumer recognition in the general population" (citation omitted)); *Glob. Brand Holdings, LLC v. Church & Dwight Co.*, No. 17-cv-6571, 2017 WL 6515419, at *5 (S.D.N.Y. Dec. 19, 2017) (allegations that "goods bear-ing [plaintiff's] marks are sold nationwide and online through large, well-known retailers," and plaintiff "spent millions of dollars to create consumer recognition," coupled with vague "allega-tions of advertisements" insufficient); *Plumeus, Inc. v. Intersog LLC*, No. 13-cv-2206, 2013 WL 5609331, at *2 (N.D. Ill. Oct. 11, 2013) (allegations that plaintiff "invested substantial resources" in "numerous national and international marketing campaigns," and that its "marks ha[d] become

### 3.    Shein States a Claim for False Advertising (Count 14)

WhaleCo also tries to dodge Shein's false advertising claim, which alleges that WhaleCo distributed "Influencer Guidelines" to social media influencers instructing them to claim (falsely, says Shein) that the products sold on Temu are "cheaper" and of "way better quality" than products sold on Shein's marketplace, and several influencers then did just that. Compl. ¶¶ 138, 140, 254–59. Although a close call, the Court will not dismiss that count at this stage.

Section 43(a) of the Lanham Act prohibits any "false or misleading description of fact" in "commercial advertising or promotion" that "misrepresents the nature, characteristics, [or] qualities" of products or services. 15 U.S.C. § 1125(a)(1). To state a false advertising claim, a plaintiff must allege facts to show that the defendant's commercial "advertising was: (1) false or misleading, (2) actually or likely deceptive, (3) material in its effect on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff." *Aristotle, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 6 (D.D.C. 2010) (citation omitted). WhaleCo says Shein's claim fails for two reasons. Though it does not quibble with the last four elements, WhaleCo argues that the "accused statements" are either non-actionable statements of opinions—mere "puffery"—or verifiably true. ECF No. 36-1 at 24–29. Moreover, it claims that the statements are not in any WhaleCo "advertising." *Id.* at 29–31. The Court takes these arguments in reverse order.

Start with the threshold question: whether the "accused statements" qualify as "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1). For purposes of the Lanham Act, advertising means "commercial speech" that is made "by a defendant" who competes with the plaintiff "for the purpose of influencing consumers to buy the defendant's goods" and that is "disseminated

---

famous in the United States" through plaintiff's "longstanding, continuous, and extensive use" of its marks insufficient to "suggest" that marks "are household names").

sufficiently to the relevant purchasing public." *In re McCormick & Co. v. Pepper Prod. Mktg. & Sales Pracs. Litig.*, 215 F. Supp. 3d 51, 59 (D.D.C. 2016) (citation omitted). WhaleCo says Shein's claim falters because the "Influencer Guidelines" it allegedly "provided" to influencers, which contain the allegedly false statements, amount to "[p]rivate communications with business partners." ECF No. 36-1 at 30–31. In other words, the only "statements" WhaleCo made were "not published to the public." *Id.* at 31. But that misconstrues Shein's claim.

WhaleCo is right—and Shein does not dispute—that providing "Guidelines" to paid social media influencers who are not alleged to be Temu customers, without more, would not give rise to a false advertising claim. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (no claim where "brochures" were not "actually disseminated to any potential customers"). But Shein's claim is not so narrow: as Shein explains, it "relate[s] to the Influencer Statements made at WhaleCo's direction *in compliance with*" the Guidelines. ECF No. 45 at 16 (emphasis added). And the complaint bears that out. It alleges that WhaleCo "provided influencers with guidelines" that "*require[d]* them to make . . . false" statements on social media. Compl. ¶ 138 (emphasis added). And "[s]everal influencers" allegedly then "published" these statements while acknowledging their "[p]aid partnership with shoptemu." *Id.* ¶¶ 140–41; *see id.* ¶¶ 142–43. Those influencer statements, Shein says, are WhaleCo's commercial advertising. ECF No. 45 at 16.[13]

WhaleCo, for its part, does not dispute that social-media posts by paid influencers qualify as commercial advertising under the Lanham Act. *See* ECF No. 45 at 16–18; ECF No. 47 at 13–14. Indeed, the "touchstone" of whether a statement constitutes "commercial advertising" under

---

[13] WhaleCo says Shein is "rewriting" its complaint to state a claim based on statements by third parties, ECF No. 47 at 13, but as the quoted allegations show, Shein pled that theory from the start.

the Lanham Act "is that the contested representations are part of an organized campaign to pene-

trate the relevant market." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F.

Supp. 3d 263, 293 (S.D.N.Y. 2016) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA,*

*LLC*, 314 F.3d 48, 57 (2d Cir. 2002)). And "companies" now regularly "pay" influencers to "tout[]

their products" on social media. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir.

2021). As the Ninth Circuit put it, even though "social media posts may not" look like "traditional

advertisement, there can be little doubt that these paid posts are in fact advertisements." *Id.* And

for that reason, a plaintiff can state a false advertising claim by alleging that "the *defendant itself,*

*or through its paid* agents, made false statements in commercial advertisements." *BHRS Grp.,*

*LLC v. Brio Water Tech., Inc.*, 553 F. Supp. 3d 793, 800 (C.D. Cal. 2021) (emphasis in original);

*see, e.g.*, *Interlink Prods. Int'l Inc. v. F&W Trading LLC*, No. 15-cv-1340, 2016 WL 1260713, at

*8 (D.N.J. Mar. 31, 2016) (defendants allegedly engaged in "massive" and "continuous ratings

manipulation" by sending "excessive quantities of free samples to professional reviewers" result-

ing in numerous fake or biased reviews); *AlphaCard Sys. LLC v. Fery LLC*, No. 19-cv-20110,

2020 WL 4736072, at *1 & *3 (D.N.J. Aug. 14, 2020) (defendant allegedly "placed hundreds of

phony customer reviews on its products" purporting "to state customers' honest opinions even

though reviewers did not purchase or honestly evaluate the product").

　　　Rather than challenge the viability of that agency theory of liability under the Lanham Act,

WhaleCo appears to argue that Shein does not allege enough facts to support it. *See* ECF No. 47

at 14 (arguing complaint lacks allegations of "vicarious or agency liability"). Not so. Again, Shein

alleges that WhaleCo "hired" social-media influencers to publicly rate and review its products and,

as part of that paid partnership, *required* them to make allegedly false statements. Compl. ¶¶ 138–

43. Thus, Shein "plead[s] enough facts to plausibly connect" the influencer statements to

WhaleCo, "such as would support an inference that" these influencers "were acting on [its] be-half." *BHRS Grp., LLC v. Brio Water Tech., Inc.*, 553 F. Supp. 3d 793, 799 (C.D. Cal. 2021). In sum, the influencer statements are "commercial advertisement" that can be imputed to WhaleCo.

WhaleCo's second argument—that the influencer statements "are not false or misleading statements of fact" but instead mere opinions or puffery—is a closer call. ECF No. 36-1 at 24–29. But the Court concludes that, at this early stage, the statements cannot be deemed puffery as a matter of law.

To be actionable under the Lanham Act, a statement must make "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Ariix*, 985 F.3d at 1121 (citation omitted). "Statements of opinion and puffery, however, are not actionable." *Id.* "Puffery," courts have recognized, generally comes in two forms. *See Pizza Hut, Inc. v. Papa Johns Int'l Inc.*, 227 F.3d 489, 496–97 (5th Cir. 2000); *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 59–60 (2d Cir. 2022). One encompasses "subjective claims about products, which cannot be proven either true or false." *Int'l Code Council*, 43 F.4th at 59 (citation omitted). Those often manifest as "general claim[s] of superiority expressed in broad, vague, and commendatory language" that can only be understood to express "the seller's opinion." *Id.* at 59–60 (internal quotation marks and citation omitted). "The Best Beer in America" is one example. *See In re Boston Beer Co.*, 198 F.3d 1370, 1372 (Fed. Cir. 1999).[14] Simply put, a state-ment that cannot be proven false cannot give rise to a "false advertising" claim. Courts "must analyze the message conveyed in full context" and not "dissect[]" it. *Int'l Code Council*, 43 F.4th

---

[14] The second form of puffery involves "exaggerated, blustering, and boasting state-ment[s]" that "technically" are "provable" but upon which "no reasonable buyer" could justifiably rely. *Int'l Code Council*, 43 F.4th at 60; *see Pizza Hut*, 227 F.3d at 497 (same). For example, "With SLIM-NOW, you'll see pounds melt away in the blink of an eye." 4 McCarthy on Trade-mark and Unfair Competition § 27.38 (5th ed.).

at 57; *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (similar).

As noted, WhaleCo's Influencer Guidelines "instruct" influencers to include, among others, the following statements in their "Instagram Caption":

- "Shein is not the only cheap option for clothing!  Check Temu.com out, cheaper and way better quality!";
- "Looking for clothes better than Shein but cheaper than revolve?  Check Temu.com out."

ECF No. 1-22 at 5; Compl. ¶ 138.   Shein gives two examples of such posts. Compl. ¶¶ 141–43; ECF Nos. 1-23, 1-24.  One influencer included the following caption with her Instagram post showing images of different clothing articles: "Shein Alternatives, cheaper but way better quality!  Check Temu.com out! . . . ." ECF No. 1-23.  Another captioned her post with, "My items from Temu came in and I'm obsessed!!!  Way better quality than SHEIN and other companies and so cheap! . . . ."  ECF No. 1-24.  Shein alleges that the "influencer statements are false and misleading because the clothes sold on Temu.com are not less expensive and not of 'way better quality' than those sold on the SHEIN" marketplace.  Compl. ¶ 144.

The statements—that Temu's clothes are "cheaper" but "way better quality" than Shein's—are actionable because they make "specific" claims that can "be[] proved false" or can "reasonably be interpreted as . . . statement[s] of objective fact." *Ariix*, 985 F.3d at 1121.  That is, a consumer could reasonably understand them to convey factual assertions: that WhaleCo's prices for comparable goods are lower than Shein's, and that its products are of better quality—for example, they use higher quality materials and last longer—than those of its competitor.

No doubt, that clothes on Temu are "cheaper" is an objectively verifiable claim about price—not an opinion.  *Int'l Code Council*, 43 F.4th at 59.  That Temu's clothes are "way better quality" than Shein's presents a somewhat trickier issue because, as WhaleCo points out, statements like "better" generally "amount[] to little more than an exaggerated opinion of superiority

that no consumer would be justified in relying on." *Pizza Hut*, 227 F.3d at 499.  As another court put it, advertising that "one product is 'better' than another" is "just a slightly weaker variety of the broad assertion that the product is 'the best'—clearly puffery." *Guidance Endodontics, LLC v. Dentsply Int'l Inc.*, 708 F. Supp. 2d 1209, 1243 (D.N.M. 2010).  But this issue is not black and white.  For example, saying, that one's "product can do something 'more efficiently,' 'easier,' 'quicker,' or 'safer' is more specific." *Id.*  As such, "[i]t is not so inherently clear that no reasonable consumer would believe that those statements could be true." *Id.*  That is especially so when a statement "make[s]" an "explicit comparison" to "other brands" about "particular characteristics that would be important to a consumer." *Id.* at 1243–44.  In that context, a reasonable consumer could "believe" that the advertising party actually "test[ed]" and compared competing products and "deduced" that one was "superior in these ways." *Id.* at 1244; *see also L.A. Taxi Cooperative, Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015) (because "Uber's statements also explicitly compare the safety of its services with those offered by taxi cab companies," a "reasonable consumer . . . could conclude that an Uber ride is objectively and measurably safer than a ride" with competitors).

Here, a reasonable consumer could think just that.  The alleged influencer statements do not simply label Temu's products as "better" or make "broad assertions of superiority *in the field*." *Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*, 202 F. Supp. 2d 431, 435 (M.D.N.C. 2002) (emphasis added).  Instead, they "referenc[e] . . . particular competing product[s]," *id.*—Shein's— and assert that Temu's clothes are "way better" as to a specific characteristic: "quality."  And that "characteristic[]" is one that matters to consumers, *Guidance*, 708 F. Supp. 2d at 1244, particularly in the fast-fashion context, where buyers know that low prices (a key selling point) can come at the cost of quality.  *Cf. Chanel, Inc. v. RealReal, Inc.*, 499 F. Supp. 3d 422, 443 (S.D.N.Y. 2020).

Other contextual clues undercut WhaleCo's argument too. To begin, the fast-fashion context itself renders the statement less "vague" and "unmeasurable," *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 976–77 (C.D. Cal. 2018), because there are only so many ways in which one company's clothing article can be of "better quality" than another's. More, the assertion about "way better quality" appears next to the verifiable claim that Temu's clothes are "cheaper" than Shein's, ECF No. 1-23, and is made by an "influencer" (depicting herself wearing Temu's clothes) whom consumers perceive as having personal experience with—*i.e.*, as having "tested"—the products they promote. *Guidance*, 708 F. Supp. 2d at 1244. Considered in context and drawing all inferences in Shein's favor, then, a reasonable consumer could believe that WhaleCo's influencers "actually" compared Temu's clothes to Shein's and concluded that Temu's won out on both price and quality—"particular characteristics" that are "objectively verifiable." *Id.* Simply put, the influencer statements are "sufficiently specific so as to not constitute mere puffery at the pleading stage." *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 977 (C.D. Cal. 2018).

Resisting that conclusion, WhaleCo cites several cases to argue that "characterizing a product as 'better' than a competitor's" is inactionable puffery. ECF No. 36-1 at 26–28; ECF No. 47 at 15–17. True. But as explained, that is not what the influencer statements say. And in this context, appeals to other decisions are not always persuasive; how other courts treat a "a specific word is of little help unless that word is used in a sufficiently similar context," *Int'l Code Council*, 43 F.4th at 61, and none of WhaleCo's cases passes the test. Indeed, most of them involved general claims of superiority—for example, "better customer service" and "better coverage," or "better data network"—with no reference to specific features or specific competitor products. ECF No. 47 at 16 (quoting *Metro Mobile CTS, Inc. v. Newvector Commc'ns, Inc.*, 643 F. Supp. 1289, 1293 (D. Ariz. 1986), and *Cablevision Sys. Corp. v. Verizon N.Y. Inc.*, 119 F. Supp. 3d 39, 53 (E.D.N.Y.

)); *see* ECF No. 45 at 19 n.2.

WhaleCo also attempts to establish the truth of its pricing claim, often a difficult task at the pleading stage because whether a statement is true "is a question of fact." *E.g.*, *Instant Check-mate, Inc. v. Background Alert, Inc.*, No. 14-cv-1182, 2014 WL 12526275, at *5 (S.D. Cal. Dec. 5, 2014). And WhaleCo comes up short. It says "Shein's own allegations and the documents attached to its Complaint" show that "products on Temu are cheaper." ECF No. 36-1 at 28. That is, Shein elsewhere alleges that Temu "focuses on offering the lowest possible prices for a wide range of consumer goods," Compl. ¶ 5, and that it "squeeze[s] prices to rock bottom levels," *id.* ¶ 77. And a news article appended to the complaint states that "Temu's prices" for clothing "are *usually* . . . 20-30% lower than on SHEIN." ECF No. 1-1 at 7 (emphasis added). But these cherry-picked allegations do not get WhaleCo far because none shows that Temu's prices are *always* cheaper than Shein's—which WhaleCo would need to show to establish that the alleged influencer statements, portraying particular products, are true. At most, the cited allegations support the in-ference that the influencers' claims are true, but WhaleCo, as the movant here, does not get to benefit from inference-drawing. So at this stage, the Court cannot conclude that the influencers' claims about price are true and thus not actionable.

Finally, WhaleCo argues that Shein failed to allege facts to show that the influencer state-ments "communicated some other implied deceptive message" or "that the statements are likely to deceive or confuse consumers." ECF No. 36-1 at 29. True, but irrelevant. To state a false adver-tising claim, a plaintiff must allege that the statement is *either* false *or*, "if not literally false," that "it is likely to mislead and confuse consumers." *Pizza Hut*, 227 F.3d at 495 (citation omitted). Shein states a plausible claim based on falsity, so it need not plead facts to show that the statements were misleading. So the Court will deny WhaleCo's motion to dismiss Shein's false advertising

count.

### 4.      Shein States a Claim for Contributory False Advertising (Count 15)

WhaleCo also moves to dismiss Shein's contributory false-advertising claim, which is based on the same influencer statements giving rise to Shein's direct-liability claim. *See* Compl. ¶¶ 260–66; ECF No. 45 at 22. WhaleCo offers two grounds for dismissal, but the Court has already rejected one of them—that the influencer statements are opinions, not "false or misleading statements of fact." ECF No. 36-1 at 33. And as for the other—that "contributory" false advertising is not a cognizable legal claim—WhaleCo's reasoning is unconvincing. *Id.* at 31–33.

Neither the Supreme Court nor any court in this Circuit has addressed whether, under the Lanham Act, a party can be contributorily liable for another's false advertising. But the page is not entirely blank either. The Eleventh Circuit has held that contributory liability claims are available under the statute, *see Duty Free Americas, Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1276–77 (11th Cir. 2015), the Second Circuit has recognized the possibility, *see Societe Des Hotels Meridien v. LaSalle Hotel Operation P'ship, L.P.*, 380 F.3d 126, 132–33 (2d Cir. 2004) (reinstating claim), and many district courts routinely assume a cause of action exists.[15] Finding the Eleventh Circuit's reasoning persuasive, the Court adopts it here.

Contributory liability under the Lanham Act "is a judicially developed doctrine," *Duty Free*, 797 F.3d at 1274, that "derives from the common law of torts," *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010); *cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

---

[15] *See, e.g.*, *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1329–30 (S.D. Fla. 2021); *In re Outlaw Lab'y, LLP*, 463 F. Supp. 3d 1068, 1082 (S.D. Cal. 2020); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 425 (S.D.N.Y. 2013); *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, No. 8-cv-1372, 2010 WL 2079694, at *4 (W.D. Wash. May 20, 2010), *aff'd*, 447 F. App'x 814 (9th Cir. 2011); *Allen Organ Co. v. Galanti Organ Builders, Inc.*, 798 F. Supp. 1162, 1172–73 (E.D. Pa. 1992), *aff'd*, 995 F.2d 215 (3d Cir. 1993).

545 U.S. 913, 930 (2005) (observing, in the copyright context, that "doctrines of secondary liabil-ity emerged from common law principles and are well established in the law").  That is, Section 43(a) of the Lanham Act—which bans both trademark infringement and false advertising—does not speak to the existence or scope of vicarious liability.  *See* 15 U.S.C. § 1125(a).  But in the trademark infringement context, the Supreme Court has long recognized that liability "can extend beyond those who actually mislabel goods."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853 (1982).  Thus, the Court made clear, a manufacturer or distributor can be "contributorially" liable if it "intentionally induces another to infringe a trademark" or "continues to supply its prod-uct to one whom it knows or has reason to know is engaging in trademark infringement."  *Id.* at 854 (citing *William R. Warner & Co. v. Eli Lilly & Co*, 265 U.S. 526 (1924)).  And following *Inwood*, circuit courts have applied its reasoning beyond manufacturers and distributors to "cover a wide variety" of other infringement contexts.  *Duty Free*, 797 F.3d at 1275 (citing cases); *e.g.*, *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991) ("A person who knowingly participates in furthering the trade dress infringement is liable as a contributing party."); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 190–91 (D.D.C. 2005) ("contributory trademark infringe-ment" requires allegations that "defendants" have "induced a third party to infringe the plaintiff's mark with actual knowledge that the product is being used to infringe the mark" (citation modi-fied).

  In light of the Supreme Court's recognition of contributory liability for trademark infringe-ment, extending a similar theory to false advertising claims makes sense.  *See Duty Free*, 797 F.3d at 1275–77.  Both causes of action are part of a single statutory provision:

> (1) Any person who, on or in connection with any goods or services, or any con-tainer for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affilia-
tion, connection, or association of such person with another person, or as to the
origin, sponsorship, or approval of his or her goods, services, or commercial activ-
ities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteris-
tics, qualities, or geographic origin of his or her or another person's goods, services,
or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is
likely to be damaged by such act.

15 U.S.C. § 1125(a).  More, the introductory language banning trademark infringement and false

advertising is "identical."  *See* 15 U.S.C. § 1125(a).  And as such, "the two causes of action should

be interpreted to have the same scope."  *Duty Free*, 797 F.3d at 1275.  More generally, section

43(a)'s trademark protections and ban on false advertising "were motivated by a unitary purpose":

to provide a "federal cause of action for unfair competition."  *Id.* (cleaned up and citation omitted).

Both causes of action "are 'part of the broader law of unfair competition that has its sources in

English common law,'" *id.* at 1276 (quoting *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418,

428 (2003)), and "courts routinely" look to "basic tort liability concepts to determine the scope of

liability" the Lanham Act—as the Supreme Court did in recognizing that the Lanham Act contem-

plates liability that extends "beyond direct violators" of § 43(a)'s trademark provision.  *Id.* (cita-

tions omitted).  And the case for recognizing this liability is even stronger for the false-advertising

provision, which the Supreme Court has acknowledged "entails *broader* protections."  *Id.* (empha-

sis added) (citing *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014)).  In sum, the

two prohibitions' shared common-law origin, their placement in the same statutory section, and

the Supreme Court's recognition of indirect liability for trademark infringement, together support

the conclusion that "a plaintiff may bring a claim for contributory false advertising under § 43(a)

of the Lanham Act." *Id.* at 1277.

Up against the Eleventh Circuit's persuasive reasoning and the weight of authority recognizing contributory liability in this context, WhaleCo hangs its hat on one line in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 120 (2014). ECF No. 36-1 at 31–33. There, the Supreme Court explained that "a plaintiff suing" for false advertising "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l*, 572 U.S. at 133. Its emphasis on "the *defendant's* advertising," on WhaleCo's account, forecloses a contributory liability theory of false advertising. ECF No. 36-1 at 32 (emphasis in brief). WhaleCo overreads *Lexmark*. *Lexmark* is a statutory standing case, in which the Court held that a Lanham Act claim is available only to plaintiffs whose interests "fall within the zone of interests protected by the law invoked" and whose injuries are "proximately caused by violations of the statute." 572 U.S. at 129–32 (citation omitted). And to show proximate causation, the Court explained, a plaintiff must "ordinarily" show injury stemming from deception "by the defendant's advertising." *Id.* at 133. So *Lexmark* limits who may sue, not who may be sued. And even if the reference to "defendant's advertising" were a backhand reference to the scope of liability—which is doubtful—the Supreme Court qualified it by saying that this showing was required only "ordinarily." So even on WhaleCo's reading, the Supreme Court left room for the possibility that sometimes the advertising is not the defendant's own.[16]

None of WhaleCo's remaining arguments carry the day. It argues that § 43(a)'s "plain

---

[16] *Lexmark* is also consistent with *Duty Free*'s standard for pleading a contributory false advertising claim. To state such a claim, the Eleventh Circuit explained, a plaintiff must plead that (1) "a third party in fact directly engaged in false advertising that injured the plaintiff" and (2) "the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free*, 797 F.3d at 1277. That formulation tracks *Lexmark*'s proximate-cause requirement.

language"—prohibiting "any person" from "us[ing]" any "false or misleading description of fact"—holds "persons liable" only for "their own false" statements, not those of others. ECF No. 36-1 at 32. But, as explained, contributory liability is a common law theory of derivative liability that requires no express statutory basis. The Supreme Court has been clear on that score. It adopted such a cause of action for trademark infringement, which (again) is housed in the same statutory provision as that for false advertising, *see Inwood Labs.*, 456 U.S. at 853–54, and for copyright infringement as well, even though "the Copyright Act does not expressly" provide for it, *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929–30 (2005) (the "doctrines" of contributory and vicarious "liability emerged from common law principles and are well established in the law"). WhaleCo also foreshadows "untold liability" for "any person" based on "third parties' social media posts," ECF No. 36-1 at 33, but that parade of horribles ignores the requirement that a plaintiff must plead and then prove that the defendant "knowingly induc[ed]," "caus[ed]," or "materially participat[ed] in" the false advertising. *Duty Free*, 797 F.3d at 1277. Shein does not seek to hold WhaleCo liable for unrelated third parties' statements on social media. Instead, the complaint alleges that WhaleCo crafted and directed its influencers to make them.

In sum, because the Court concludes that contributory false advertising is a cognizable theory under the Lanham Act, and because Shein has identified actionable false advertising based on WhaleCo's paid influencers' statements, the Court will deny WhaleCo's motion as to this count.

### 5.    Shein States Claims for Trade Secret Misappropriation (Counts 1 and 2)

Finally, WhaleCo seeks dismissal of Shein's claims for trade secret misappropriation under the federal Defend Trade Secrets Act and the D.C. Uniform Trade Secrets Act. To prevail under either statute, a plaintiff must show (1) "the existence of a trade secret" that (2) "has been misappropriated." *Trilogy Fed., LLC v. CivitasDX LLC*, No. 24-cv-2713 (BAH), 2025 WL 436850, at

*8 (D.D.C. Feb. 9, 2025) (citation omitted); *see* 18 U.S.C. § 1836(b)(1); D.C. Code § 36-403. WhaleCo argues Shein fails to plead either.  But Shein clears both bars—the first one easily so, and the second despite the fairly cursory allegations in its complaint.

First, Shein sufficiently alleges that its "Best Seller Data" is a trade secret.  A "trade secret" includes (1) "all forms and types of financial, business," or "economic . . . information" (2) that the owner "has taken reasonable measures to keep . . . secret" and (3) that "derives independent economic value . . . from not being generally known."  18 U.S.C. § 1839(3); D.C. Code § 13-401. Information that is "generally known or readily ascertainable to the public" cannot be a trade secret.  *Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 8 (D.D.C. 2004) (citations omitted).  That said, even if individual elements are known to the public, a trade secret can exist "in a combination" of those otherwise publicly available elements.  *Id.* at 9.  Also, given the very nature of a trade-secret misappropriation claim, a plaintiff need not "identify trade secret information in detail" to "avoid dismissal at the 12(b)(6) stage."  *Aristotle Int'l, Inc. v. Acuant, Inc.*, No. 22-cv-741 (DLF), 2023 WL 1469038, at *8 (D.D.C. Feb. 2, 2023) (citation omitted). Less is required: the plaintiff need only identify the information "with enough specificity to place a defendant on notice of the bases for" its claim.  *Id.* (citation omitted).

Shein plausibly alleges the existence of a protectable trade secret in its "Best Seller Data," which is "information about the top-selling and most popular styles on the SHEIN" marketplace that, it says, is "critical to [its] tremendous success."  Compl. ¶¶ 45–46.  According to the complaint, the Best Seller Data "includes (1) a list of the best-selling styles; (2) the styles' rankings among the items sold on the SHEIN website; (3) internal pricing information; and (4) photos of each style—among other confidential business information."  *Id.* ¶ 46.  That "dataset" allegedly "also contains links to the items on the SHEIN Website, making them easily identifiable."  *Id.*

This Best Seller Data enables Shein to "monitor the costs of, and the market for, its products" and to "set sales strategy." *Id.* ¶ 47. Shein, therefore, "keeps tight control over" this data by "employ[ing] rigorous internal controls" in the form of "extensive and detailed protocol[s]" restricting its "dissemination" and "access," including through password protection, and by requiring "proper destruction" and "training for employees." *Id.* ¶ 48.

These allegations pass muster. For one thing, the Best Seller Data falls squarely within the type of information—"pricing information, sales and marketing strategies, and other business information"—that "federal courts" routinely hold "can constitute 'trade secrets.'" *Aristotle Int'l*, 2023 WL 1469038, at *7 (citation omitted); *see, e.g.*, *AlterG, Inc. v. Boost Treadmills LLC*, No. 18-cv-7568, 2019 WL 4221599, at *6 (N.D. Cal. Sept. 5, 2019) ("Pricing and marketing strategies tied to specific products are typical trade secrets."); *Phillips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) (similar). Shein's description is also sufficiently specific; again, it need not reveal the content of the trade secret themselves. *Aristotle Int'l*, 2023 WL 1469038, at *8. As for the steps it takes to keep the information secret, and the value it derives from its Best Seller Data, Shein's allegations—as WhaleCo appears to concede—clear the pleading hurdle too. *See Trilogy Fed.*, 2025 WL 436850, at *3–4 (D.D.C. Feb. 9, 2025) (similar allegations sufficient).

WhaleCo has two responses, but neither warrants dismissal. First, it argues that "[e]very single aspect of the alleged 'Best Seller Data' is publicly available on Shein's website, including which styles are 'best-selling,' how styles rank among the items sold on [its] website, and the photos and price of each style." ECF No. 36-1 at 41. For support, WhaleCo provides exhibits of Shein's website that has "a best-selling product listing page for various categories," which apparently "allows anyone to sort products by popularity." *Id.*; *see* ECF Nos. 37-3–37-6. But the

problem for WhaleCo is that "even if some of the information" included in the Best Seller Data is "readily accessible" on Shein's website, it is quite plausible that "at least some" information is not. *Meyer Grp., Ltd v. Rayborn*, 695 F. Supp. 3d 39, 63 (D.D.C. 2023).  Indeed, that is true—at a minimum—for the "*internal* pricing information" Shein alleges is part of its Best Seller Data. Compl. ¶ 46 (emphasis added).  By definition, that is not the same as the prices shown on its website.  More, drawing all reasonable inferences in Shein's favor, it is plausible that the information Shein collects as its Best Seller Data differs from what it shows on its website.  For instance, the Best Seller Data, which also includes "other confidential business information," *id.*, may contain information about the popularity of Shein's styles disaggregated by age and geography.  In any event, it would be premature to decide, as a matter of law and based on screenshots of Shein's website, that the filtering option permitting users to sort through "popular" styles covers the same information as the Best Seller Data Shein claims as its trade secret.  *See Meyer Grp., Ltd. v. Rayborn*, No. 19-cv-1945 (ABJ), 2020 WL 5763631, at *5 (D.D.C. Sept. 28, 2020).  WhaleCo may raise this argument at the summary-judgment stage, "when the content" of the alleged trade secret "is a matter of record, and one can assess whether the information [is] available in the public domain." *Id.* at *5 n.2.

Trying a different tack, WhaleCo contends Shein's "allegations lack sufficient specificity to plausibly state the existence of a trade secret separate and apart from the information available to the public through [its] own website."  ECF No. 36-1 at 42.  Shein's "categories" are too "vague," it says, and contain no "temporal allegations sufficient to identify the particular supposed 'Best Seller Data.'" *Id.* at 43.  But, as explained, Shein's pleading burden is not a high one.  All it had to do was give "sufficient detail to put [WhaleCo] on notice what *kind* of information is at stake here." *Aristotle Int'l*, 2023 WL 1469038, at *8 (emphasis added).  And Shein has done just

that. *See, e.g.*, *id.* ("highly sensitive confidential information about [plaintiff's] data coverage by country" sufficient at the pleading stage); *Roeslein & Assocs., Inc. v. Elgin*, No. 17-cv-1351, 2019 WL 195089, at *12 (E.D. Mo. Jan. 15, 2019) (plaintiffs pled trade secrets "with sufficient particularity by putting forth general categories of their trade secrets"). Nor is it clear to the Court why Shein's Best Seller Data must be "temporal[ly]" set in stone to constitute a trade secret, and WhaleCo cites no authority on that score. In the end, perhaps there is no "daylight" between the Best Seller Data and the information on Shein's website. ECF No. 47 at 29. If so, discovery will reveal that. WhaleCo's "demand for further precision" at the pleading stage, however, is misplaced. *Aristotle, Inc.*, 2023 WL 1469038, at *8 (citation omitted).

Switching gears, WhaleCo also argues that Shein failed to adequately plead that "WhaleCo—as opposed to some other entity—misappropriated" the Best Seller Data. ECF No. 36-1 at 43. Though hardly a slam dunk for Shein, its allegations sufficiently implicate WhaleCo in the alleged misappropriation to ward off dismissal. "Misappropriation" can occur in three ways: acquisition, disclosure, or use. *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 113 (D.D.C. 2019); *see* 18 U.S.C. § 1839(5); D.C. Code § 36-401(2). Because "misappropriation and misuse can rarely be proved by convincing direct evidence," plaintiffs "often rely on circumstantial evidence that creates an inference of misappropriation." *Aristotle Int'l*, 2023 WL 1469038, at *9 (citation modified). Shein attempts to assert misappropriation based on all three theories.

The complaint alleges that "at least one employee of PDD-affiliated entities stole the SHEIN Best Seller Data at the direction of their PDD-affiliated employer and shared it with hundreds of people, including Temu's sellers and suppliers, via WeChat" (a Chinese messaging service). Compl. ¶ 66. "Temu knew that the Best Seller Data was confidential, proprietary, and considered a trade secret," Shein alleges, "yet distributed it to hundreds of sellers and suppliers

anyway, explaining on WeChat that the data was internal SHEIN data and that Temu sellers should create and sell the same products." *Id.* ¶ 68. "Temu" allegedly also "directed [its] employees to access or acquire the SHEIN Best Seller Data and to share it with Temu's seller and supplier partners." *Id.* ¶ 73. On top of that, "Temu" allegedly "taught suppliers how to copy SHEIN's most popular products and incentivized them to do so by providing them rewards." *Id.* ¶ 69. Ans "when Temu received the Best Seller Data," it purportedly "used th[at] information without authorization for its own economic benefit, including to directly compete with SHEIN by manufacturing and selling counterfeit versions of SHEIN's most popular products." *Id.* ¶ 74.

Based on these allegations, the Court agrees with WhaleCo that Shein fails to plausibly allege that WhaleCo "acquired" the Best Seller Data. *See* ECF No. 36-1 at 44. On that misappropriation theory, all Shein alleges is that "one employee of PDD-affiliated entities" stole the alleged trade secret without specifying *which* "PDD-affiliate" employed that person, and there are many. Compl. ¶ 66. And by elsewhere referring to "Temu" but here referring a "PDD-affiliated" entity—and by alleging that the "theft" took place "in China"—Shein has failed to implicate WhaleCo in any acquisition of Shein's Best Seller Data. *Id.* ¶ 152.

Shein does, however, sufficiently link WhaleCo to unlawful "disclosure" and "use." As already explained, the complaint's references to "Temu" obviously refer to WhaleCo—which does business as Temu—because it specifically refers to "PDD" or "PDD-affiliates" when describing conduct taken by someone other than WhaleCo, as the quoted allegations show. And the complaint alleges that Temu "distributed"—that is, disclosed—the allegedly stolen data to its suppliers and sellers, told them to share it with others, and taught them how to "copy" Shein's products. Compl. ¶¶ 68–69, 73. It also alleges that Temu "used" the data by then selling fake version of those products. *Id.* ¶ 74. More, Shein points to examples of allegedly counterfeit products appearing on

Temu, which provides circumstantial evidence of misappropriation. *See, e.g.*, *id.* ¶¶ 130–35.

WhaleCo contends that Shein fails to plead "that WhaleCo disclosed or used" the Best Seller Data "with the requisite knowledge of how it was allegedly obtained or derived." ECF No. 36-1 at 45. But that argument falls flat. Shein's allegation that "Temu knew" the data was confidential to Shein is enough at this stage. Compl. ¶ 68. Indeed, if a PDD-affiliated employee took Shein's Best Seller Data and shared it "with hundreds of people," the Court can reasonably infer that anyone receiving it would know or have reason to know that such competitor information (which, again, allegedly includes internal pricing information) was "highly sensitive" and confidential to Shein. *Id.* ¶ 67. At the very least, the "complaint sets out a plausible theory." *Trilogy Fed.*, 2025 WL 436850, at *4. Recall that the question now "is simply whether [Shein] provided allegations of misappropriation sufficient to raise a right to relief above the speculative level on the assumption that the allegations" are "true." *Oakwood Laby's LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021) (cleaned up and citation omitted). And for the reasons explained, it did.

WhaleCo also argues that Shein engages in improper collective pleading by lumping WhaleCo together with other defendants. ECF No. 36-1 at 45–46; ECF No. 47 at 29–30. That is, Shein "merely alleges" that "Temu" (which it elsewhere defines as covering all defendants "collectively") used and disclosed the data, but it does not "explain how each defendant misappropriated trade secrets." ECF No. 47 at 29 (citation omitted). Thus, it says, absent allegations "specific to WhaleCo," the claims must be dismissed. *Id.* (citation omitted). Not so.

For one thing, WhaleCo parses the complaint too finely. As already noted, the trade-secret misappropriation allegations distinguish between "Temu" and "PDD-affiliated" entities, and the former no doubt covers WhaleCo, which the complaint states "do[es] business under the brand name Temu." Compl. ¶ 19. And WhaleCo recognizes as much; indeed, it argues that Shein fails

to plead that WhaleCo "acquired" the Best Seller Data *because* the complaint specifies that another entity did so.  ECF No. 36-1 at 44.  So it cannot escape liability by claiming that, when the complaint then refers to "Temu," it is unclear whether it refers to WhaleCo or some other entity.

For another, group pleading is not improper per se.  It is permissible under Federal Rule of Civil Procedure 8 "so long as the complaint provides sufficient detail to put the defendants on notice of the claims." *Symbria, Inc. v. Callen*, No. 20-cv-4084, 2022 WL 60530, at *10 (N.D. Ill. Jan. 6, 2022) (rejecting similar argument in trade-secret context).  Even assuming "Temu" refers collectively to the defendants, "taken along with [the] individual pleadings" throughout the complaint, the allegations here "create . . . a plausible inference" that WhaleCo "is liable" for the alleged misconduct.  *Grovers Inc. v. R.C. Bremer Mktg. Assocs. Inc.*, No. 22-cv-50154, 2024 WL 4503240, at *4 (N.D. Ill. Oct. 16, 2024).  Said more directly, a defendant cannot get off the hook by claiming that a plaintiff engages in group pleading if the allegations and context show that the defendant is still plausibly liable.  And Shein's complaint does just that by providing significant detail about the defendants' corporate structure and "interrelatedness," such that WhaleCo's "involve[ment]" in the alleged misappropriation remains "at least plausible."  *Symbria*, 2022 WL 60530, at *10 (citation omitted); *see Green Dolphin Cap. LLC v. JPMorgan Chase Bank, N.A.*, No. 19-cv-6940, 2020 WL 5545700, at *2–3 (N.D. Ill. Sept. 16, 2020) (denying motion to dismiss complaint "lump[ing]" all JPMorgan affiliates together as "JPMorgan" because, based on their corporate structure, it was "at least plausible that each" affiliate was involved in the alleged wrongdoing).[17]

---

[17] WhaleCo likens this case to *Beijing Neu Cloud Oriental Systems Technology Co., Ltd. v. International Bus. Machines Corporation*, No. 21-cv-7589, 2022 WL 889145 (S.D.N.Y. 2022), where a Chinese company sued IBM and two subsidiaries—IBM WTC and IBM China—for trade-secret misappropriation.  But that case strikes the Court as inapposite.  The plaintiff there alleged

Thus, the Court declines to dismiss Shein's trade-secret misappropriation claims at this stage.

## IV.    Conclusion

For all these reasons, the Court will grant PDDH's Motion to Dismiss and dismiss it from the case.  The Court will also grant WhaleCo's Motion to Dismiss as to Shein's product disparagement and trademark dilution claims, but it will deny the motion as to Shein's false advertising and trade-secret misappropriation claims.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: January 7, 2026

---

that it entered an agreement with IBM, which allowed the plaintiff to purchase equipment from IBM, integrate it with its own, and sell it to its customers.  *Id.* at *1; *see* Dkt. 1, ¶ 47.  Under the agreement, the plaintiff submitted "bid requests" to IBM China, which included its confidential "customer information," 2022 WL 889145, at *1, which "IBM China agreed" to keep confidential, Dkt. 1, ¶ 55.  IBM then "established a joint venture," which two IBM China employees with knowledge of the plaintiff's customer information joined, *id.* ¶¶ 56, 63, and that joint venture then "sent letters to various entities," including the plaintiff's customers, to sell the product plaintiff was supposed to sell exclusively in China, *id.* ¶ 64.  Based on these allegations, the court dismissed IBM's U.S. subsidiary (IBM WTC), because the complaint—while detailing the role of IBM and IBM China—made no "specific" allegations as to that entity that would implicate it in the alleged misappropriation of the plaintiff's customer information.  2022 WL 889145, at *4.  All it allegedly did was sign the purchasing agreement with the plaintiff.  Dkt. 1, ¶ 48.  *Beijing*, then, is not about improper group pleading—the linchpin of WhaleCo's argument here.  In that case, there was no plausible basis to conclude the subsidiary was involved in the alleged misappropriation.  Here, on the other hand, the question boils down to whether the Court can plausibly infer that Shein's references to "Temu" implicate WhaleCo in the alleged conduct.  And for the reasons discussed, the answer is yes.